No. 25-50891

# In the United States Court of Appeals for the Fifth Circuit

BOOK PEOPLE, INCORPORATED; VBK, INCORPORATED, doing business as BLUE WILLOW BOOKSHOP; AMERICAN BOOKSELLERS ASSOCIATION; ASSOCIATION OF AMERICAN PUBLISHERS; AUTHORS GUILD, INCORPORATED; COMIC BOOK LEGAL DEFENSE FUND,

Plaintiffs–Appellees,

v.

MIKE MORATH, in his official capacity as the COMMISSIONER OF THE TEXAS EDUCATION AGENCY,

Defendant–Appellant.

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## BRIEF FOR APPELLANT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

WILLIAM R. PETERSON
Solicitor General
William.Peterson@oag.texas.gov

CAMERON FRASER
NATHANIEL A. PLEMONS
Assistant Solicitors General

*Counsel for Appellant*

# Certificate of Interested Persons

No. 25-50891

Book People, Incorporated; VBK, Incorporated, doing business as Blue Willow Bookshop; American Booksellers Association; Association of American Publishers; Authors Guild, Incorporated; Comic Book Legal Defense Fund,

Plaintiffs–Appellees,

v.

Mike Morath, in his official capacity as the Commissioner of the Texas Education Agency,

Defendant–Appellant.

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellant, as a governmental party, need not furnish a certificate of interested persons.

/s/ William R. Peterson
William R. Peterson
*Counsel for Appellant*

## Statement Regarding Oral Argument

This appeal concerns the injunction of a state law and presents important and complex issues regarding the First Amendment when the State acts as a participant in the marketplace. Oral argument would aid this Court's decisional process.

# Table of Contents

Page

Certificate of Interested Persons ........ i
Statement Regarding Oral Argument ........ ii
Table of Authorities ........ v
Statement of Jurisdiction ........ 1
Issues Presented ........ 2
Introduction ........ 3
Statement of the Case ........ 4
Summary of the Argument ........ 10
Standard of Review ........ 13
Argument ........ 14

I. The District Court Erred by Failing to Apply the Strict Standards for Facial Challenges. ........ 14

II. As a Marketplace Participant, the State Does Not Violate the First Amendment by Requesting Information About Goods It Purchases. ........ 16

A. The State, as a marketplace participant, can place conditions on its purchase of goods and services that the State could not mandate as a regulator. ........ 17

B. READER places constitutional conditions on sales to school districts. ........ 20

C. The State's role as a marketplace participant answers Plaintiffs' other complaints. ........ 25

III. The State Does Not Violate the First Amendment by Requiring Vendors to Report the State's Rating of a Product to the State. ........ 29

A. The Texas Education Agency's rating of library material constitutes government speech. ........ 31

B. As a condition of selling books to public schools, READER permissibly requires vendors to repeat the Texas Education Agency's rating of material to the State. ........ 31

1. Vendors are free to publicly dispute the Texas Education Agency's ratings. ........ 33

2. Plaintiffs' purported fears that the agency's ratings will be attributed to them are speculative and unsupported. .................. 34
IV. The District Court Erred by Entering a Universal Injunction. ................. 38
Conclusion ........................................................................................... 39
Certificate of Compliance ....................................................................... 40

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........................................8, 11, 16, 21, 23, 24, 25, 27, 33, 34

*Associated Builders & Contractors Inc. v. City of Jersey City*,
836 F.3d 412 (3d Cir. 2016)..........................................................................19

*Bd. of Cnty. Comm'rs v. Umbehr*,
518 U.S. 668 (1996) .......................................................................... 22

*Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*,
507 U.S. 218 (1993) ..................................................................17, 18, 19

*Board of Education v. Pico*,
457 U.S. 853 (1982) .......................................................................... 28

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) ..........................................................1, 3, 7, 16, 35

*Book People, Inc. v. Wong*,
98 F.4th 657 (5th Cir. 2024) ..........................................................3, 7, 20

*Chamber of Com. v. Brown*,
554 U.S. 60 (2008)..........................................................................19

*Citizens United v. FEC*,
558 U.S. 310 (2010).......................................................................... 14

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)..........................................................32, 35, 37, 38

*Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*,
73 F.4th 322 (5th Cir. 2023)..........................................................................13

*Dolan v. City of Tigard*,
512 U.S. 374 (1994) .......................................................................... 21

*Edgar v. Haines*,
2 F.4th 298 (4th Cir. 2021) ..........................................................................15

*FCC v. League of Women Voters of Cal.*,
468 U.S. 364 (1984) .......................................................................... 23

*Hamer v. Musselwhite*,
376 F.2d 479 (5th Cir. 1967).......................................................................... 30

*Hicklin v. Orbeck*,
437 U.S. 518 (1978) ..........................................................................19

*Hughes v. Alexandria Scrap Corp.*,
426 U.S. 794 (1976) .......... 18
*Kolender v. Lawson*,
461 U.S. 352 (1983) .......... 25
*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025) .......... 11, 12, 28, 29
*Machete Productions, L.L.C. v. Page*,
809 F.3d 281 (5th Cir. 2015) .......... 26
*Machinists v. Wisc. Emp. Rels. Comm'n*,
427 U.S. 132 (1976) .......... 17
*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .......... 32
*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... 10, 15
*Muir v. Alabama Educ. Television Comm'n*,
688 F.2d 1033 (Former 5th Cir. 1982) .......... 28
*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
No. 25-1189, 2026 WL 321433 (4th Cir. Feb. 6, 2026) .......... 26
*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) .......... 26, 27
*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) .......... 30
*Oakes Farms Food & Distrib. Servs., LLC v. Adkins*,
154 F.4th 1338 (11th Cir. 2025) .......... 16
*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) .......... 31
*Regan v. Tax'n With Representation of Wash.*,
461 U.S. 540 (1983) .......... 22
*Roark & Hardee LP v. City of Austin*,
522 F.3d 533 (5th Cir. 2008) .......... 25
*Royal Ins. Co. of Am. v. Quinn-L Cap. Corp.*,
3 F.3d 877 (5th Cir. 1993) .......... 1
*Rust v. Sullivan*,
500 U.S. 173 (1991) .......... 22, 26
*Sanders v. Christwood*,
970 F.3d 558 (5th Cir. 2020) .......... 13

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................................ 14, 39
*Turtle Island Foods, S.P.C. v. Strain*,
65 F.4th 211 (5th Cir. 2023) ........................................ 14, 15
*United Healthcare Ins. v. Davis*,
602 F.3d 618 (5th Cir. 2010) ........................................ 11, 18, 19
*United States v. Am. Libr. Ass'n, Inc.*,
539 U.S. 194 (2003) ........................................ 21
*Voting for Am., Inc. v. Andrade*,
488 F. App'x 890 (5th Cir. 2012) ........................................ 30
*Voting for Am., Inc. v. Steen*,
732 F.3d 382 (5th Cir. 2013) ........................................ 30
*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) ........................................ 31
*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) ........................................ 30
*White v. Mass. Council of Constr. Emps., Inc.*,
460 U.S. 204 (1983) ........................................ 18, 19
*Wisc. Dep't of Indus. v. Gould Inc.*,
475 U.S. 282 (1986) ........................................ 18-19

**Constitutional Provisions, Statutes and Rules:**

U.S. Const. amend. I......... 2, 8, 9, 10, 11, 15, 16, 20, 21, 22, 24, 26, 28, 29, 31, 37, 38
22 U.S.C. § 7631 ........................................ 33
26 U.S.C. § 501 ........................................ 22
28 U.S.C.
§ 1291 ........................................ 1
§ 1331 ........................................ 1
42 U.S.C. § 1983 ........................................ 1

Tex. Educ. Code
§ 28.002 .... 4
§ 33.021 .... 4
§ 35.001 .... 4, 9, 14, 24, 39
§ 35.002 .... 4, 5, 9, 14, 24, 32, 35, 36, 39
§ 35.003 .... 4, 5, 6, 9, 14, 27, 31, 33, 35, 39
§ 35.004 .... 4
§ 35.005 .... 4
§ 35.006 .... 4
§ 35.007 .... 4, 6, 27
§ 35.008 .... 4, 6
§ 35.0021 .... 5, 9, 14, 39
Tex. Gov't Code
§ 485.022 .... 26
§ 661.252 .... 36
§ 802.107 .... 36
Tex. Loc. Gov't Code § 82.051 .... 36
Tex. Occ. Code § 51.207 .... 36
Tex. Penal Code
§ 43.21 .... 4
§ 43.25 .... 4
45 C.F.R § 89.1 .... 33
Fed. R. App. P. 4 .... 1
Fed. R. Civ. P. 58 .... 1

**Other Authorities:**

Tex. Educ. Agency, *TEA Login Page (TEAL)*, https://tealprod.tea.state.tx.us/ .... 36

## Statement of Jurisdiction

The district court had federal question jurisdiction over this suit asserting claims under Section 1983. 28 U.S.C. § 1331. Appellant Texas Education Association Commissioner Mike Morath respectfully contends that sovereign immunity bars the suit but acknowledges that this Court resolved the issue against Commissioner Morath in the appeal of the preliminary injunction. *See Book People, Inc. v. Wong*, 91 F.4th 318, 336 (5th Cir. 2024) ("Because Commissioner Morath has a sufficient connection to the statute's enforcement, Plaintiffs can sue him under *Ex parte Young.*"); *Royal Ins. Co. of Am. v. Quinn-L Cap. Corp.*, 3 F.3d 877, 881 (5th Cir. 1993) ("As to decisions of law, the interlocutory appeal will establish law of the case.").

The district court entered a judgment disposing of all claims against all parties on October 22, 2025. *See* ROA.3418–3441; ROA.20 (docket entry 110).[1] Commissioner Morath filed a timely notice of appeal on October 23, 2025. ROA.3442. This Court has jurisdiction over this appeal of a final judgment pursuant to Section 1291 of Title 28 of the United States Code.

[1] Although the district court did not enter a separate final judgment, Fed. R. Civ. P. 58(a), the validity of this appeal is unaffected. *See* Fed. R. App. P. 4(a)(7)(B) ("A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58(a) does not affect the validity of an appeal from that judgment or order.").

## Issues Presented

1. Whether the State violates the First Amendment by purchasing school library materials only from vendors that provide information requested by the State regarding the materials they sell.
2. Whether the State violates the First Amendment by purchasing school library materials only from vendors that communicate the State's corrected ratings of library materials they sell, particularly when the statute does not prohibit the vendors from noting that any corrected ratings were provided by the State.
3. Whether the district court erred by entering a universal injunction.

# Introduction

Retailers, including bookstores, are free to refuse to answer questions from customers about their products, but if they do, customers are equally free to take their business elsewhere.

Texas government agencies, when acting as consumers, are no less free to question vendors about goods they have purchased or are considering purchasing. The statute at issue requires vendors that sell books to public schools to inform the Texas Education Agency about the sexual content of those books. Vendors can freely decline to provide this information, but if they do, the State is free not to purchase from them.

For all of Plaintiffs' overwrought rhetoric about a "book ban" and "censorship boards," ROA.24, ROA.30, this case concerns a statute in which the State, as a marketplace participant, seeks information about goods it purchases. There is no more "compelled speech" in these circumstances than when a state agency asks questions of a job applicant during an interview. Put another way, answering the State's questions about goods and services is a perfectly constitutional condition for the State to purchase those goods or services. *See Book People, Inc. v. Wong*, 98 F.4th 657, 660 (5th Cir. 2024) (Ho, J., dissenting from the denial of rehearing en banc) ("The business can decline to respond, and the consumer can decline to purchase.").

In the appeal of the preliminary injunction, the panel concluded that this argument was forfeited. *Book People*, 91 F.4th at 336 n.103. The argument is now fully preserved, ROA.1697–1700, and these commonsense principles resolve this appeal in Commissioner Morath's favor.

## Statement of the Case

This appeal concerns the Restricting Explicit and Adult-Designated Educational Resources Act ("READER" or "H.B. 900"), Tex. Educ. Code §§ 33.021, 35.001–.008, which regulates the purchase of books by Texas public schools. Compliance with READER is optional. The statute does not contain any civil or criminal penalties, and the only consequence for vendors that choose not to comply is that the school districts and open-enrollment charter schools will not purchase books from them.

To be eligible to "sell library materials to a school district or open-enrollment charter school,"[2] a vendor must provide "ratings regarding sexually explicit material and sexually relevant material previously sold to a district or school." Tex. Educ. Code § 35.002(a). Material is "sexually relevant" if it "describes, depicts, or portrays sexual conduct," unless it is "directly related" to the required curriculum. *Id.* § 35.001(c);[3] *see also id.* § 28.002 (required curriculum). Material is "sexually explicit" if it does so "in a way that it patently offensive." *Id.* §§ 35.001(b), 33.021(a).[4]

In evaluating whether material is "sexually explicit," vendors must consider its "full context," recognizing that these "determinations are necessarily highly fact-

---

[2] This brief generally uses "public schools" to refer to "school district[s] or open-enrollment charter school[s]." Tex. Educ. Code § 35.002(a).

[3] "'Sexual conduct' means sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." Tex. Penal Code § 43.25(2).

[4] "'Patently offensive' means so offensive on its face as to affront current community standards of decency." Tex. Penal Code § 43.21(4).

specific." Tex. Educ. Code § 35.0021(d). In particular, vendors must consider and weigh "the explicitness or graphic nature of a description or depiction of sexual conduct," "whether the material consists predominantly of or contains multiple repetitions of [sexual] depictions," and "whether . . . the material intentionally panders to, titillates, or shocks the reader." *Id.* § 35.0021(b), (c).

Each vendor must submit to the Texas Education Agency "a list of library material rated as sexually explicit material or sexually relevant material sold by the vendor to a school district or open-enrollment charter school" before April 2024 and "still in active use." Tex. Educ. Code § 35.002(c). Vendors must submit an updated list each year by September 1. *Id.* § 35.002(d). Vendors may not sell sexually explicit materials to schools and must recall any copies of previously sold sexually explicit material still in use. *Id.* § 35.002(b).

READER requires the Texas Education Agency to post ratings lists "in a conspicuous place on the agency's Internet website as soon as practicable." *Id.* § 35.002(e). The statute does not require the agency to attribute these ratings to any vendor. Nor does the statute require the agency to make these ratings available to the public. *See* ROA.1393 (testifying that portions of the agency's website are available only to school districts).

The Texas Education Agency "may"—but is not required to—review library material, and if it "determines that the library material is required to be rated as sexually explicit material or sexually relevant material or to receive no rating at all," it "shall provide written notice to the vendor." Tex. Educ. Code § 35.003(a). If so, the vendor must revise the material's rating. *Id.* § 35.003(b). A vendor that refuses to

report the corrected rating may not sell materials to public schools. *Id.* § 35.003(c)–(e).

The commissioner of the Texas Education Agency "may adopt rules as necessary to administer this chapter," and the agency "may provide assistance to school districts and open-enrollment charter schools in complying with this chapter." Tex. Educ. Code §§ 35.007, 35.008.

***Plaintiffs Sue to Enjoin the Statute***

Before READER could take effect, Plaintiffs—three nonprofits, two bookstores, and a legal defense fund—sued to enjoin it. ROA.23. Their complaint repeatedly mischaracterizes the law as a "Book Ban," repeating the phrase dozens of times. ROA.23–49. Throughout this litigation, Plaintiffs' rhetoric has been extreme: "[T]he Book Ban establishes its own censorship board—the Texas Education Agency." ROA.32. They compare the law "to dark days in our nation's history when the government served as licensors and dictated the public dissemination of information." ROA.32.

In their motion for a preliminary injunction, Plaintiffs ultimately acknowledged that the law governs only whether vendors may "continue selling books to public schools." ROA.119. The statute, they recognized, reflects the State's determination regarding "which books are available in public schools and which booksellers can conduct business with public schools." ROA.125.

Following a hearing, the district court entered a preliminary injunction. ROA.709; ROA.779–780. Commissioner Morath appealed. ROA.768–69.

### *This Court Affirms the Preliminary Injunction After Concluding that the State Forfeited a Key Argument*

In an opinion authored by Judge Willett, this Court affirmed the preliminary injunction as to Commissioner Morath. *Book People,* 91 F.4th at 318.[5]

The panel held that "the government-speech doctrine does not apply," *id.* at 338, the government operations exception does not apply, *id.* at 339, and that the commercial speech exception for truthful advertising does not apply, *id.* at 340. "Plaintiffs are thus likely to succeed on their compelled speech claim." *Id.* Crucially, the panel did not address the primary argument raised by Commissioner Morath in this appeal: READER concerns the State as a marketplace participant, not as a regulator. *See id.* at 336 n.103 (holding that this argument was forfeited as a basis for opposing the preliminary injunction).

This Court considered rehearing en banc, which was denied in a 9–8 vote. *Book People*, 98 F.4th at 657. Judge Ho, dissenting from the denial of rehearing en banc, explained that the panel erred by conflating the government in its role as regulator with the government in its role as consumer:

> The READER Act doesn't compel anyone to say anything. It simply provides that any vendor who wishes to sell books to public schools must answer certain questions prior to the sale—just as ordinary consumers often ask questions of merchants before deciding whether to make a purchase. . . .
>
> In short: The business can decline to respond, and the consumer can decline to purchase. That's not compelled speech—that's consumer speech.

*Id.* at 660 (Ho, J., dissenting from denial of rehearing en banc).

---

[5] The panel vacated the preliminary injunction with respect to Chairs Wong and Ellis, 91 F.4th at 332 & n.72, who are no longer involved in the case.

***The District Court Grants Summary Judgment in Favor of Plaintiffs and Enters a Permanent Injunction***

On remand, both sides moved for summary judgment. ROA.906 (Plaintiffs' motion); ROA.1672 (Defendant's motion).

Throughout his motion for summary judgment and his response to Plaintiffs' motion, Commissioner Morath emphasized the argument that the panel did not address in the previous appeal. *See, e.g.*, ROA.1698 ("READER is not a bookselling regulation, it is a consumer demand. The government is entitled to broadly define the limits for spending appropriated public funds."); ROA.3252 ("READER is not a market regulation, but instead a set of conditions under which Texas schools—as consumers, not regulators—will purchase books."); *see also* ROA.1697–1700; ROA.3252–3258; ROA.3336–3339.

In response, Plaintiffs eventually acknowledged that READER regulates the State's purchasing decisions but framed READER's requirements as an unconstitutional condition: "[T]he State threatens to rescind Plaintiffs' ability to sell books to public schools . . . in order to coerce Plaintiffs into issuing controversial ratings for thousands of books." ROA.3286; *see also* ROA.3288 ("This case involves the State commanding Plaintiffs to submit to an onerous and unconstitutional regulatory scheme as a condition of doing business with Texas schools.").

But rather than argue and apply the governing test for whether conditions are constitutional, Plaintiffs simply declared READER "a textbook unconstitutional condition" because it touches on the First Amendment. ROA.3286. *But see Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (explaining

that the Constitution allows "condition[s] [that] may affect the recipient's exercise of its First Amendment rights").

The district court granted Plaintiffs' motion for summary judgment and denied Commissioner Morath's. ROA.3440. Consistent with Plaintiffs' arguments, the district court's analysis conflates the State as a regulator with the State as a marketplace participant, erroneously analyzing READER under the same standards that would apply if the statute regulated Plaintiffs' sales to third parties. *E.g.*, ROA.3430–3434. And like Plaintiffs, the district court did not analyze whether READER constituted a constitutional condition on sales to the State, instead assuming that any conditions related to the First Amendment are constitutionally infirm. *See* ROA.3429 ("The government may not deny Plaintiffs the right to sell books to public schools on a basis that infringes their constitutionally protected interests.").

Based on that reasoning, the district court entered a universal permanent injunction against enforcement of the law:

> Commissioner of Education Mike Morath and all of his officers, agents, employees, attorneys, and other persons in active concert with him are ENJOINED from applying, enforcing, or attempting to enforce, either criminally or civilly, §§ 35.001, 35.002, 35.0021, and 35.003 of HB 900, the Restricting Explicit and Adult-Designated Educational Resources (READER) Act.[6]

ROA.3440–41; *see also* ROA.20. Commissioner Morath now appeals. ROA.3442.

---

[6] Commissioner Morath understands the injunction's references to sections of HB 900 as references to the Texas Education Code.

## Summary of the Argument

Two aspects of READER are at issue: (1) the initial requirement that vendors rate materials sold to public schools; and (2) the requirement that vendors note any corrected ratings provided by the Texas Education Agency. The district court erroneously analyzed these two provisions together. *See* ROA.3429 (describing the statute as "requir[ing] Plaintiffs to surrender their First Amendment rights in order to do any business with public schools."). Plaintiffs raise different complaints about these provisions, and a different analysis is required for each, but each comports with the First Amendment.

As an initial matter, the district court erred by failing to hold Plaintiffs to their burden to satisfy the strict requirements for a facial challenge. The opinion does not expressly state whether it is analyzing an as-applied or facial challenge, but the district court entered a universal permanent injunction, ROA.3440–41, and its analysis does not concern application the statute to the plaintiffs but purported deficiencies in the statute itself. ROA.3418–3441. This required "determin[ing] a law's full set of applications, evaluat[ing] which are constitutional and which are not, and compar[ing] the one to the other." *Moody v. NetChoice, LLC*, 603 U.S. 707, 718 (2024). Plaintiffs' arguments must be considered under these strict standards.

Throughout its analysis, the district court disregarded the nature of the law: READER does not involve the State as regulator but the State as marketplace participant. Vendors that wish to sell to public schools must provide information about their products. The only consequence for vendors that decline to provide this information is that public schools will not purchase from them.

The various First Amendment doctrines invoked by Plaintiffs and the district court—void for vagueness; compelled speech; prior restraint—are inapplicable in this context. No "prior restraint of speech" occurs, for example, when the government declines to purchase a book. *Compare* ROA.3434 ("READER thus prevents the distribution of and access to books with literary, artistic, political, or scientific value.") *with Little v. Llano County*, 138 F.4th 834, 836 (5th Cir. 2025) (en banc) (rejecting "a brave new right to receive information from the government in the form of taxpayer-funded library books"). When the government is purchasing a product, it "can choose its contracting partners as if it were a private party." *United Healthcare Ins. v. Davis*, 602 F.3d 618, 624 (5th Cir. 2010).

The district court alternatively framed the statute as a condition on the benefit of selling books to the government, but it apparently assumed that any condition touching on the First Amendment was impermissible. *See* ROA.3429 ("The government may not deny Plaintiffs the right to sell books to public schools on a basis that infringes their constitutionally protected interests."). The Supreme Court disagrees. *See Alliance for Open Soc'y,* 570 U.S. at 214 (holding that "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds," even if the "condition may affect the recipient's exercise of its First Amendment rights"). Applying the Supreme Court's precedent, because the only "compelled speech" concerns speech directed to the government regarding products that vendors sell to the government, READER is a constitutional condition on the benefit of selling materials to the government. *See id.* at 214 (permitting regulation of speech within "the limits of the government spending program").

With respect to the requirement that vendors report any corrected ratings provided by the Texas Education Agency, the district court's analysis misconstrues the statute, suggesting that vendors must "accept the TEA's ratings as their own," ROA.3429, and "adopt the government's speech," ROA.3430. But the statute requires nothing of the sort—it merely requires vendors to repeat the government's ratings back to it. Plaintiffs' theory that the government will "publish its own rating as being attributed to Plaintiffs," ROA.3430–31, rests on sheer speculation about a hypothetical, future website. In this facial, pre-enforcement posture, Plaintiffs cannot rely on such speculation that government might enforce the statute impermissibly, despite numerous constitutional applications.

Plaintiffs' remaining arguments are meritless. The facial challenge is not a separate argument; it is the standard that applies to Plaintiffs' other arguments. ROA.3436. Plaintiffs' overbreadth argument is not cognizable where the State acts as a purchaser. ROA.3436. There is no right to receive information and ideas by requiring the government to purchase library materials. *Compare* ROA.938 *with Little*, 138 F.4th at 836. And there is no delegation when the government asks sellers for information to guide its own purchasing decisions. ROA.940.[7]

Recognizing that READER regulates the government's purchasing decisions makes this appeal straightforward. This Court should reverse the summary judgment in favor of Plaintiffs and render judgment in favor of Commissioner Morath.

At a minimum, the universal injunction must be reversed.

---

[7] Nor would Plaintiffs have standing to complain about delegation to themselves.

## Standard of Review

This Court reviews de novo the grant of summary judgment. *Sanders v. Christwood*, 970 F.3d 558, 561 (5th Cir. 2020). On cross-motions for summary judgment, this Court "reviews each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*, 73 F.4th 322, 327 (5th Cir. 2023).

## ARGUMENT

### I. The District Court Erred by Failing to Apply the Strict Standards for Facial Challenges.

The district court's order granting the motion for summary judgment does not identify whether it is addressing a facial or as-applied challenge. The opinion never expressly states whether it is analyzing the constitutionality of READER in the abstract or only as applied to the particular plaintiffs. ROA.3418–3441. Standing alone, this error might well warrant reversal.

In substance, however, the district court's analysis makes clear that it was addressing a facial challenge to the statute. *See Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 218 (5th Cir. 2023) ("[W]e turn to the language of the lower court's order to evaluate whether it reviewed the case as a facial challenge or as applied[.]"). This is revealed most clearly in the relief awarded: a universal injunction that prohibits Commissioner Morath from enforcing READER against anyone:

> Commissioner of Education Mike Morath and all of his officers, agents, employees, attorneys, and other persons in active concert with him are ENJOINED from applying, enforcing, or attempting to enforce, either criminally or civilly, §§ 35.001, 35.002, 35.0021, and 35.003 of HB 900, the Restricting Explicit and Adult-Designated Educational Resources (READER) Act.

ROA.3440–3441. As detailed below, a universal injunction is always improper, *Trump v. CASA, Inc.*, 606 U.S. 831, 844 (2025), but it would be irrational for the district court to have entered a universal injunction after concluding only that the statute could not constitutionally be applied to Plaintiffs. *See Citizens United v. FEC*, 558 U.S. 310, 331 (2010) (explaining that the distinction between facial and as-

applied challenges "goes to the breadth of the remedy employed by the Court"); *see also Turtle Island*, 65 F.4th at 219 ("[T]he district court found the Act in its entirety to be unconstitutional and invalidated the entire statute. So, we evaluate Tofurky's constitutional challenge as one targeting the Act's facial validity.").

The substance of the district court's analysis similarly focuses on the statute in the abstract, not any particular characteristics of Plaintiffs. *See, e.g.*, ROA.3430 ("[READER] is a bookselling regulation that unconstitutionally compels speech."); ROA.3431 ("READER *can* and *does* violate the First Amendment in several ways[.]"); ROA.3432 ("[T]he Ratings Requirements unconstitutionally compel speech."); ROA.3434 ("READER is void for vagueness because of what it does[.]"). Nothing about the district court's analysis turned on Plaintiffs in particular or how the statute would be applied to them—the district court analyzed the statute in the abstract. *See Edgar v. Haines*, 2 F.4th 298, 313 (4th Cir. 2021) (distinguishing between arguments that challenged actions are unconstitutional "as applied to [plaintiffs'] own conduct" as opposed to "as they apply to the population generally"). This is a facial analysis that was required to satisfy the requirements for a facial challenge.

Plaintiffs contend that READER cannot constitutionally be applied to anyone. Litigating in this manner "comes at a cost," including that plaintiffs must demonstrate that "the law's unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 723–24. This Court should consider Plaintiffs' theories under this strict test.

## II. As a Marketplace Participant, the State Does Not Violate the First Amendment by Requesting Information About Goods It Purchases.

In granting the Plaintiffs' motion for summary judgment and denying Commissioner Morath's, the district court erred by failing to distinguish between the State as a regulator and the State as a marketplace participant. The First Amendment "leaves room for the government's interests when it acts as an employer or marketplace consumer, rather than as a sovereign." *Oakes Farms Food & Distrib. Servs., LLC v. Adkins*, 154 F.4th 1338, 1343–44 (11th Cir. 2025). READER regulates purchasing by public schools, not transactions with third parties or the marketplace generally, and the State—like any other consumer—is perfectly free to request information from potential vendors and decline to purchase materials from vendors that decline to provide the requested information.

Put another way, requiring the disclosure of information about goods is a constitutional condition for the State to purchase those goods. *See, e.g.*, *Alliance for Open Soc'y*, 570 U.S. at 214–15 (explaining that the government may place conditions within "the limits of the government spending program" but not "conditions that seek . . . to regulate speech outside the contours of the program itself").

In the appeal of the preliminary injunction, the panel concluded that these arguments had been forfeited. *Book People*, 91 F.4th at 336 n.103. The arguments are now preserved and warrant reversal of the grant of summary judgment in favor of Plaintiffs and rendition of summary judgment in favor of Commissioner Morath.

### A. The State, as a marketplace participant, can place conditions on its purchase of goods and services that the State could not mandate as a regulator.

READER concerns the government as a marketplace participant—public schools purchasing library materials for their own use—not the government as a regulator. The statute does not regulate vendors' sales to third parties, communications with third parties, or any behavior outside the context of sales to public schools. As courts have recognized in many areas of the law, governments purchasing goods and services for themselves are not bound by the same rules that apply when governments regulate transactions between private parties.

For example, in the labor context, *Machinists* preemption "prohibits state and municipal regulation of areas that have been left 'to be controlled by the free play of economic forces.'" *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 225 (1993) (*Boston Harbor*) (quoting *Machinists v. Wisc. Emp. Rels. Comm'n*, 427 U.S. 132, 147 (1976)). The doctrine "create[s] a zone free from all regulations, whether state or federal." *Id.* at 226.

But *Machinists* preemption applies only when the State acts as a regulator, not when the State acts as a "proprietor" that "owns and manages property":

> When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*.
>
> Our decisions in this area support the distinction between government as regulator and government as proprietor.

*Id.* at 227. The Supreme Court permits "the States to participate freely in the marketplace." *Id.* at 230; *see also id.* at 229 ("[A] State may act without offending the pre-emption principles of the NLRA when it acts as a proprietor and its acts therefore are not 'tantamount to regulation' or policymaking.").

When purchasing on its own behalf, a government generally has the same rights as a private party: "To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same." *Id.* at 231.

Similarly, in the dormant Commerce Clause context, this Court has recognized that when a State "is purchasing or selling a product or service," the State "can choose its contracting partners as if it were a private party." *United Healthcare Ins. Co.*, 602 F.3d at 624. In these circumstances, the State may "deal preferentially with in-state entities." *Id.* (citing *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 809–810 (1976)); *see also Hughes*, 426 U.S. at 810 ("Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others."); *White v. Mass. Council of Constr. Emps., Inc.*, 460 U.S. 204, 210 (1983) (explaining that the burden on interstate commerce is relevant only if "the city is regulating the market rather than participating in it").

To be clear, neither doctrine allows the government to regulate under the guise of market participation. Labor preemption applies to statutes that "addres[s] employer conduct unrelated to the employer's performance of contractual obligations to the State." *Boston Harbor*, 507 U.S. at 228–29 (discussing *Wisc. Dep't of Indus. v.*

*Gould Inc.*, 475 U.S. 282 (1986)); *see also Associated Builders & Contractors Inc. v. City of Jersey City*, 836 F.3d 412, 418 (3d Cir. 2016) (asking "whether the action is so broad as to be considered, in effect, regulatory"); *Chamber of Com. v. Brown*, 554 U.S. 60, 70 (2008) ("California enacted AB 1889 in its capacity as a regulator rather than a market participant."). Alaska's ownership of oil and gas similarly did not permit it "to force virtually all businesses that benefit in some way from the economic ripple effect of Alaska's decision to develop its oil and gas resources to bias their employment practices in favor of the State's residents." *Hicklin v. Orbeck*, 437 U.S. 518, 531, (1978).

In this appeal, however, this Court need not consider the "limits on a state or local government's ability to impose restrictions that reach beyond the immediate parties with which the government transacts business," *White*, 460 U.S. at 211 n.7, because READER applies only to vendors that wish to transact business with public schools. *See also United Healthcare Ins.*, 602 F.3d at 624–25 (same). No other parties are affected.

Nor does READER regulate vendors apart from their transactions with public schools, *i.e.*, their "performance of contractual obligations to the State." *Boston Harbor*, 507 U.S. at 228–29. Complying with READER does not require vendors to alter their interactions with third parties in any manner: vendors remain free to sell sexually explicit material and sexually relevant material to the general public, and they are free to label these materials (or not label them) any way they please in these sales.

READER thus falls within the heartland of the State acting as a marketplace participant: it affects only vendors who wish to sell library materials to public schools,

and it concerns only the materials sold, not vendors' transactions with others and not vendors' speech or conduct outside those sales.

The First Amendment principles invoked by Plaintiffs and the district court restrict the State acting as a regulator, not the State acting as a market participant and purchasing products. As Judge Ho explained in dissenting from the denial of rehearing en banc, the compelled speech doctrine does not apply "when the government is asking questions as a potential consumer—rather than compelling speech as a regulator armed with the coercive powers of the state." *Book People*, 98 F.4th at 660 (Ho, J., dissenting from the denial of rehearing en banc). "The READER Act doesn't compel anyone to say anything. It simply provides that any vendor who wishes to sell books to public schools must answer certain questions prior to the sale—just as ordinary consumers often ask questions of merchants before deciding whether to make a purchase." *Id.* at 660.

### B. READER places constitutional conditions on sales to school districts.

Analyzing READER as a condition placed on the benefit of selling books to public schools leads to the same conclusion. The government can permissibly condition its purchase of products on sellers providing information about those products.

The district court began this analysis, characterizing READER as a condition related to "the benefit of selling to public schools." ROA.3431. But rather than apply the body of law governing whether conditions are constitutional or unconstitutional, the district court apparently assumed that *any* First Amendment-related condition placed on receipt of a government benefit was unconstitutional. *See* ROA.3429

("READER imposes unconstitutional conditions on a party's ability to contract with the government, because it requires Plaintiffs to surrender their First Amendment rights in order to do any business with public schools."); ROA.3431 ("READER denies Plaintiffs the benefit of selling to public schools on a basis that infringes their First Amendment rights—an unconstitutional condition.").

The district court's assumption was incorrect. The Supreme Court holds that the receipt of government funds may permissibly be conditioned on restrictions of recipients' First Amendment rights:

> As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights.

*Alliance for Open Soc'y*, 570 U.S. at 214; *see also United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (plurality op.) (rejecting an unconstitutional conditions argument based on libraries installing internet filtering software because "[t]o the extent that libraries wish to offer unfiltered access, they are free to do so without federal assistance").

The Supreme Court has drawn the line "between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Alliance for Open Soc'y*, 570 U.S. at 214–15. *Cf. Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994) ("[T]he government may not require a person to give up a constitutional right—here the right to receive just compensation when property is taken for a public use—in exchange for a

discretionary benefit conferred by the government *where the benefit sought has little or no relationship to the property.*" (emphasis added)).

For example, Congress could require that nonprofit organizations seeking tax-exempt status under 26 U.S.C. § 501(c)(3)—which the Supreme Court characterized as a form of cash grant—not engage in substantial efforts to influence legislation. *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540 (1983). The organization was free to incorporate in a "dual structure" and continue lobbying, just not with the use of subsidized funds. *Id.*; *see also Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (rejecting a First Amendment challenge to family planning restrictions because "the Government ha[d] not discriminated on the basis of viewpoint" but "ha[d] merely chosen to fund one activity to the exclusion of the other").

Similarly, the First Amendment "protects government employees from termination because of their speech on matters of public concern." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996). But it would be absurd to suggest—as Plaintiffs' arguments would—that a potential government employee cannot be "compelled" to answer questions about the employee's experience or qualifications during a hiring interview and cannot be "compelled" to provide a resume. A job applicant can certainly decline to answer questions during an interview or decline to provide a resume, just as the government is free to decline to extend a job offer to an applicant who refuses to provide that information. READER similarly asks vendors to supply

information about the products they sell the government. Their speech is "compelled" only in the same sense as that of a job applicant.[8]

The government acts impermissibly only when its conditions seek to regulate speech *outside* the scope of the government program. The government could not, for example, prohibit "all editorializing"—including editorializing "using even wholly private funds"—as a condition of receiving Corporation for Public Broadcasting funds. *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 400 (1984). Nor could the government condition funding to combat HIV/AIDS on an organization adopting "a policy explicitly opposing prostitution and sex trafficking." *Alliance for Open Soc'y*, 570 U.S. at 208. A recipient could not avow this belief "and then turn around and assert a contrary belief, or claim neutrality, when participating in activities on its own time and dime." *Id.*

Analyzed as a condition on the benefit of selling materials to public schools, READER falls squarely on the constitutional side of the line. The only effect on vendors concerns speech to the Texas Education Agency regarding products that the vendor sells to Texas school districts.

Outside the context of those communications to the Texas Education Agency regarding particular products sold to public schools, on their own time and dime, vendors remain free to say (or not say) anything they please. There are no restrictions

[8] There are, of course, limits on questions that could permissibly be asked of job applicants, and there are similarly limits on conditions that could be placed on vendors. But this Court need not explore those outer limits because READER merely requires vendors to place materials they have sold within statutorily defined categories—the only furnished information concerns products sold to public schools.

placed on the sale of any products to third parties and no requirement that vendors communicate anything about products sold to third parties. Vendors can even (as they have in this litigation) publicly dispute the relevance of the categorizations required by READER. The Act merely requires them to identify whether products they sell to public schools fit within particular statutory criteria. Tex. Educ. Code §§ 35.001, 35.002. There is no regulation of any speech outside the context of the regulated sales to public schools, the benefit at issue. The condition of providing information about products sold to public schools is a constitutional condition on the benefit of making those sales.

Neither the district court nor Plaintiffs provided any contrary analysis. Plaintiffs' only answer to the State's explanation that it was acting as a market participant rather than a regulator was reliance on the doctrine of unconstitutional conditions. ROA.2076–79. But rather than engage with the governing test for constitutionality of conditions, Plaintiffs simply declared it "a textbook unconstitutional condition." ROA.2077. And their arguments conflict directly with the Supreme Court's holdings. *Compare* ROA.2077 ("the government may not deny a benefit on a basis that infringes one's constitutionally protected freedom of speech") *with Alliance for Open Soc'y*, 570 U.S. at 214 (holding that the government may permissibly impose "a condition [that] may affect the recipient's exercise of its First Amendment rights"). The district court committed the same error, apparently assuming without explanation that any "conditio[n]" that affects First Amendment rights is impermissible. ROA.3429.

Plaintiffs have no right to sell materials to public schools. READER asks vendors, if they wish to sell to public schools, to provide information about the products they sell. If Plaintiffs dislike the conditions imposed by READER and do not wish to inform the Texas Education Agency whether their products fall within the statutory categories, then their "recourse is to decline the [sales]." *Alliance for Open Soc'y*, 570 U.S. at 214. No rights are violated when the government declines to purchase from a vendor that declines to furnish requested information about its products.

### C. The State's role as a marketplace participant answers Plaintiffs' other complaints.

Recognizing that the State is acting as a marketplace participant purchasing goods for its own use and not as a regulator also answers Plaintiffs' other complaints about the statute.

The district court held that READER is "void for vagueness," ROA.3432 (emphasis omitted), but this doctrine applies to laws that might "'encourage arbitrary and discriminatory enforcement'" or potentially "'chill constitutionally protected conduct,'" ROA.3432 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) and *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546 (5th Cir. 2008)). Like the other principles relied upon by the district court and Plaintiffs, this doctrine applies where the State acts as a regulator, not to State's own purchasing decisions.

Neither Plaintiffs nor the district court identify any case applying the "void for vagueness" doctrine to a State as a marketplace participant. To the contrary, as the Supreme Court has explained, "[W]hen the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe."

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). The government is allowed to apply a "subjective selection process" when determining what to fund, *id.* at 590, and should be even less constrained when determining what to purchase.

Consider, for example, *Machete Productions, L.L.C. v. Page*, in which this Court examined an incentive program for movie production companies. 809 F.3d 281 (5th Cir. 2015). Among other statutory requirements, applications could be denied "because of inappropriate content or content that portrays Texas or Texans in a negative fashion," "general standards of decency," and "respect for the diverse beliefs and values of the citizens of Texas." *Id.* at 285 (quoting Tex. Gov't Code § 485.022(e)). This Court readily rejected a First Amendment and due process vagueness challenge to this program. The grant program did not "prohibi[t] Machete from engaging in protected First Amendment activity 'outside the scope' of the Incentive Program." *Id.* at 290 (quoting *Rust*, 500 U.S. at 197). Nor were the grant criteria infirm for vagueness; the State was "acting as a patron rather than as sovereign." *Id.* at 291 (quoting *Finley*, 524 U.S. at 588–89);[9] *see also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189, 2026 WL 321433, at *1, *9 (4th Cir. Feb. 6, 2026) (rejecting a vagueness challenge to termination of "'equity-related' grants or

---

[9] Although *Machete Productions* resolved these issues in the context of qualified immunity, holding that the plaintiff's clearly established rights were not violated, its analysis provides helpful guidance. 809 F.3d at 289.

Its facts illustrate the absurdity of Plaintiffs' arguments: although the State could permissibly apply these criteria to its grant programs (and, presumably, when purchasing films for its own use), in Plaintiffs view, if the application form asked the applicant to address whether its project satisfied these criteria, the program impermissibly compel speech in violation of the First Amendment.

contracts" because courts "should afford greater latitude for vagueness in funding decisions"). The State should be afforded even greater latitude in purchasing goods and services for its own use than when subsidizing provide activities through grants.

The district court also failed to acknowledge the consequences—or, more accurately, lack of consequences—for an erroneous rating. If a vendor rates material incorrectly, the only statutory effect is that the Texas Education Agency "may" disagree and inform the vendor of the error. Tex. Educ. Code § 35.003;[10] *see infra* pp. 29–38. As in *Finley*, the purportedly vague criteria control only the government's decisions about how to spend the government's money.

The State is allowed to apply criteria to its own purchasing decisions that would be impermissibly vague if applied by the State as a regulator, and the State is entitled to ask vendors how the State's criteria apply to the materials they sell. If vendors do not wish to provide this information (or find the requested information too challenging to provide), then their recourse is to forgo the benefit of selling to public schools. *Alliance for Open Soc'y*, 570 U.S. at 214.

Similarly, the district court's "prior restraint" analysis disregards that the State is purchasing books for itself, not regulating sales to third parties. *See* ROA.3434–35. No protected speech is restrained because, as Plaintiffs appear to concede, ROA.3286, they have no right to sell books to the public schools. This Court's

---

[10] The Commissioner of the Texas Education Agency is entitled to "adopt rules as necessary to administer this chapter," Tex. Educ. Code § 35.007, and bad faith by a vendor—such as simply rating all material sold as "no rating" regardless of its content—might be equivalent of refusing to provide ratings at all.

analysis in *Little v. Llano County* forecloses the district court's apparent theory that Plaintiffs have a right for the government to purchase their books. *Compare* ROA.3434 ("READER thus prevents the distribution of and access to books with literary, artistic, political, or scientific value.") *with* 138 F.4th at 836 (rejecting "a brave new right to receive information from the government in the form of taxpayer-funded library books").

The same is true of the arguments that the district court did not reach. Plaintiffs' facial invalidity argument is not a separate argument, and it ignores that READER involves the government as marketplace participant, not the government as regulator. ROA.934–37. Plaintiffs' overbreadth argument—in which they contend that READER "infringe[s] the rights of students to receive information and ideas" in public school libraries and the rights of authors to sell to public school libraries—rests on the false assumption that students have a First Amendment right to taxpayer-funded library books. ROA.938–940. Plaintiff rested their argument on the plurality opinion in *Board of Education v. Pico*, 457 U.S. 853, 856 (1982). *See* ROA.939 (citing *Pico* for the "constitutional right of students to receive information and ideas and access non-obscene materials in their school library" (internal quotation marks omitted)). But as the en banc court recently reiterated, "*Pico* carries no precedential weight." *Little*, 138 F.4th at 843 (citing *Muir v. Alabama Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (Former 5th Cir. 1982) (en banc)). This Court squarely rejected Plaintiffs' attempt to "challenge which books libraries buy." *Id.* at 845. The right to receive information "is not implicated . . . by [a library] not acquiring a book." *Id.* at 842.

Similarly, there is no "delegation" of government authority: READER merely requests information from vendors about products they sell. ROA.940–941. Nor have Plaintiffs ever articulated how they could have standing to challenge a delegation *to themselves*. Each of these arguments, like the district court's analysis generally, rests on disregarding that the State is as a marketplace participant asking for information about products it purchases and instead treating the State as a regulator.

* * *

As in *Little v. Llano County*, Plaintiffs' arguments rest on "unusually over-caffeinated" rhetoric, 138 F.4th at 838, invoking the specter of book bans and censorship boards, ROA.24; ROA.30. In truth, READER concerns the State's own purchasing decisions for its public schools and asks vendors to provide information to the State about products they sell to those schools. Vendors that decline to provide this information or that find providing the information too onerous are entirely free to take their business elsewhere.

The district court erred by applying First Amendment principles that govern the State as a regulator to a statute that governs the State as a marketplace participant. There is nothing wrong with the State, like any other consumer, declining to purchase from vendors who decline to provide requested information about their products.

## III. The State Does Not Violate the First Amendment by Requiring Vendors to Report the State's Rating of a Product to the State.

READER also requires that if the Texas Education Agency disagrees with a vendor's rating of library material, then the vendor must report the Texas Education

Agency's rating rather than the vendor's rating. This speech—repeating the government's rating back to the government—is also constitutional condition on the benefit of selling books to public schools.

Plaintiffs' contrary arguments rest on strained hypotheticals about how READER might operate when implemented, including speculation about future hypothetical websites hosted by the Texas Education Agency. These arguments are particularly inappropriate in the pre-enforcement posture of this lawsuit.

"Courts generally disfavor facial challenges" because they "'threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.'" *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386–87 (5th Cir. 2013) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008)). Before holding this democratically enacted statute unconstitutional, "every reasonable construction must be resorted to . . . in order to save [it] from unconstitutionality." *Id.* at 387 (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012)).

"In this vein, [Commissioner Morath's] interpretation must be accorded some meaningful weight, as [he] is the official charged with enforcing the statute." *Id.* (quoting *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 895 (5th Cir. 2012) (second alteration in original)). This Court must "defer to [Commissioner Morath's] interpretation of how the law is to be enforced, so long as it does not conflict with the statutory text." *Id.* (citing *Hamer v. Musselwhite*, 376 F.2d 479, 481 (5th Cir. 1967)).

### A. The Texas Education Agency's rating of library material constitutes government speech.

The Texas Education Agency "*may* review library material sold by a library material vendor." Tex. Educ. Code § 35.003(a) (emphasis added). "If the agency determines that the library material is required to be rated as sexually explicit material or sexually relevant material or to receive no rating at all," then the Texas Education Agency must provide written notice of "the corrected rating required for the library material." *Id.*

The corrected rating will be determined entirely by the Texas Education Agency and transmitted from the Texas Education Agency to the vendor. There is no question that the communication of the corrected ratings from the agency to the vendor constitutes government speech, not restricted by the First Amendment: "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–468 (2009)). There is no argument that the First Amendment is violated by the Texas Education Agency determining that library material should be rated differently than it was rated by a vendor and communicating its determination to the vendor.

### B. As a condition of selling books to public schools, READER permissibly requires vendors to repeat the Texas Education Agency's rating of material to the State.

Plaintiffs' arguments focus on the requirement that, after receiving a corrected rating from the Texas Education Agency, vendors must "rate the library material according to the agency's corrected rating." Tex. Educ. Code § 35.003(b)(1).

The statute does not require the vendor to agree with the agency's rating, avow the correctness of the agency's rating, or make any public statements regarding the corrected rating (or any other rating). The requirement that the vendor "rate the library material" requires only that the vendor submit the rating to the Texas Education Agency in its list of rated library material. Tex. Educ. Code § 35.002 (discussing ratings lists). In other words, the statute requires only that vendors repeat the government's speech back to the government. The statute does not prescribe any particular form for these lists of ratings that vendors must provide.

The district court acknowledged that the Texas Education Agency could review and rate library material for itself. *See* ROA.3431 ("[T]he government has the power to do the contextual ratings for the books itself."). If it did, the State could surely require vendors to supply lists of library materials they sold to public schools alongside the agency's rating of those materials. There is nothing unconstitutional in the agency providing ratings for only *some* of the library materials.

Plaintiffs' arguments rest on speculation that the Texas Education Agency will misrepresent the corrected ratings as the vendors' views rather than the agency's, but this argument rests on speculation. It is, at the very least, premature in this pre-enforcement posture.

The chain of causation that Plaintiffs hypothesize is far too attenuated to give rise to standing. Injuries must be "actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). "Allegations of possible future injury are not sufficient." *Id.* (internal quotation marks omitted). Plaintiffs lack standing to raise a claim based on

the unfounded belief that the Texas Education Agency might falsely attribute its own speech to Plaintiffs.

#### 1. Vendors are free to publicly dispute the Texas Education Agency's ratings.

The statute does not require vendors to agree with the correctness of the agency's ratings. Vendors must provide the corrected ratings in their reporting to the Texas Education Agency, but the statute does not affect their speech outside the context of that program. Vendors remain free to express disagreement publicly with the agency's ratings.

There is sharp contrast between the mandate of READER—"rate the library material according to the agency's corrected rating," Tex. Educ. Code § 35.003(b)(1)—and the funding condition rejected by the Supreme Court in *Alliance for Open Society*. That case involved funding to combat the spread of HIV/AIDS, but funds could not be provided to an organization "that does not have a policy explicitly opposing prostitution and sex trafficking." 570 U.S. at 208 (quoting 22 U.S.C. § 7631(f)). Recipients of funding were required to agree in the award document that they were "opposed to 'prostitution and sex trafficking because of the psychological and physical risks they pose for women, men, and children.'" *Id.* at 210 (quoting 45 CFR § 89.1(b)).

This condition, the Supreme Court explained, was "an ongoing condition on recipients' speech and activities, a ground for terminating a grant after selection is complete." *Id.* at 218. The condition "compell[ed] grant recipient[s] to adopt a particular belief as a condition of funding." *Id.* Recipients were required to "adopt—as

their own—the Government's view on an issue of public concern." *Id.* "A recipient cannot avow the belief dictated by the Policy Requirement when spending Leadership Act funds, and then turn around and assert a contrary belief, or claim neutrality, when participating in activities on its own time and dime." *Id.*

READER, in contrast, leaves vendors precisely the freedom that was absent in *Alliance for Open Society*. Vendors are not required to "avow [any] belief," *id.*—they must simply use the corrected rating in lists they provide to the Texas Education Agency. Outside that context, *i.e.*, outside the context of the sales to public schools, vendors can freely assert a contrary belief, on their own time and dime.

Like the requirement that vendors report their own ratings to the Texas Education Agency, the requirement that vendors report any corrected ratings provided by the agency is a condition of selling to public schools that regulates speech only within the context of the program itself. It falls squarely on the constitutional side of the line.

#### 2. Plaintiffs' purported fears that the agency's ratings will be attributed to them are speculative and unsupported.

Plaintiffs express fear that the agency's corrected ratings "published online, will be attributed to them by their loyal customers and potential buyers." ROA.926. This argument, raised in a pre-enforcement posture, rests on speculation that ratings lists (to be created at some point in the future) might be presented on the Texas Education Agency's website (at some point in the future).

As an initial matter, Plaintiffs' hypothetical future injuries would be entirely self-inflicted. READER does not mandate that ratings lists be provided to the Texas

Education Agency in any particular form or format. Tex. Educ. Code § 35.002. In providing a ratings list to the agency, there is no reason that Plaintiffs could not mark every corrected rating with an asterisk, noting it reflects a rating issued by the Texas Education Agency under section 35.003, or include a parenthetical to the same effect. Or a vendor could divide its ratings list into two categories, one listing material rated by the vendor and one with corrected ratings issued by the agency. Put simply, nothing in READER precludes a vendor from truthfully indicating which ratings were provided by the vendor and which were provided by the Texas Education Agency. By taking these steps, Plaintiffs would eliminate any risk that the public might erroneously attribute the corrected ratings provided by the agency to the vendors themselves.

At the preliminary injunction stage, this Court assumed that vendors' rating lists would not distinguish between their own ratings and those provided by the agency: "The corrected rating is again put on TEA's website and attributed to the vendor." *Book People*, 91 F.4th at 338. But nothing in the statute prohibits vendors from distinguishing between the vendor's own ratings and the corrected ratings. *See* ROA.3971 ("There's nothing in the statute preventing them from doing that.").

To the extent that Plaintiffs insist that they intend to submit ratings lists in a manner that fails to distinguish their own ratings from corrected ratings provided by the agency, such a self-inflicted injury cannot give rise to standing. *Clapper*, 568 U.S. at 418.

Moreover, there is no reason to believe that the Texas Education Agency's website would publicly attribute any ratings to a vendor. READER requires the agency

to post "each list" submitted by vendors "in a conspicuous place" on its website. Tex. Educ. Code § 35.002(e). But nothing in READER compels the agency to create a public-facing page tying particular vendors to ratings, much less to corrected ratings provided by the agency.

Had the Texas Legislature intended to require READER ratings lists to be posted on a publicly available website, it would have said so expressly. *See, e.g.*, Tex. Occ. Code § 51.207 (requiring "a link to an Internet website that allows *the public* to track legislation affecting the programs administered by the department") (emphasis added); Tex. Loc. Gov't Code § 82.051 (referring to "a county's *public* Internet website") (emphasis added); Tex. Gov't Code § 802.107 (requiring posting "on a *publicly available* Internet website") (emphasis added); *id.* § 661.252 (requiring posting "on the agency's Internet website in a location easily accessible by the agency's employees *and the public*") (emphasis added). In contrast, nothing in READER requires that ratings lists be posted in a publicly accessible portion of the Texas Education Agency's website.

The Texas Education Agency often posts information on the non-public facing portion of its website, which can only be accessed by those with the appropriate credentials. *See* ROA.1393 ("There's certain portions of the website that only certain school districts with certain access can see."); Tex. Educ. Agency, *TEA Login Page (TEAL)*, https://tealprod.tea.state.tx.us (last visited February 13, 2026). The link to the TEAL Login screen is conspicuously displayed in the "Popular Applications" bar at the top of TEA's website. *See* Tex. Educ. Agency, *TEA Home Page*, https://tea.texas.gov (last visited February 13, 2026).

The deposition of the Texas Education Agency's corporate representative confirmed that no "steps to implement" READER had been taken "[o]ther than communicating about what was in" it before entry of the preliminary injunction. ROA.1357. The agency has not yet determined how it will display the ratings and noncompliance lists. *See* ROA.1350 ("Q: And how has TEA determined that it will post the list of material vendors that have rated books as sexually explicit or sexually relevant? A: That has not been determined."); ROA.1362 ("Q: How does that happen? A: We haven't made those determinations yet."). Nor has the agency mocked up how its website might implement READER's posting provisions. *See* ROA.1350 ("Q: Have there been any mockups done of what a website would look like since [the lists are] required to be posted on a website? A: No."). All Plaintiffs can offer concerning how the lists might appear on the website (and who might access them) is unfounded speculation.

Not only does a First Amendment claim based on this speculation fail on the merits—Plaintiffs did not present any evidence that the Texas Education Association will act in an unconstitutional manner in enforcing the statute by posting to its website—but such speculation does not give rise to standing. Article III requires an injury that is "actual or imminent," not "speculative." *Clapper*, 568 U.S. at 409. The theory that the Texas Education Agency will create a website that misattributes the government's speech to vendors concerns, at most, a possible future injury, not one that is certainly impending. *Id.*

Plaintiffs can say only that the statute authorizes (but does not mandate or direct) the posting of lists in this manner, conjectural allegations that do not give risk

to standing. *See id.* at 412 ("[B]ecause § 1881a at most *authorizes*—but does not mandate or *direct*—the surveillance that respondents fear, respondents' allegations are necessarily conjectural.").

Moreover, as a remedy for potential misattribution of speech, the district court's injunction is overbroad. Such an injury could be cured by an injunction requiring only that when ratings are posted on the Texas Education Agency's website, the agency not misattribute its corrected ratings of library materials to vendors. Even if Plaintiffs' theory were correct, injunction of the entire statute would be improper when a narrow and tailored injunction—"do not misattribute"—would fully prevent the harm that they purport to fear.

The First Amendment does not prohibit the State from requiring vendors who seek to sell library materials to public schools from reporting the Texas Education Agency's rating of materials that are sold. Plaintiffs' theory that the Texas Education Agency will publicly misattribute its ratings to the vendors themselves is speculative and unsupported by the evidence. In the unlikely event that the Texas Education Agency does so in the future, any Plaintiff could raise an as-applied challenge at that time. With respect to Plaintiffs' arguments related to corrected ratings, this Court should either render summary judgment for Commissioner Morath or dismiss for lack of standing.

## IV. The District Court Erred by Entering a Universal Injunction.

The district court also erred by issuing a universal permanent injunction, forbidding Commissioner Morath from enforcing READER against anyone, not merely Plaintiffs:

> Commissioner of Education Mike Morath and all of his officers, agents, employees, attorneys, and other persons in active concert with him are ENJOINED from applying, enforcing, or attempting to enforce, either criminally or civilly, §§ 35.001, 35.002, 35.0021, and 35.003 of HB 900, the Restricting Explicit and Adult-Designated Educational Resources (READER) Act.

ROA.3440–41; *see also* ROA.20.

This order violates black-letter law. Universal injunctions "fal[l] outside the bounds of a federal court's equitable authority." *CASA*, 606 U.S. at 847; *see also* ROA.4099 ("*Trump vs. CASA* says an injunction binds only the parties before the Court."). At a minimum, this Court should vacate the permanent injunction and remand for entry of an injunction that is no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861.

## Conclusion

For these reasons, this Court should reverse and render judgment in favor of Commissioner Morath.

Respectfully submitted.

/s/ William R. Peterson
William R. Peterson
Solicitor General
William.Peterson@oag.texas.gov

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Cameron Fraser
Nathaniel A. Plemons
Assistant Solicitors General

*Counsel for Appellant*

## Certificate of Compliance

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,901 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ William R. Peterson
William R. Peterson