No. 25-50891

# In the United States Court of Appeals for the Fifth Circuit

**BOOK PEOPLE, INCORPORATED; VBK, INCORPORATED, doing business as BLUE WILLOW BOOKSHOP; AMERICAN BOOKSELLERS ASSOCIATION; ASSOCIATION OF AMERICAN PUBLISHERS; AUTHORS GUILD, INCORPORATED; COMIC BOOK LEGAL DEFENSE FUND,**

*Plaintiffs-Appellees,*

**v.**

**MIKE MORATH, in his official capacity as the Commissioner of the Texas Education Agency,**

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
Case No. 1:23-CV-00858-ADA, Judge Alan Albright

## BRIEF OF PLAINTIFFS-APPELLEES

Laura Lee Prather
Catherine L. Robb
Michael J. Lambert
William Reid Pillifant
**HAYNES AND BOONE, LLP**
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
Telephone: (512) 867-8400

Daniel L. Geyser
**HAYNES AND BOONE, LLP**
2801 N. Harwood St., Ste. 2300
Dallas, Texas 75201
Telephone: (303) 382-6219

**ATTORNEYS FOR PLAINTIFFS-APPELLEES**

# CERTIFICATE OF INTERESTED PERSONS

**Case Number and Style**: No. 25-50891, *Book People, Inc., et al. v. Morath*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualifications or recusal.

1. **Plaintiffs-Appellees**: Book People, Inc., VBK, Inc. d/b/a Blue Willow Bookshop, American Booksellers Association, Association of American Publishers, Authors Guild, Inc., and Comic Book Legal Defense Fund. None of the Plaintiffs-Appellees are a publicly held corporation; no Plaintiff-Appellee has any parent corporation; and no publicly held corporation owns 10 percent or more of any Plaintiff-Appellee's stock.

2. **Counsel for Plaintiffs-Appellees**: Laura Lee Prather, Daniel L. Geyser, Catherine L. Robb, Michael J. Lambert, and William Reid Pillifant of Haynes and Boone, LLP.

3. **Defendant-Appellant:** Mike Morath.

4. **Counsel for Defendant-Appellant**: Nathaniel A. Plemons, Cameron Fraser, Ken Paxton, William R. Peterson, Brent Webster, and William F. Cole, of the Office of the Attorney General.

5. **Amici in District Court**: Educational Book & Media Association, Association of University Presses, Barnes & Noble, Inc., Freedom to Read Foundation, Freedom to Learn Advocates, American Association of School Librarians, and Association of University Presses.

6. **Counsel for Amici in District Court**: Peter D. Kennedy of Graves, Dougherty, Hearon & Moody, P.C.; Everett William Jack, Jr., Celyra Imani Myers, and Linda J. Steinman of Davis Wright Tremaine LLP.

/s/ Laura Lee Prather
Laura Lee Prather
Attorney of record for Plaintiffs-Appellees

## STATEMENT REGARDING ORAL ARGUMENT

This Court and the District Court correctly enjoined HB 900's Rating Requirements under controlling First Amendment precedent. In this second appeal, Defendant does not meaningfully grapple with the well-reasoned opinion of this Court. Instead, Defendant advances a newly reframed theory he failed to preserve in his first appeal and that is unsupported by HB 900's text, purpose, or practical operation. Although the constitutional defects of the Rating Requirements remain clear, given the importance of Plaintiffs' First Amendment rights and the public interest involved, oral argument may assist the Court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................i

STATEMENT REGARDING ORAL ARGUMENT ........................................ iii

TABLE OF CONTENTS ...................................................................................iv

TABLE OF AUTHORITIES ........................................................................... vii

INTRODUCTION ..............................................................................................1

JURISDICTIONAL STATEMENT ....................................................................4

ISSUES PRESENTED........................................................................................4

STATEMENT OF THE CASE............................................................................5

I.  HB 900 regulates the ability to sell books to Texas schools by compelling booksellers to issue subjective, controversial ratings about the sexual content of books and adopt the government's ratings in violation of their constitutional rights. ............................................5

    A.  The Texas Legislature adopts HB 900 and imposes significant speech-based restrictions on booksellers—despite obvious concerns about its constitutionality............................5

        1.  HB 900 requires booksellers to review and rate all books previously sold to Texas schools as "sexually relevant" or "sexually explicit"—before they can sell *any* books to Texas schools. ...............................6

        2.  HB 900 requires TEA to post the booksellers' ratings "in a conspicuous place" on TEA's website and requires booksellers to adopt the TEA's "corrected" ratings as their own.................................9

    B.  Plaintiffs sue to enjoin enforcement of HB 900 and prevent imminent harm. ..........................................................10

II.  This Court affirms the preliminary injunction and holds that HB 900 is likely unconstitutional compelled speech. ........................................12

III. The District Court permanently enjoins the enforcement of the Rating Requirements as unconstitutional in at least three ways. .................13

SUMMARY OF THE ARGUMENT .......................................................14

STANDARD OF REVIEW ...................................................................17

ARGUMENT .......................................................................................17

I. The State has effectively conceded that HB 900 is unconstitutional in at least three ways. .........................................17

    A. The District Court correctly held that HB 900 violates the First Amendment because it compels speech. ...................18

        1. HB 900 requires private booksellers, against their will, to issue subjective, controversial book ratings based on government criteria. ...................................19

        2. HB 900 requires private booksellers to publicly adopt the government's speech as their own against their will. .......................................................................21

        3. Booksellers' ratings will be posted publicly in a conspicuous place on the internet and attributed to them. ...........................................................................23

    B. The District Court correctly held that HB 900 is void for vagueness .................................................................26

    C. The District Court correctly held that HB 900 is an unconstitutional prior restraint. ........................................30

    D. The Rating Requirements are facially unconstitutional because they have no constitutional applications. .............32

II. Defendant's new "marketplace participant" argument fails in every conceivable way...............................................................34

    A. HB 900 does not establish a marketplace for the State to buy books. ...................................................................35

B.     The State acts as a regulator, not a "marketplace participant," under HB 900. ..............................................38

C.     The cases relied on by the State are inapposite and do not apply in the First Amendment context. ..............................................39

III.    Even if the State acted as a valid marketplace participant, HB 900 should be enjoined because it imposes unconstitutional conditions. ..............................................41

A.     HB 900 imposes unconstitutional conditions by requiring booksellers to adopt the government's message in order to have the opportunity to sell books to Texas schools. ..........................42

B.     The ratings are controversial and subjective opinions, *not* objective facts. ..............................................47

IV.    This Court correctly established as law of the case that Plaintiffs have standing, that their claims are ripe, and that sovereign immunity, government speech, government operations, and commercial speech doctrines do not apply. ..............................................48

V.    The District Court correctly issued a permanent injunction that is properly tailored to provide complete relief. ..............................................52

CONCLUSION ..............................................56

CERTIFICATE OF SERVICE ..............................................58

ECF CERTIFICATION ..............................................58

CERTIFICATE OF COMPLIANCE ..............................................59

APPENDIX ..............................................60

# TABLE OF AUTHORITIES

**CASES**                                                          **PAGE(S)**

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023)................................................................18, 19, 22

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013)................................................................33, 42, 46

*Amawi v. Pflugerville Indep. Sch. Dist.*,
    373 F. Supp. 3d 717 (W.D. Tex. 2019), *vacated after law amended
    sub nom. Amawi v. Paxton*, 956 F.3d 816 (5th Cir. 2020) .................................44

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963)................................................................30

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*,
    518 U.S. 668 (1996)................................................................44

*Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders
    & Contractors of Mass./R.I., Inc.*,
    507 U.S. 218 (1993)................................................................40

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) ................................................................*passim*

*Chiles v. Salazar*,
    146 S. Ct. 1010 (2026)................................................................1, 16, 22, 39

*Chiu v. Plano ISD*,
    339 F.3d 273 (5th Cir. 2003) ................................................................31

*F.C.C. v. League of Women Voters of California*,
    468 U.S. 364 (1984)................................................................45

*In re Felt*,
    255 F.3d 220 (5th Cir. 2001) ................................................................49

*Gonzalez Hernandez v. Garland*,
    No. 22-60110, 2023 WL 5995499 (5th Cir. Sept. 15, 2023)................................................................49

*In re Goode*,
821 F.3d 553 (5th Cir. 2016) ....................................................................31

*Hughes v. Alexandria Scrap Corp.*,
426 U.S. 794 (1976)....................................................................................40

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995)....................................................................................18

*Little v. Llano Cnty.*,
138 F.4th 834 (5th Cir. 2025) ...................................................................32

*Machete Prods., L.L.C. v. Page*,
809 F.3d 281 (5th Cir. 2015) ....................................................................29

*Matal v. Tam*,
582 U.S. 218 (2017)..............................................................................51, 52

*McNutt v. U.S. Dep't of Justice*,
No. 24-10760, 2026 WL 971617 (5th Cir. Apr. 10, 2026)....................17

*Minarcini v. Strongsville City School Dist.*,
541 F.2d 577 (6th Cir. 1976) ....................................................................31

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....................................................................................33

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
167 F.4th 86 (4th Cir. 2026) .....................................................................29

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998)....................................................................................29

*Notorantonio v. Voccola*,
No. C.A. 86-0234, 1988 WL 1017211 (R.I. Super. May 11, 1988)....................24

*Oakes Farms Food & Distrib. Servs., LLC v. Adkins*,
154 F.4th 1338 (11th Cir. 2025) ..............................................................41

*Penguin Random House LLC v. Gibson*,
796 F. Supp. 3d 1052 (M.D. Fla. 2025)..................................................46

*Perry v. Sindermann*,
408 U.S. 593 (1972)..................................................................41, 42

*Regan v. Taxation With Representation of Washington*,
461 U.S. 540 (1983)........................................................................44

*Reno v. Am. Civil Liberties Union*,
521 U.S. 844 (1997)........................................................................48

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
487 U.S. 781 (1988)........................................................................18

*Roark & Hardee LP v. City of Austin*,
522 F.3d 533 (5th Cir. 2008) .........................................................26

*Royal Ins. Co. of Am. v. Quinn-L Cap. Corp.*,
3 F.3d 877 (5th Cir. 1993) ..........................................................4, 48

*Rust v. Sullivan*,
500 U.S. 173 (1991)........................................................................44

*Sanders v. Unum Life Ins. Co. of Am.*,
553 F.3d 922 (5th Cir. 2008) ..........................................18, 19, 52

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975)..................................................................30, 31

*Shurtleff v. City of Boston, Mass.*,
596 U.S. 243 (2022)..................................................................51, 52

*Sindhi v. Raina*,
905 F.3d 327 (5th Cir. 2018) .........................................................53

*Smith v. People of the State of Cal.*,
361 U.S. 147 (1959)........................................................................32

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)........................................................................19

*St. Paul Mercury Ins. Co. v. Williamson*,
332 F.3d 304 (5th Cir. 2003) ....................................................48, 50

*Suzio v. Semple*,
No. CV165006812S, 2016 WL 6884235 (Conn. Super. Ct. Oct. 19, 2016) ..............................................................24

*Todd v. Rochester Community Schools*,
200 N.W.2d 90 (Mich. App. 1972) ...................................31

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .........................................53, 54, 55

*United States v. One Book Called Ulysses*,
5 F. Supp. 182 (S.D.N.Y. 1933) .......................................31

*United States v. 162.20 Acres of Land, More or Less, Situated in Clay Cnty., State of Miss.*, 733 F.2d 377 (5th Cir. 1984) ..............................50

*United States v. Strakoff*,
719 F.2d 1307 (5th Cir. 1983) .......................................24

*United States v. Wills*,
40 F.4th 330 (5th Cir. 2022) .........................................49

*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) .......................................................26

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) .......................................................18

*Welty v. Dunaway*,
791 F. Supp. 3d 818 (M.D. Tenn. 2025) .......................54, 55

*White v. Mass. Council of Constr. Employers, Inc.*,
460 U.S. 204 (1983) .......................................................40

*Women's Med. Ctr. of Nw. Houston v. Bell*,
248 F.3d 411 (5th Cir. 2001) .........................................26

**Statutes**

28 U.S.C. § 1291 .............................................................4

28 U.S.C. § 1331 .............................................................4

28 U.S.C. § 1343 .............................................................4

Tex. Educ. Code § 11.002 ...............................................................36

Tex. Educ. Code § 11.151 ...............................................................36

Tex. Educ. Code § 33.021 ...........................................................*passim*

Tex. Educ. Code § 33.026 ...............................................................37

Tex. Educ. Code § 35.001 ...........................................6, 7, 8, 20, 53

Tex. Educ. Code § 35.002 ...........................................................*passim*

Tex. Educ. Code § 35.003 ...................................9, 10, 21, 30, 53

Tex. Educ. Code § 35.0021 ..............................................7, 8, 53

Tex. Penal Code § 43.01 ..................................................................7

Tex. Penal Code § 43.21 ..................................................................8

Tex. Penal Code § 43.25 ..................................................................7

**Other Authorities**

2 Smolla & Nimmer on Freedom of Speech § 19:7 ...............................48

Black's Law Dictionary (12th ed. 2024) ...............................................24

Cameron Abrams, *Canyon ISD Removes the Bible From School Libraries, Citing Law Targeting 'Sexually Explicit' Material*, THE TEXAN, December 19, 2024, https://thetexan.news/issues/education/canyon-isd-removes-the-bible-from-school-libraries-citing-law-targeting-sexually-explicit-material/article_9aa20254-be1c-11ef-b5dd-7faeb6c9d2e6.html.........................28

Guidance Document for Senate Bill (SB) 13 Library Materials Policy, TEXAS EDUCATION AGENCY, https://tea.texas.gov/texas-schools/school-boards/sb13-guidance.pdf ("TEA SB 13 Guidance"). ...............................24, 25, 37

Texas Constitution and Statutes Home page, https://statutes.capitol.texas.gov/?tab=3&code=ZZ&text=%2522conspicuous%2520place%2522. ........................................................24

Texas Constitution and Statutes Home page,
  https://statutes.capitol.texas.gov/?tab=3&code=ZZ&text=
  conspicuous............................................................................................................24

## INTRODUCTION

This appeal seeks to resurrect an unconstitutional law that has already been enjoined by both this Court and the District Court. Texas House Bill 900's regulatory regime compels private booksellers to issue controversial content-based book ratings against their will, forces them to adopt the government's viewpoints as their own, and blocks the distribution of constitutionally protected books through a vague, standardless, and censorial scheme with no right to appeal. The District Court correctly granted summary judgment to Plaintiffs and permanently enjoined enforcement of HB 900's Rating Requirements. That judgment should be affirmed.

Unable to challenge the District Court's core holdings that the Rating Requirements are compelled speech, void for vagueness, and a prior restraint, Defendant now pivots to a previously forfeited and novel "marketplace participant" argument, despite the fact that the State does not purchase books and the statute's express language confirms the law is a regulation. Defendant's recent efforts to "recast" HB 900 as anything but a book ratings law amount to "little more than a labeling game." *Chiles v. Salazar*, 146 S. Ct. 1010, 1020, 1023–24 (2026) (internal quotations omitted). It is a regulation, plain and simple, and Texas school districts, not the State, purchase books.

Defendant concedes both points in his Statement of the Case: "This appeal concerns the Restricting Explicit and Adult-Designated Educational Resources Act

1

("READER" or "H.B. 900"), Tex. Educ. Code §§ 33.021, 35.001–.008, **which *regulates* the purchase of books by Texas public schools**." Br. 4 (emphases added). Indeed, the Legislature left no question about the nature of the law in the caption itself:

H.B. No. 900

```
                              AN ACT
  relating to the regulation of library materials sold to or included
  in public school libraries.
```

The statute repeatedly describes its provisions as a "regulation" (ROA.52–54). So too did Defendant when he was previously before this Court, touting the State's ability to retain power to "prescribe [such] regulations" (Dkt. 164 at 11), and referring to HB 900 as a "regulatory scheme" and a "civil regulation" (Dkt. 71 at 15–16, 40).

In any event, HB 900 does not merely guide school purchasing decisions. It imposes a comprehensive statewide regulatory regime that places unconstitutional conditions on booksellers' ability to sell any books to Texas schools—requiring them to perform subjective, controversial content analyses of the sexual content of books, publicly label those books using government-defined categories (with which they disagree), and if the TEA concludes the rating should be different, adopt the government's "corrected" ratings as their own—or face a ban from being able to sell

2

books to Texas schools. This, again, is a speech-based regulation, plain and simple, and compelled speech in its most fundamental form.

This Court has already recognized as much. In affirming the preliminary injunction, a unanimous panel of this Court held that HB 900 likely violates the First Amendment because it unconstitutionally compels private booksellers to issue book ratings and acquiesce to the State's revised ratings—or surrender their First Amendment rights. *Book People, Inc. v. Wong*, 91 F.4th 318, 335, 340 (5th Cir. 2024). Meanwhile, this Court rejected every theory the State advanced to avoid constitutional scrutiny—standing, sovereign immunity, ripeness, government speech, government operations, and commercial speech.

The summary-judgment record now confirms what was evident at the preliminary-injunction stage. HB 900 requires booksellers to navigate a 16-step rating process riddled with undefined and subjective terms such as "lewd exhibition," "patently offensive," "community standards," and "active use" in order to rate books as "sexually relevant" or "sexually explicit." App. A; ROA.964–965. It provides no clear guidance, no safe harbor, and no opportunity for independent review—yet it authorizes TEA to override a bookseller's ratings, publicly attribute the government's views to the bookseller, and blacklist any vendor that refuses to comply. Faced with these undisputed facts, the District Court correctly held the Rating Requirements unconstitutional on three independent grounds (as compelled

speech, void for vagueness, and a prior restraint) and permanently enjoined their enforcement.

Because Defendant has failed to meaningfully contest the District Court's compelled speech, vagueness, and prior restraint rulings—and because his newly minted theory cannot cure those defects—the judgment below should be affirmed.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction over the final judgment under 28 U.S.C. § 1291.

As Defendant concedes (Br. 1), this Court resolved the issue of sovereign immunity against Defendant in the prior appeal (*Book People*, 91 F.4th at 336), and that holding is now "law of the case." *Royal Ins. Co. of Am. v. Quinn-L Cap. Corp.*, 3 F.3d 877, 881 (5th Cir. 1993) (describing the effect of "decisions of law" in earlier interlocutory appeals).

## ISSUES PRESENTED

1.     Whether HB 900's Rating Requirements violate the First and Fourteenth Amendments by (a) compelling private individuals and entities to engage in speech with which they disagree or face punishment, (b) failing to provide explicit standards for applying the law to avoid arbitrary and discretionary applications, and (c) preventing the dissemination of constitutionally protected works without procedural safeguards.

2.     Whether a permanent injunction of the Rating Requirements is appropriate when (a) the Rating Requirements violate the First and Fourteenth Amendments, (b) enforcement of the Rating Requirements would cause Plaintiffs irreparable constitutional, economic, and reputational harm, and (c) the balance of equities and public interest favor enjoining the Rating Requirements.

## STATEMENT OF THE CASE

**I.     HB 900 regulates the ability to sell books to Texas schools by compelling booksellers to issue subjective, controversial ratings about the sexual content of books and adopt the government's ratings in violation of their constitutional rights.**

### A.     The Texas Legislature adopts HB 900 and imposes significant speech-based restrictions on booksellers—despite obvious concerns about its constitutionality.

During the 2023 legislative session, the Texas Legislature enacted a new scheme regulating the ability of booksellers to sell books to Texas schools. Texans raised a series of significant concerns about HB 900, including its regulation of books, compelled rating system, confusing terms and definitions, and lack of constitutional safeguards. ROA.32–34. Despite these warnings and proposed amendments to address HB 900's constitutional and practical infirmities, the measure was passed unchanged (ROA.34), and HB 900 was set to take effect in September 2023, impacting the 2023–24 academic year (ROA.59).

**1.** **HB 900 requires booksellers to review and rate all books previously sold to Texas schools as "sexually relevant" or "sexually explicit"—before they can sell *any* books to Texas schools.**

In order to sell any books to Texas schools, HB 900 requires all "library material vendors,"[1] such as Plaintiffs, to (i) review all "library material" previously sold to a "school district or open-enrollment charter school" that remains in "active use" (not defined) and is not "directly related to the curriculum" (not defined), (ii) review all books they wish to sell in the future, and (iii) rate all material as "sexually relevant," "sexually explicit," or provide no rating. Tex. Educ. Code §§ 33.021(a), 35.001(1), 35.001(3), 35.002(a).[2]

To comply with the Rating Requirements, booksellers are compelled to follow 16 onerous and confusing steps. App. A; ROA.964–965. First, booksellers must perform a four-part assessment to decide *which* books to rate: (1) determine what "library material" is subject to HB 900 and (2) compile a list of all books "previously sold" or they wish to sell to Texas schools that (3) are not "directly related to the curriculum" and (4) are currently in "active use" (the first three steps of the 16-step process). §§ 35.001(3), 35.002, 33.021(a). Yet no statewide curriculum governs the 1,025 Texas school districts, and "active use" is not defined in the statute or

---

[1] A "library material vendor" is defined as "any entity that sells library material to a public primary or secondary school in this state." Tex. Educ. Code § 35.001(1) (hereinafter, "bookseller").

[2] All statutory citations are to the Texas Education Code unless otherwise noted.

elsewhere in the Education Code. § 35.002; ROA.1372 (TEA Depo. 101:10–21). *If* such a list *can* be compiled, booksellers then must read *every* passage of *every* book and make a subjective assessment about each book based on the unclear definitions of "sexually relevant" and "sexually explicit" (steps 4–16). §§ 35.002(a), 35.001(3), 35.0021(b).

Applying the definition of "sexually relevant" (step 4) involves jumping from one definition to the next and guessing what undefined terms mean and what the author's intent was at the time the book was written. § 35.001(3). Embedded within the definition of "sexually relevant" is the term "sexual conduct" (as defined by Texas Penal Code § 43.25) (step 5), which then leads to a defined term and undefined term. The defined term, "sexual contact," imposes on the bookseller the task of determining the intent of the author (step 6) (Texas Penal Code § 43.01—"with intent to arouse or gratify the sexual desire of any person"). It also leads to the undefined and ambiguous term "lewd exhibition" (step 7). ROA.1394 (TEA Depo. 191:16–21).

Absent from HB 900 is any consideration of the artistic, literary, political, or scientific value of the work as a whole. Books rated "sexually relevant" can only be accessed "outside the school library" with written parental consent. § 35.001(3); ROA.1397 (TEA Depo. 203:11–204:2).

Applying the definition of "sexually explicit" is even more opaque and

7

subjective and invites different outcomes in different parts of the state (step 8). § 33.021(a). The embedded term "patently offensive" requires booksellers to determine, for each book, whether it is "so offensive on its face as to affront current community standards of decency" (step 9). Tex. Penal Code § 43.21(a)(4). HB 900 does not identify what community to consider, what the standards of decency are in each community, or which age or grade level should be considered (step 10)—much less how a typical bookseller can determine any of this. ROA.1384 (TEA Depo. 150:25–151:4).

Booksellers are also compelled to "perform a contextual analysis" (step 11) on "each instance" of "sexual conduct" by weighing and balancing three subjective factors (steps 12–15), which requires the impossible task of determining what a "reasonable person" would think of an author's "intent," while recognizing that *each instance* of sexual conduct "may present a unique mix of factors." § 35.0021(b), (c). Although neither explicitly stating that the entire book should be read nor providing for consideration of the "work as a whole," booksellers must also "consider the full context . . . recognizing that contextual determinations are necessarily highly fact-specific and require the consideration of contextual characteristics that may exacerbate or mitigate the offensiveness of the material" (step 16). § 35.0021(d). Books rated "sexually explicit" that are "in active use" must be recalled from school libraries and are barred from being sold to Texas schools. §§ 33.021(a), 35.001(2).

8

HB 900 contains no guidance on how to conduct a recall or what happens when booksellers provide different ratings of the same book. ROA.1381 (TEA Depo. 139:15–24). Unless and until a bookseller successfully completes the above steps, the bookseller "may not sell library materials" to Texas schools—even books indisputably falling outside HB 900's amorphous ambit. § 35.002(a); ROA.1349 (TEA Depo. 11:6–10, 65:10–15).

### 2. HB 900 requires TEA to post the booksellers' ratings "in a conspicuous place" on TEA's website and requires booksellers to adopt the TEA's "corrected" ratings as their own.

After booksellers determine which previously sold books need to be rated and compile their initial ratings, they must submit those ratings to TEA, which is led and controlled by Defendant Mike Morath. § 35.002(c); ROA.1361 (TEA Depo. 60:18–61:2). TEA must post each bookseller's list of ratings as the booksellers' own rating "in a conspicuous place" on TEA's website "as soon as practicable." § 35.002(e). Each rating is then subject to TEA's second-guessing (and ultimate override). § 35.003. If a bookseller fails to rate a book or TEA believes a book was "incorrectly rated by the vendor," TEA can issue its own rating and compel the bookseller to adopt the government's "corrected rating" (which will be published and attributed to the bookseller on TEA's website). § 35.002(e); § 35.003(b), (c). If a bookseller refuses to accept the government's rating as its own, the bookseller will be placed on a public blacklist (also conspicuously published on TEA's website), and Texas

9

schools are prohibited from purchasing *any* books (not only those with "corrected ratings") from that bookseller.[3] § 35.003(c), (d), (e); ROA.1350 (TEA Depo. 15:10–20); ROA.1351 (TEA Depo. 20:2–9); ROA.1362 (TEA Depo. 61:24–62:4); ROA.1371 (TEA Depo. 98:8–19); ROA.1379 (TEA Depo. 129:25–130:17). Booksellers must repeat the ratings process each year and submit a revised list of ratings by September 1 for TEA to review and post "in a conspicuous place" on its website. § 35.002(d), (e).

HB 900 includes no ability to seek independent review of its determinations. ROA.1363 (TEA Depo. 67:10–18). Nor do booksellers receive any assistance from the State or TEA to help them attempt to comply with HB 900. ROA.1377 (TEA Depo. 122:6–9). Only booksellers who are completely compliant with the law—by submitting ratings and adopting the government's ratings for *every* book—can sell books to Texas schools. § 35.003(d), (e); ROA.1394 (TEA Depo. 192:15–193:12).

**B.    Plaintiffs sue to enjoin enforcement of HB 900 and prevent imminent harm.**

In July 2023, Plaintiffs, a coalition of booksellers, publishers, and authors, filed suit under 42 U.S.C. § 1983, seeking to enjoin HB 900's enforcement.

---

[3] It is unclear if the prohibition extends to all imprints of a bookseller. For instance, Penguin Random House operates over 300 independent imprints worldwide. https://www.penguinrandomhouse.com/about-us/our-story/. If Penguin Random House and TEA disagree on a single rating for a single book, are all 300+ imprints prohibited from selling books to Texas schools? HB 900 provides no answer.

ROA.23–97; ROA.107–180. Plaintiffs include Book People, Inc., Texas's largest independent bookstore based in Austin, and VBK, Inc. d/b/a Blue Willow Bookshop, a Houston family-owned and operated bookstore, as well as four organizations representing booksellers, authors, and publishers—American Booksellers Association, Association of American Publishers, Authors Guild, Inc., and Comic Book Legal Defense Fund.[4] ROA.26–29.

After full briefing on Defendant's motion to dismiss and Plaintiffs' motion for preliminary injunction (ROA.107–651), the District Court found that HB 900's book rating regime is likely unconstitutional, and it prevented the Rating Requirements from taking effect. ROA.709–767. As the court explained, the Rating Requirements likely violate the First and Fourteenth Amendments because they (1) unconstitutionally compel speech, (2) contain unconstitutionally vague provisions, and (3) act as an unconstitutional prior restraint. ROA.709–767. The court also found the law subjects Plaintiffs to irreparable harm and the balance of harms and public interest favors an injunction preserving the status quo. ROA.762–766. The court did not enjoin the separate standards for school districts to follow when developing library-collection policies, § 33.021 ("Library Standards"), or provisions concerning liability, parental consent for using certain library materials,

---

[4] Despite its name, CBLDF is a nonprofit organization (ROA.29), not a "legal defense fund" (*contra* Br. 6).

and reporting obligations for schools, among others. §§ 35.004–008; ROA.767.

## II.     <u>**This Court affirms the preliminary injunction and holds that HB 900 is likely unconstitutional compelled speech.**</u>

In January 2024, this Court unanimously affirmed the preliminary injunction, holding that Plaintiffs were likely to succeed on their First Amendment compelled speech claim because HB 900 forces private booksellers to conduct subjective, fact-intensive analyses of books and publicly express judgments about their sexual content. *Book People*, 91 F.4th at 341 (Willett, J.).

This Court rejected the State's jurisdictional objections. It found that Plaintiffs had standing to bring a pre-enforcement challenge because the law caused "concrete, cognizable injuries," and those injuries were traceable to Defendant and capable of redress. *Id*. at 332. It likewise found Plaintiffs' First Amendment challenges were ripe because they presented "pure question[s] of law" that needed no further factual or legal development. And it finally held Defendant was not entitled to sovereign immunity because he has a "sufficient connection" to HB 900's enforcement. *Id*. at 334–35.

The Court then turned to the merits. It declared the government speech doctrine did not apply because the ratings are the booksellers' speech, not the government's; this was not an essential governmental operation because HB 900 requires *booksellers* to undertake a contextual analysis and weigh and balance various factors; and the commercial speech doctrine did not apply because the

ratings are "neither factual nor uncontroversial." *Id*. at 337–340. This Court also found Defendant's market-participant argument forfeited because it was raised for the first time on appeal. *Id*. at 336 n.103.

In addition to finding Plaintiffs likely to prevail on the merits, the Court further found Plaintiffs would suffer irreparable constitutional and economic injury absent an injunction and the equities and public interest favored enjoining an unconstitutional law. *Id*. at 341.

## III. <u>The District Court permanently enjoins the enforcement of the Rating Requirements as unconstitutional in at least three ways.</u>

In October 2025, after discovery and cross-motions for summary judgment, the District Court ruled for Plaintiffs and permanently enjoined the Rating Requirements. ROA.3440. The court confirmed that Plaintiffs have standing and rejected Defendant's arguments for sovereign immunity, the government speech doctrine, and the commercial speech exception. ROA.3424–3429. The court further rejected Defendant's "attempted characterization" of HB 900 as a "consumer demand," rather than a bookselling regulation, and found that HB 900 imposes unconstitutional conditions by requiring Plaintiffs to surrender their First Amendment rights in order to do business with Texas schools. ROA.3428–3429.

As the court explained, the Rating Requirements (1) unconstitutionally compel speech by forcing booksellers to assign ratings to books—even when they would prefer not to—and by requiring them to adopt the TEA's ratings as their own;

(2) are void for vagueness because they fail to give vendors of ordinary intelligence a reasonable opportunity to know what is required; and (3) constitute an unconstitutional prior restraint because they prohibit protected speech without adequate procedural safeguards. ROA.3430–3435. The court thus permanently enjoined Defendant and all those acting in concert with him from enforcing the Rating Requirements. ROA.3440.

## SUMMARY OF THE ARGUMENT

The District Court properly enjoined HB 900's Rating Requirements as violating the First Amendment in at least three independent ways: they compel speech, are void for vagueness, and constitute an unconstitutional prior restraint.

HB 900 compels speech by requiring booksellers to issue subjective, controversial book ratings based on government-defined criteria and adopt the government's "corrected" ratings as their own—or be barred from selling books to Texas schools. HB 900 is void for vagueness because it requires booksellers to navigate a 16-step process riddled with novel, undefined, and subjective terms without any articulable guidance. HB 900 is an unconstitutional prior restraint because it prevents the distribution of constitutionally protected books to Texas schools—including books with serious literary, artistic, political, or scientific value—without procedural safeguards.

14

Defendant fails to squarely confront these serious defects on appeal, effectively conceding that HB 900 is unconstitutional in multiple ways. Instead, Defendant rests his entire case on a novel "marketplace participant" theory. That theory, of course, was forfeited when resisting a preliminary injunction and then barely mentioned at summary judgment. And for good reason: Defendant himself describes HB 900 as "*regulat[ing]* the purchase of books" (Br. 4) (emphasis added), and the Legislature itself understood the law as "*regulat[ing]* . . . library materials sold to or included in public school libraries." ROA.52 (emphasis added). HB 900, in short, is a *regulation*, which immediately disqualifies any "marketplace-participant" excuse. Yet Defendant, unable to defend HB 900 on any conventional ground, now elevates this last-ditch theory as the centerpiece of his appeal with his other arguments already rejected.

Defendant's belated shift in strategy underscores the weakness of his position. First, it is pure fiction that HB 900 establishes a "marketplace" for the State to buy books. The statute's plain language confirms that school districts, not the State, purchase library materials, and school districts possess independent authority under Texas law—which is why the Legislature deemed it necessary to *regulate* this in the first place. Second, every facet of HB 900 carries the hallmarks of regulation, not market participation. The State is not merely deciding what to purchase for itself. It dictates what *separate entities* may buy; it demands what private actors must do; it

imposes a comprehensive regulatory scheme for classifying books (by private actors); it empowers TEA to override those private determinations; and it requires private actors to adopt the State's views as their own. That is pure regulation of speech, and Defendant cannot sidestep the First Amendment with mere semantics. *Chiles*, 146 S. Ct. at 1021–23 (First Amendment rights "cannot be renamed away or their protections nullified by 'mere labels'"). Third, Defendant has no plausible foothold for his position in any recognized precedent. He relies on inapposite cases involving labor projects and the dormant Commerce Clause, not the First Amendment, and he cannot cite any example (historical or otherwise) remotely authorizing this direct regulatory intrusion on free speech.

Even if the marketplace-participant theory somehow applied, HB 900 would still fail by attaching unconstitutional conditions on booksellers' fundamental First Amendment rights. The law requires booksellers to surrender their free speech rights as a condition of selling any books to Texas schools. This violates the bedrock principle that the government may not deny a person benefits on a basis that infringes constitutionally protected interests. Defendant's subsidy cases are likewise irrelevant: HB 900 is not a subsidy; it leverages the opportunity to sell books (even those all agree are appropriate) to regulate private speech outside any legitimate government program.

16

Other legal issues need not be revisited because it is law of the case that Plaintiffs have standing; their claims are ripe; sovereign immunity does not apply; the government speech, government operations, and commercial speech doctrines do not apply; Plaintiffs have demonstrated irreparable injury; and the balance of equities and public interest favor injunctive relief. Neither the facts nor the law have changed since the initial panel decision; indeed, the summary-judgment record confirmed this Court's findings.

Finally, Defendant's challenge to the injunction's scope fails. The injunction is appropriately tailored to provide complete relief to Plaintiffs—including their thousands of organizational members—and targets only the Rating Requirements, not the entirety of HB 900.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment *de novo*, the permanent injunction for abuse of discretion, and the legal issues underlying the grant of an injunction *de novo*. *McNutt v. U.S. Dep't of Justice*, No. 24-10760, 2026 WL 971617, at *3 (5th Cir. Apr. 10, 2026).

## ARGUMENT

**I.**     **The State has effectively conceded that HB 900 is unconstitutional in at least three ways.**

Defendant does not squarely address the District Court's key holdings that the Rating Requirements are unconstitutional as compelled speech, void for vagueness,

and an impermissible prior restraint. Any challenges to those holdings are thereby forfeited. *Sanders v. Unum Life Ins. Co. of Am.*, 553 F.3d 922, 926 (5th Cir. 2008). Although Defendant now rests his case on the "marketplace participant" theory, he offers no meaningful response to these otherwise-recognized constitutional infirmities.

> ### A. The District Court correctly held that HB 900 violates the First Amendment because it compels speech.

It is well established that the government cannot compel speech when the speaker chooses to remain silent, nor can it compel a speaker to adopt the government's speech as its own. *See, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023); *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 791 (1988) (the government "may not substitute its judgment as to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if directed by the government").[5] As this Court and the District Court correctly held, the Rating Requirements flagrantly flout both fundamental First Amendment tenets by compelling Plaintiffs to (1) issue controversial content-based ratings[6] against their

---

[5] *See also Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) ("A speaker has the autonomy to choose the content of his own message."); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.").

[6] The ratings are "pure speech" that "communicate ideas"—among other things, whether a book contains content that is "sexually explicit" or "sexually relevant"—

will and (2) acquiesce to the government's preferred messages in violation of their sincerely held beliefs. *Book People*, 91 F.4th at 338–40; ROA.3430–3432 (HB 900 compels Plaintiffs' speech in both ways "clearly forbidden" in *303 Creative*).

*303 Creative* is illustrative. There, Colorado sought to "force an individual to speak in ways that align with [the State's] views but defy her conscience about a matter of major significance." Likewise, HB 900 seeks to force Plaintiffs to issue ratings according to the State's views that violate their beliefs about the controversial topic of sexual content in books. And like Colorado's regulation in *303 Creative*, HB 900 "does not seek to impose an incidental burden on speech"; rather, it allows the State to "coopt" Plaintiffs' voices "for its own purposes" and requires Plaintiffs to "utter what is not in [their] mind[s]."[7] *303 Creative*, 600 U.S. at 592, 596.

1.    **HB 900 requires private booksellers, against their will, to issue subjective, controversial book ratings based on government criteria.**

In order to sell *any* books to Texas schools, HB 900 first requires all booksellers, such as Plaintiffs, to review all books previously sold to Texas schools

_____

and thus receive the utmost protection under the First Amendment. *303 Creative*, 600 U.S. at 587; *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."); *Book People*, 91 F.4th at 338 (HB 900 "requires vendors to undertake a fact-intensive process of weighing and balancing factors to rate library material," which is "highly discretionary").

[7] Defendant does not directly address the compelled-speech findings of the Fifth Circuit and District Court (or the binding cases on which those decisions are based), thereby effectively conceding HB 900 compels speech. *Sanders*, 553 F.3d at 926.

that remain in "active use" and are not "directly related to the curriculum" and then rate those books as "sexually relevant," "sexually explicit," or no rating, all using content-based criteria with which they disagree.[8] §§ 33.021(a), 35.001(1), 35.001(3), 35.002(a).

To complete this burdensome task, booksellers are compelled to follow 16 onerous and confusing steps, App. A (ROA.964–965), which includes determining what books to review, applying unclear definitions of newly created terms (*e.g.*, "sexually relevant," "sexually explicit"), and ascribing a rating for each book after performing a "contextual analysis" and weighing and balancing three factors. Plaintiffs have consistently testified they do not wish to express their views on the content of books and do not want to be associated with HB 900's ratings mandate. ROA.1147 ¶¶ 20–22; ROA.1453–54 ¶¶ 17–22; ROA.1460 ¶¶ 14–15; ROA.1461 ¶ 20; ROA.1468 ¶ 16; ROA.1474 ¶ 9; ROA.1475 ¶ 15; ROA.1479 ¶ 6. They have also repeatedly expressed they do not know how to apply the ratings because the ratings are confusing and unclear. *See, e.g.*, ROA.1467–1468 ¶ 13; ROA.1469–1470 ¶ 19. Finally, Plaintiffs have explained that attempting to comply with the Rating

---

[8] *See* ROA.1004 (BookPeople Depo. 149:2–150:12); ROA.1065 (Blue Willow Depo. 38:20–39:8); ROA.1146–47 (ABA Depo. 21:4–22:9); ROA.1150 (ABA Depo. 37:3–13); ROA.1193–94 (AAP Depo. 49:16–50:12); ROA.1230–31 (Authors Guild Depo. 72:1–73:14, 74:5–75:7); ROA.1277–78 (CBLDF Depo. 59:14–63:14); ROA.1361 (TEA Depo. 60:20–25); ROA.1362 (TEA Depo. 62:2–9).

Requirements would cost them millions of dollars and cause them to go out of business. ROA.941, ROA.3295–3296.

### 2. HB 900 requires private booksellers to publicly adopt the government's speech as their own against their will.

Even if they attempt to rate the books initially, HB 900 requires all booksellers, such as Plaintiffs, to adopt the government's ratings *as their own* if TEA determines that any rating is "incorrect." § 35.003; ROA.1350 (TEA Depo. 15:10–20); ROA.1371 (TEA Depo. 98:8–19). If a bookseller refuses to accept the government's rating as its own, the bookseller will be placed on a public blacklist (§ 35.003(c)), and Texas schools are prohibited from purchasing *any* books from that bookseller. § 35.003(d). Plaintiffs have consistently testified that they do not want to be coerced into expressing the State's rating as their own. ROA.1154 (ABA Depo. 51:12–52:1); ROA.1232 (Authors Guild Depo. 81:15–24); ROA.1447 ¶ 21; ROA.1460 ¶ 14; ROA.1468 ¶ 16.

Defendant's new suggestion that vendors could use an "asterisk" or "parenthetical" to indicate ratings corrected by the TEA (Br. 35) is both atextual and speculative. HB 900 itself certainly permits no such proviso, and any such allowance (not yet officially adopted or endorsed) is incompatible with HB 900's express mandate, which requires booksellers to submit ratings *as their own*, without any disclaimer. ROA.1520 (TEA will post the booksellers' ratings on its website with

the booksellers' names); ROA.1563–64 (the ratings would be posted publicly under the booksellers' name); ROA.1385 (TEA Depo. 153:8–22).

But even if it were possible to include a disclaimer with the corrected ratings, Defendant's argument still fails because requiring booksellers to *repeat* the government's speech is still *compelled* speech. *303 Creative*, 600 U.S. at 586 ("[T]he government may not compel a person to speak its own preferred messages."). It makes no difference if HB 900 "merely requires the vendors to repeat the government's ratings." Br. 12. The First Amendment protects both how and when to speak, including what to say and not to say. *Chiles*, 146 S. Ct. at 1021 ("[T]he First Amendment protects the inalienable right of every individual to decide for himself 'how best to speak.'"). The fact that TEA chooses the words for Plaintiffs to mouth is no less violative of core First Amendment precepts.

Nor, for that matter, does Defendant acknowledge the extensive threshold requirements booksellers must meet *before* TEA gets involved, such as determining what books to rate, reading thousands of books to issue initial ratings, recalling books that are deemed "sexually explicit" (with no guidance), submitting the ratings to TEA, and waiting to see if TEA disagrees with the booksellers' assessment. Only after betraying their conscience multiple times through onerous tasks do booksellers face the daunting question whether to adopt the State's preferred ratings or forfeit the right to sell books to Texas schools.

### 3. Booksellers' ratings will be posted publicly in a conspicuous place on the internet and attributed to them.

TEA must post the booksellers' initial ratings and the "corrected" ratings "in a conspicuous place" on TEA's website, attributed to the vendor for everyone to see. § 35.002(e). Defendant belatedly and incorrectly suggests that the ratings, possibly at least, might not be attributed to booksellers or posted on TEA's public website. Br. 34–38. This is fanciful: it is contrary to this Court's prior conclusion, incompatible with HB 900's plain text, and at odds with the State's own prior admissions.

This Court has already found that "although the ratings will be posted on TEA's website, the public will be able to see how each vendor rated material and will attribute the ratings to the vendor—not TEA." *Book People*, 91 F.4th at 337. So, too, will the corrected ratings be "put on TEA's website and attributed to the vendor." *Id*. at 338. This understanding followed directly from HB 900's text: TEA "shall post each list submitted under Subsection (c) or (d) in a *conspicuous* place on [TEA's] Internet website as soon as practicable." § 35.002(e) (emphasis added); *Book People*, 91 F.4th at 337. It is also consistent with the law's recognition that parents are the "primary decision makers regarding a student's access to library material" (§ 33.021(d)(2)(D)), which would be undermined if the ratings were not available to parents. To that end, TEA recently issued guidelines for SB 13 emphasizing "the need to keep parents informed as to the materials that are available

for their students" and asking the public, including students, parents, and community members, to identify how library materials violate the Library Standards, both of which can only be fulfilled if the information is public.[9]

Moreover, a "conspicuous place" is defined as "a location that is reasonably likely to be seen." Black's Law Dictionary (12th ed. 2024). This Court and others have understood "conspicuous" to mean visible to the public, not only accessible to a select few. *See United States v. Strakoff*, 719 F.2d 1307, 1309 (5th Cir. 1983) (law that a notice shall be posted "in a conspicuous place" on federal property required posting of the notice near the front of the courthouse where it could be seen by the public).[10] The word "conspicuous" appears more than 200 times in Texas statutes[11] and the term "conspicuous place" appears more than 60 times in Texas statutes,[12] often in the context of posting requirements and safety notifications to the public.

---

[9] *See* Guidance Document for Senate Bill (SB) 13 Library Materials Policy, TEXAS EDUCATION AGENCY, https://tea.texas.gov/texas-schools/school-boards/sb13-guidance.pdf ("TEA SB 13 Guidance").

[10] *See also Suzio v. Semple*, No. CV165006812S, 2016 WL 6884235, at *5 (Conn. Super. Ct. Oct. 19, 2016) (a statute stating that information must be posted "in a conspicuous place" on a web site requires "the public to have easy and clear access to the information"); *Notorantonio v. Voccola*, No. C.A. 86-0234, 1988 WL 1017211, at *2 (R.I. Super. May 11, 1988) (a statute stating that a license must be posted "in a conspicuous position" means that the license is "plainly visible" to the public).

[11] *See* Texas Constitution and Statutes Home page, https://statutes.capitol.texas.gov/?tab=3&code=ZZ&text=conspicuous.

[12] *See* Texas Constitution and Statutes Home page, https://statutes.capitol.texas.gov/?tab=3&code=ZZ&text=%2522conspicuous%2520place%2522.

During hearings before the District Court, the State repeatedly stated that TEA would both attribute the ratings to booksellers and publicly post the ratings on TEA's website. ROA.1520 (admitting that TEA will post the booksellers' ratings on its website with the booksellers' names); ROA.1563–64 (explaining that the ratings would be posted publicly under the booksellers' name because otherwise "[t]here would be no other way for the school district[s] to know who they can purchase from"). Under oath, TEA's corporate representative testified that the ratings would be attributed to the booksellers. ROA.1385 (TEA Depo. 153:8–22). The representative also testified that HB 900 requires TEA to post the ratings "in a conspicuous place on" TEA's website and that "conspicuous" means "readily apparent" and "prominently displayed." ROA.1393 (TEA Depo. 187:4–24).

Defendant cannot now backtrack from these prior admissions to conveniently support a new argument. Nor can he wish away TEA's prior commitment to "maximiz[e] transparency with parents and community members" about books in public school libraries.[13] In any event, the State has never committed to keeping the ratings private. Defendant's casual speculation is too little and too late, even if he could somehow square his makeshift policy revision with the statutory mandate that the ratings be posted "in a conspicuous place."

---

[13] *See* TEA SB 13 Guidance, supra n.9.

**B.     The District Court correctly held that HB 900 is void for vagueness.**

HB 900 is impermissibly vague because it fails to provide booksellers with a "reasonable opportunity to know what is prohibited" and fails to provide "explicit standards" to avoid "arbitrary and discriminatory applications." ROA.3432; *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008); *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) (courts apply a more stringent vagueness test when, as here, a law "interferes with the right of free speech").

HB 900 requires Plaintiffs to navigate a 16-step process riddled with novel, undefined, vague terms and unworkable instructions for every book. App. A (ROA.964–965). The Rating Requirements are "so vague" that Plaintiffs "must necessarily guess at [their] meaning," ensuring arbitrary and inconsistent applications. *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001). Plaintiffs testified extensively about the difficulties of performing each step of the analysis.

- **Step 1 (identifying all prior sales)**: Charley Rejsek testified that BookPeople "does not have complete records detailing all products sold to Texas public schools during its 54 years in business, so it cannot identify all books previously sold to Texas public schools, as HB 900 requires." ROA.1445 ¶ 10. Valerie Koehler testified that Blue Willow "has no complete record of books sold to Texas public schools since 1996." ROA.1451 ¶ 7.

- **Step 2 (determining what books are "directly related to the curriculum")**: Matthew Stratton testified that "[i]t is unclear to AAP and its members what it means for books to be 'directly related' to the required curriculum."

26

ROA.1467 ¶ 13a. Valerie Koehler testified that there is "no realistic way of ascertaining the curriculum for each school, grade level, and classroom" in Texas schools. ROA.1453 ¶ 19.

- **Step 3 (determining what books are in "active use")**: Matthew Stratton testified that "[i]t is unclear to AAP and its members what 'active use' means." ROA.1467 ¶ 13b. Valerie Koehler testified that "Blue Willow has no way of knowing which books are in 'active use.'" ROA.1452 ¶ 9.

- **Step 4–7 (determining whether a book is "sexually relevant")**: Mary Rasenberger testified that it is "effectively impossible" for the Authors Guild and its members to determine how to rate a book. ROA.1474 ¶ 12. David Grogan testified that it would be difficult for booksellers to determine whether a book is "sexually relevant" because the law is "confusing and unworkable" and contains "undefined and subjective" standards. ROA.1459 ¶ 8–12.

- **Steps 8–10 (determining whether a book is "sexually explicit")**: Matthew Stratton testified that the term "sexually explicit materials" is "utterly confusing" and that trying to figure out community standards is "an impossible task." ROA.1193–94 (AAP Dep. 49:16–50:12).

- **Steps 11–16 (conducting a "contextual analysis")**: Matthew Stratton testified that the term "sexually explicit" is "unclear and confusing" because "the contextual analysis does not adjust for differences in ages or communities and does not provide for consideration of the work as a whole" and that "the balancing test is entirely subjective and cannot be applied with any consistency." ROA.1467–1468 ¶ 13(e), (g).

TEA's own representative could not explain—and TEA has yet to clarify—

how booksellers should determine several key factors:

- Whether a book is "directly related to the curriculum." ROA.1372 (TEA Depo at 101:14–21).
- Whether a book is in "active use." ROA.1372 (TEA Depo at 101:10–13).
- Which community standards should apply. ROA.1384 (TEA Depo at 150:25–152:25).
- What constitutes a "lewd exhibition." ROA.1380 (TEA Depo at 133:15–23).

27

- Whether a book is "sexually relevant." ROA.1380 (TEA Depo at 133:24–134:3).
- How to conduct the "contextual analysis." ROA.1380 (TEA Depo at 136:1–17).
- What occurs if there are conflicting ratings. ROA.1399 (TEA Depo. 209:22–210:5).

When deposed, the TEA representative admitted the ratings are ultimately subjective, many terms are undefined, and it was unclear the extent of the burden imposed on booksellers. ROA.1391–92 (TEA Depo at 178:14–18, 183:21–184:7); ROA.1394 (TEA Depo at 190:21–191:12). The TEA representative could not even rate her own favorite book because "several" aspects of the Rating Requirements "need to be clarified." ROA.1398–99 (TEA Depo. 208:9–210:21). Serious questions remain about the "correct" way to rate books under HB 900. Canyon Independent School District, for example, once *removed copies of the Bible* from school libraries on account of HB 900, only to reverse course after receiving clarification from HB 900's sponsor.[14] In short, neither TEA (the agency tasked with overseeing the ratings) nor school districts apparently understand HB 900's language or its requirements; it is inconceivable that private booksellers—lacking comparable

---

[14] *See* Cameron Abrams, *Canyon ISD Removes the Bible From School Libraries, Citing Law Targeting 'Sexually Explicit' Material*, THE TEXAN, December 19, 2024, https://thetexan.news/issues/education/canyon-isd-removes-the-bible-from-school-libraries-citing-law-targeting-sexually-explicit-material/article_9aa20254-be1c-11ef-b5dd-7faeb6c9d2e6.html.

institutional knowledge, staff, and resources[15]—can somehow be expected to comply with the law.

In response to HB 900's obvious vagueness, Defendant insists the government may apply a "subjective selection process" in determining what to fund and purchase. Br. 26. Yet HB 900 requires *booksellers* (not the government) to make those subjective determinations and rate books in the first place. Unlike a grant program where the government applies subjective criteria, HB 900 forces *booksellers* to apply vague standards, and *booksellers* face an industry prohibition if TEA disagrees with their interpretations.

Nor can Defendant retreat to three inapposite cases—*National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), *Machete Productions, L.L.C. v. Page*, 809 F.3d 281 (5th Cir. 2015), and *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86 (4th Cir. 2026). Those cases involved congressional appropriations and government grants—not a comprehensive regulatory scheme controlling private speech. More specifically: *Machete* dealt with a Texas film incentive program; *Finley* dealt with considerations for grant applications; and *Trump* dealt with executive orders regarding "equity-related" federal grants and contracts. HB 900 is not a grant program; booksellers are not government

---

[15] TEA has asked and received from the Texas Legislature $2 million to review books. ROA.2583–2584; ROA.1353 (TEA Depo. 25:17–23); ROA.1373–1374 (TEA Depo. 107:15–109:1).

employees; and the government is not providing any funds for booksellers to make these ratings. ROA.1377 (TEA Depo. 122:6–9). The speech here is outside the scope of a government program. None of the cases involve laws that directly regulate speech or prohibit sales of constitutionally protected material. And none involve anything resembling the imprecise and unknowable criteria applied here.

**C.**     **The District Court correctly held that HB 900 is an unconstitutional prior restraint.**

HB 900 is an unconstitutional prior restraint because it (1) prevents the distribution of constitutionally protected material (2) without procedural safeguards. ROA.3435; *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (Rhode Island law establishing a commission to review and rate books as "objectionable for sale, distribution or display to youths under 18 years of age" was an unconstitutional "system of prior administrative restraints"); *see also Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

The law demands that booksellers identify all books ever sold to Texas schools, even decades ago (if that is even possible), and rate each of them for the mere opportunity to sell *any* books to Texas schools. Like the Rhode Island law in *Bantam Books*, the Rating Requirements suppress the future distribution of constitutionally protected books by preventing booksellers from selling books that are deemed "sexually explicit," even where books otherwise contain serious literary, artistic, political, or scientific value. §§ 33.021(a), 35.002, 35.003(d); ROA.1371

(TEA Depo. 98:8–19); *Chiu v. Plano ISD*, 339 F.3d 273, 280 (5th Cir. 2003) (the "prohibition of distributing literature is a classic form of a prior restraint"). Given the lack of protection for valuable works, there is a real risk that many classic books, such as *Catch-22*, *Slaughterhouse Five*, and *Ulysses*,[16] will be removed from Texas schools.

The Rating Requirements also lack due-process safeguards, such as independent judicial determination of whether a book is "sexually explicit." *Se. Promotions*, 420 U.S. at 559 ("The settled rule is that a system of prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system."); ROA.1363 (TEA Depo. 67:10–18) (testifying that HB 900 does not include an appeal); ROA.1591 (admitting the lack of an appeal); ROA.1447 ¶ 21; ROA.1453–54 ¶ 20.

Defendant has not shown that distributing books "poses either a clear and present danger or a serious and imminent threat to a protected competing interest," nor that HB 900 is "narrowly tailored and provides the least restrictive means to achieve the Government's goal." *In re Goode*, 821 F.3d 553, 559 (5th Cir. 2016). It is a classic, and unjustified, prior restraint.

---

[16] These books have previously been pulled from shelves before courts intervened. *See Minarcini v. Strongsville City School Dist.*, 541 F.2d 577 (6th Cir. 1976) (*Catch-22*); *Todd v. Rochester Community Schools*, 200 N.W.2d 90 (Mich. App. 1972) (*Slaughterhouse Five*); *United States v. One Book Called Ulysses*, 5 F. Supp. 182 (S.D.N.Y. 1933) (*Ulysses*).

Defendant's reliance on *Little v. Llano County*, 138 F.4th 834, 836 (5th Cir. 2025), is misplaced. *Llano County* was not a prior-restraint case—it addressed only whether individuals can invoke a right to receive information from the government in the form of taxpayer-funded books, holding narrowly that individuals "cannot invoke a right to receive information to challenge a library's removal of books." *Id*. The specific problem here is not the removal of books; it is the speech-based restraint on the right to sell and distribute protected material[17]—a right *Llano County* neither addressed nor disturbed. ROA.3434–3435 (the Rating Requirements "prevent speech from occurring in the first instance by prohibiting the distribution of books"). Plaintiffs are not demanding the right to *compel* public schools to purchase their books; they are simply demanding the right not to be barred from distributing books for failing to engage in government-directed speech.

**D.      The Rating Requirements are facially unconstitutional because they have no constitutional applications.**

Defendant's complaint about the facial nature of Plaintiffs' challenge is meritless. Br. 14–15. The Rating Requirements—not the entirety of HB 900—are facially invalid because they have no constitutional applications.

---

[17] *Smith v. People of the State of California*, 361 U.S. 147, 150 (1959) (the First Amendment protects the "free publication and dissemination of books and other forms of the printed word"); *Book People*, 91 F.4th at 329 n.49 (citing cases recognizing the right to distribute books).

To succeed on a facial challenge in a First Amendment case, courts have "lowered" the "very high bar" and "substituted a less demanding" standard to provide "breathing room for free expression." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Under *Moody*, a facial analysis requires a two-step process: courts must (1) assess the scope of the law and (2) decide which of the law's applications violate the First Amendment as measured against the rest. A law is facially invalid when its "unconstitutional applications substantially outweigh its constitutional ones." *Id*. at 724. The Rating Requirements flunk those standards.

The Rating Requirements categorically fail across the board. HB 900 requires *all* booksellers to submit ratings (compelled speech) and adopt the government's ratings against their will (more compelled speech)—on penalty of being banned *from selling books* (direct speech violation). Each application raises First Amendment concerns, and each violates the First Amendment. Unlike in *Moody*, there is no meaningful application in which the Rating Requirements may constitutionally exist.

This Court and the District Court each found the Rating Requirements to be facially unconstitutional. Br. 14; *Book People*, 91 F.4th at 330–31 (addressing HB 900's "facial[]" application). Defendant admits the District Court engaged in a facial analysis, focusing on the law itself and "not any particular characteristics of

33

Plaintiffs." Br. 14. There is no obvious subset of applications where the Rating Requirements might survive.

## II. Defendant's new "marketplace participant" argument fails in every conceivable way.

After previously forfeiting the argument,[18] Defendant now insists as his "primary" theory that HB 900 merely "concerns the State as a marketplace participant, not as a regulator." Br. 7. This is meritless.

Defendant's position is based on the false premise that HB 900 merely guides the State's own participation in a free marketplace. This fails on every level. HB 900's plain language confirms its core function: it *regulates* the ability of private parties to sell books, and it conditions their private rights on their willingness to engage in state-compelled speech. It restricts the ability of Texas schools (which act independently under Texas law) to purchase books, thus distorting the marketplace based on the State's direct regulation of private speech. The State does not itself purchase anything; it acts only as a regulator, not a participant, and it conditions market transactions on impermissible speech-related grounds.

There is no precedent, anywhere, supporting Defendant's effort to recast an obvious regulatory regime as mere marketplace conduct. The First Amendment

---

[18] *Book People*, 91 F.4th at 336 n.103.

cannot be evaded so easily, and Defendant should have left this argument where it began—on the cutting-room floor.

### A.     HB 900 does not establish a marketplace for the State to buy books.

The State's belated "marketplace participant" argument fails from the jump because HB 900 does not establish a marketplace for the State to buy books. The plain language of HB 900 confirms that school districts—not the State—are tasked with buying books under HB 900. Its text repeatedly refers to sales of library materials to "a school district or open-enrollment charter school," *not* the State. *See* § 35.002(a) ("A library material vendor may not sell library materials to a school district or open-enrollment charter school unless the vendor has issued appropriate ratings . . . ."), § 35.002(c), (d) (library material is "sold by the vendor to a school district or open-enrollment charter school"); § 35.003(d) ("A school district or open-enrollment charter school may not purchase library material from a library material vendor on the list described by Subsection (c)."). The State confirmed at a hearing that booksellers' ratings must be posted publicly on the TEA's website "so the school districts know if they can purchase from those vendors." ROA.1563–64.

Under Texas law, school districts are independent entities with their own decision-making authority. The Education Code reserves certain powers for local school districts. School-district trustees, for example, "have the exclusive power and duty to govern and oversee the management of the public schools of the district."

§ 11.151(b). TEA "may not substitute its judgment for the lawful exercise of those powers and duties by the trustees." *Id.* Moreover, school districts "have the primary responsibility for implementing the state's system of public education and ensuring student performance in accordance with this code." § 11.002.

With respect to the authority to purchase books, no statute provides the State power to buy books for schools. Instead, school districts and individual schools—not the State—buy books for school libraries. Under 13 Tex. Admin. Code § 4.2(a), each Texas public-school-district board or governing body must approve and institute a collection-development policy that describes the processes and standards by which a school library acquires, maintains, and withdraws materials. Defendant even admits that "Texas schools purchase books through authorized vendors, using requests for proposal (RFP) and requests for quote (RFQ)." ROA.1684.

The record clearly demonstrates that the State does not purchase books. A representative of Blue Willow testified that RFPs come from school districts and RFQs come from school districts, librarians, or teachers—not from the State. ROA.1059. The Blue Willow representative also testified that booksellers do not sell books to TEA. ROA.1102.

Despite countless opportunities, the State has never assumed responsibility for purchasing library materials. In 2025, the Texas Legislature reaffirmed where this responsibility lies by passing SB 13, which delegates the ability to select, review,

and approve library materials to Texas public schools. Both the text of SB 13 and the accompanying TEA guidance[19] make clear that the Texas Legislature deliberately vested school districts—not the State—with meaningful autonomy over library-material procurement. SB 13, codified in part at Texas Education Code § 33.026(a), charges "the board of trustees of a school district" with adopting a policy for the acquisition of library materials and requires that the board itself "approve all library materials that have been donated to or that are to be procured by a school library in the district" in an open meeting. Even the school library advisory council (SLAC), a local body designed to provide recommendations on proposed library materials and policies related to library acquisitions, is composed of members appointed by and answerable to the local board of trustees—not to any state agency.[20] TEA explained that "[t]he legal responsibility for approving the procurement and acquisition of all library materials is vested in the [school] board."[21] SB 13 confirms the Legislature's intent that school districts exercise independent judgment over the composition of their library collections. In short, school districts—not TEA—purchase books. The State cannot be a "marketplace participant" if it does not even participate in the market.

---

[19] *See* TEA SB 13 Guidance, supra n.9.
[20] *Id.*
[21] *Id.*

**B.     The State acts as a regulator, not a "marketplace participant," under HB 900.**

There can be no doubt what HB 900 is about—captions are constitutionally required under Texas law, and HB 900's caption describes the bill as "relating to the **regulation** of library materials sold to or included in public school libraries." ROA.52. Thus, the Legislature itself confirmed TEA acts as a regulator, not a purchaser. As the District Court explained, HB 900 is a "bookselling regulation that compels speech." ROA.3430. If the State intended to create conditions for the State to purchase books for public-school libraries, HB 900 "failed to accomplish that." ROA.3430.

Defendant's "marketplace participant" theory cannot be squared with his own admissions and the plain language of HB 900. In prior briefing before this Court, Defendant repeatedly referred to HB 900 as a "civil regulation" (Dkt. 71 at 40) and a "regulatory scheme" (Dkt. 71 at 15–16), and touted the State's ability to retain power to "prescribe [such] regulations" (Dkt. 164 at 11). The first sentence of the Statement of the Case describes HB 900 as a law that "**regulates** the purchase of books by Texas public schools." Br. 4 (emphasis added).

As for HB 900's text, beyond the law's caption describing it as a "regulation of library materials," it is called the "**Restricting** Explicit and Adult-Designated Educational Resources (READER) Act." ROA.52 (emphasis added). Indeed, the law is aimed at "restricting" (i.e., regulating) educational resources, not the marketplace.

The title of Chapter 35, which contains the definitions pertinent to HB 900, is "**Regulation** of Certain Library Material." ROA.54 (emphasis added). Indeed, HB 900 requires booksellers to identify and rate books that have *already been sold* and are currently being used – this is not an action a purchaser could compel.

At bottom, the State cannot maintain it can "regulate the purchase of books" while simultaneously denying it acts as a "regulator." *Chiles*, 146 S. Ct. at 1023–24 (rejecting efforts by the government to "recast" a law as something other than a speech regulation). In the limited circumstances in which the "marketplace participant" argument does apply, the government makes its own purchasing decisions. That is not what is happening here. Rather, the State is *regulating* the autonomous purchasing decisions of independent school districts by dictating which booksellers they may and may not buy from based on a bookseller's speech.

C.     **The cases relied on by the State are inapposite and do not apply in the First Amendment context.**

Defendant cites no direct authority—and Plaintiffs have found none—establishing that the "marketplace participant" theory allows Defendant to escape First Amendment scrutiny. When, as here, the State acts as a regulator, the First Amendment applies in full force. *Chiles*, 146 S. Ct. at 1021–23 (laws that regulate speech are subject to strict scrutiny; First Amendment rights "cannot be renamed away or their protections nullified by 'mere labels'").

Defendant's marketplace-participant cases are narrow and arise in the labor and dormant Commerce Clause contexts, which are fundamentally distinct from the First Amendment and compelled speech. The cases involve governments making ordinary purchasing decisions—selecting contractors or preferring in-state businesses. They have nothing to do with HB 900, which goes far beyond ordinary purchasing decisions by requiring vendors to express a viewpoint—classifying materials as sexually explicit or sexually relevant based on vague and subjective criteria—and compelling those private vendors to adopt and report the government's classifications (even where they disagree).

In the labor context, *Building & Construction Trades Council of Metropolitan District v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218 (1993), involved a state entity's decision to require a pre-hire agreement with a specific contractor—a far cry from compelling all book vendors statewide to rate all products they have ever sold according to government-defined speech categories.

In the dormant Commerce Clause context, *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976), and *White v. Mass. Council of Construction Employers, Inc.*,

460 U.S. 204 (1983), involved preferences for in-state businesses in purchasing decisions—not compelled speech regimes.[22]

Defendant himself acknowledges the critical limitation—"neither doctrine allows the government to regulate under the guise of market participation." Br. 18. That concession is fatal: as a "regulation of library materials sold to or included in public school libraries" (ROA.52), that is precisely what HB 900 does. It creates a comprehensive regulatory scheme that governs how books are classified, empowers a state agency to override private determinations, mandates public posting, and prohibits schools from buying from noncompliant vendors. These features are characteristic of a regulatory framework, not the actions of a market participant.

**III.** **Even if the State acted as a valid marketplace participant, HB 900 should be enjoined because it imposes unconstitutional conditions.**

Even if the "marketplace participant" argument were somehow relevant, it could not save HB 900, which attaches unconstitutional conditions on booksellers' ability to sell quintessential speech-related materials. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

---

[22] Defendant's reliance on *Oakes Farms Food & Distribution Services, LLC v. Adkins*, 154 F.4th 1338 (11th Cir. 2025), is unavailing because it is not binding and involves a terminated contract, alleged retaliation, and the government's interest in food safety—topics entirely unrelated to the issues here.

**A.** **HB 900 imposes unconstitutional conditions by requiring booksellers to adopt the government's message in order to have the opportunity to sell books to Texas schools.**

In addition to infringing traditional First Amendment rights, the Rating Requirements impose unconstitutional conditions on Plaintiffs' ability to contract with the government. ROA.3431 (HB 900 "*can* and *does* violate the First Amendment in several ways."). HB 900 violates the cornerstone principle that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry*, 408 U.S. at 597.

HB 900 punishes booksellers by requiring them to act against their constitutional interests if they wish to sell *any* books to Texas schools. Plaintiffs lose their ability to engage in protected conduct if they follow their conscience and refuse to make content-based assessments and issue controversial ratings about what books are suitable for Texas students. Make no mistake: Plaintiffs may only receive the benefit of selling books to Texas schools if they cave to the government's mandates and review and rate *all* books (even those previously sold) according to the government's own criteria. § 35.002(a); ROA.1349 (TEA Depo. 11:6–10); ROA.1363 (TEA Depo. 65:10–15); ROA.1371 (TEA Depo. 98:8–19). But even if Plaintiffs acquiesce to compelled speech at the outset, the government may nonetheless *still* withhold benefits if TEA "corrects" a rating and the bookseller

refuses to adopt the government's ratings. § 35.003(d); ROA.1371 (TEA Depo. 98:8–19). This is not a single instance of compelled speech; it is a systematic framework of repeated constitutional infringement.

**Repetitive Instances of Compelled Speech Violations**



| **Requirement** | **Basis** |
| --- | --- |
| Rate **all** books previously sold<br><br>Tex. Educ. Code § 35.002(a) | To be able to be an authorized vendor/qualify to sell |
| Submit list of ratings for books sold*<br><br>Tex. Educ. Code § 35.002(c) | To have books considered for purchase |
| Re-rate per TEA rating*<br><br>Tex. Educ. Code § 35.003(b) | To continue eligibility and avoid permanent black balling |
| Correct rating and adopt TEA's rating<br><br>Tex. Educ. Code § 35.003 | To be removed from banned list |
| Each year: Rate **all** books sold during previous year*<br><br>Tex. Educ. Code § 35.002(d) | To continue eligibility |

\* Posted on TEA's website as booksellers' ratings

TEA admits vendors have no ability to seek independent review of TEA's determinations. ROA.1363 (TEA Depo. 67:10-18).

As shown above, HB 900 requires vendors to surrender their First Amendment rights—again and again—in order to do any business with Texas public schools. These are quintessential unconstitutional conditions. ROA.3431 (HB 900 "denies Plaintiffs the benefit of selling books to public schools on a basis that infringes their First Amendment rights—an unconstitutional condition"); *see, e.g.*, *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996) (the government may not deny a benefit on a basis that infringes one's constitutionally protected freedom of speech, even if there is no entitlement to that benefit); *Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp. 3d 717, 755 (W.D. Tex. 2019), *vacated after law amended sub nom. Amawi v. Paxton*, 956 F.3d 816 (5th Cir. 2020) (enjoining law that compelled contractors to certify that they do not boycott Israel as a condition of public employment).

To be sure, Plaintiffs do not challenge the government's spending power, and they do not ask the government to enact or restore any appropriations, fund any government program, or promote any private speech. HB 900 prohibits booksellers from selling *any* books, including constitutionally protected works with significant public value. The cases cited by Defendant involving government funding and subsidies are fundamentally distinct. *Regan v. Taxation With Representation of Washington*, for example, involved a challenge to Congress's decision not to subsidize lobbying by certain organizations. 461 U.S. 540, 545 (1983). *Rust v.*

44

*Sullivan* involved a challenge to government regulations that prohibited certain uses of federal funding under Title X of the Public Health Service Act. 500 U.S. 173, 178 (1991). *F.C.C. v. League of Women Voters of California* involved a challenge to a federal law that prohibited public broadcasting stations that received federal funds from "editorializing." 468 U.S. 364, 381 (1984).[23]

Unlike those cases, this is not a situation in which the government is simply subsidizing an activity and limiting the scope of that subsidy. Just the opposite—HB 900 provides no subsidies to vendors. ROA.1377 (TEA Depo. 122:6–9). The only government funding allocated in response to HB 900 was given by the Legislature *to TEA* to help TEA facilitate the Rating Requirements and cover costs estimated at $2 million to re-rate books in the first year. ROA.2572–81; ROA.2583–84; ROA.1527; ROA.1353 (TEA Depo. 25:17–23); ROA.1373–74 (TEA Depo. 107:15–109:1) (TEA admits receiving the money but not doing any ratings). HB 900 implements an onerous and unconstitutional regulatory scheme as a condition of booksellers doing business with Texas schools.

HB 900 squarely falls on the unconstitutional side of the line drawn by the U.S. Supreme Court in *Alliance for Open Society* between "conditions that define

---

[23] In *League of Women Voters*, the Supreme Court struck down the law because, like HB 900, it was "specifically directed at a form of speech . . . that lies at the heart of First Amendment protection." 468 U.S. at 381. There, the law was aimed at the expression of editorial opinion; here, HB 900 targets the distribution of books.

the limits of the government spending program" and "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). Here, TEA is not even a purchaser, and yet HB 900 seeks to leverage the benefits of selling books to Texas schools to regulate private speech, forcing booksellers to shelve their First Amendment rights for the opportunity to continue to sell books to Texas schools.

In response to a law allowing the removal of books from school libraries based on complaints that books were "pornographic," "harmful to minors," or "described sexual conduct," a federal court recently rejected an argument like Defendant's. *Penguin Random House LLC v. Gibson*, 796 F. Supp. 3d 1052, 1071–72 (M.D. Fla. 2025). In *Gibson*, Florida argued that the law did not violate the First Amendment because it merely withdrew a benefit facilitating the exercise of a constitutional right and the government "is not required to assist others in funding the expression of particular ideas." *Id*. at 1071. The court, relying on *Alliance for Open Society*, rejected that argument, explaining that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Id*. The court found that the challenged provisions, like the Rating Requirements, restrict speech, not funding, and that the subsidy cases relied on by Florida did not apply. *Id*. at 1072.

**B.** **The ratings are controversial and subjective opinions,** *not* **objective facts.**

The State mischaracterizes HB 900 by comparing it to ordinary commercial interactions subject to a comprehensive regulatory scheme. HB 900 is not that: it forces undesired speech on booksellers, and it governs how books are classified through highly subjective content-based categories.

HB 900 bears no resemblance to a private consumer asking questions about a product before (or after) a purchase. *Contra* Br. 20. A private consumer has no authority to compel a private party to identify products previously sold, make content-based assessments of products (already sold and to be sold), or coerce private parties to adopt their views. Nor is it the equivalent of a state agency asking questions of a job applicant during an interview. Br. 3. HB 900 does not merely ask booksellers questions or seek factual and uncontroversial information; it foists sensitive views upon them that are inconsistent with their beliefs.

The law uses the leverage of the government to demand that booksellers "undertake contextual analyses, weighing and balancing many factors to determine a rating for each book" that are "neither factual nor uncontroversial." *Book People*, 91 F.4th at 340. The law also empowers the State to override a bookseller's determinations and publicly post the ratings on the internet as the bookseller's own ratings. *Id.* at 337–338. And the law places unconstitutional conditions on booksellers by requiring them to defy their sincere beliefs in order to sell any books

47

to Texas schools. These are hallmarks of regulation, not ordinary consumer behavior. *See* 2 Smolla & Nimmer on Freedom of Speech § 19:7 ("The touchstone of the regulator/participant dichotomy is whether the government is merely behaving with the powers of a private actor or whether it is exercising functions only within the capacity of authority of the government.").

Defendant tries to minimize HB 900's impact, arguing that the only consequence of not complying with HB 900 is "public schools will not purchase from" non-compliant booksellers and booksellers are otherwise "free to take their business elsewhere." Br. 10, 29. This ignores the law's constitutional, economic, and reputational harm. And it is "no defense" that books can still be published and sold elsewhere. ROA.760. Simply put: "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 880 (1997).

**IV.** **This Court correctly established as law of the case that Plaintiffs have standing, that their claims are ripe, and that sovereign immunity, government speech, government operations, and commercial speech doctrines do not apply.**

The State concedes this Court has already resolved legal issues in Plaintiffs' favor, such as sovereign immunity, and those rulings establish law of the case. Br. 10 (citing *Royal Ins. Co. of Am.*, 3 F.3d at 881). Under that settled doctrine, "an issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *St. Paul Mercury Ins.*

*Co. v. Williamson*, 332 F.3d 304, 309 (5th Cir. 2003). The doctrine applies not only to issues decided explicitly, but also to everything decided "by necessary implication." *In re Felt*, 255 F.3d 220, 225 (5th Cir. 2001). There are three limited exceptions: "(1) The evidence at a subsequent trial is substantially different; (2) there has been an intervening change of law by a controlling authority; and (3) the earlier decision is clearly erroneous and would work a manifest injustice." *United States v. Wills*, 40 F.4th 330, 334 (5th Cir. 2022). To be "clearly erroneous," a decision must be more than possibly wrong—it must be "dead wrong." *Gonzalez Hernandez v. Garland*, No. 22-60110, 2023 WL 5995499, at *3 (5th Cir. Sept. 15, 2023). None of these limited exceptions apply.

In addition to sovereign immunity, the Fifth Circuit has established as law of the case that Plaintiffs have standing;[24] the claims are ripe;[25] and the government speech,[26] government operations,[27] and the commercial speech[28] doctrines do not

---

[24] "Plaintiffs' claims are traceable to the Commissioner and redressable by an injunction against him." *Book People*, 91 F.4th at 333. "Plaintiffs have standing." *Id*.

[25] "Plaintiffs' claims are fit for our review. No other factual or legal developments are required for us to decide this case." *Id*. "Plaintiffs' claims are ripe." *Id*. at 334.

[26] "[T]he government-speech doctrine does not apply. The ratings are the vendor's speech, not the government's." *Id*. at 338.

[27] The "government operations" exception does not apply. *Id*. at 339.

[28] The commercial speech doctrine does not apply because the ratings "are neither factual nor uncontroversial. The statute requires vendors to undertake contextual analyses, weighing and balancing many factors to determine a rating for each book." *Id.* at 340.

apply. Neither the material facts nor the applicable law have changed since the panel decision. If anything, the summary-judgment record further confirms this Court's findings at the preliminary-injunction stage. This Court's decision was not wrong, much less "dead wrong." Under these circumstances, this Court must follow these findings as law of the case. *St. Paul*, 332 F.3d at 309 (courts are "shackled by the law of the case doctrine" to follow what has been previously determined).

Despite these mandates and acknowledging the doctrine for sovereign immunity, Defendant attempts a second bite at the apple by questioning this Court's decisions on standing and government speech. There is no basis for Defendant's desired selective application of the law of the case doctrine, and regardless, each of the renewed arguments fail on their own.

Defendant makes scattershot allegations about standing (Br. 32, 35, 37, 38), but this Court previously explained in detail why Plaintiffs have standing to challenge HB 900. *Book People*, 91 F.4th at 328–33. Defendant does not articulate a clear theory why this Court's prior ruling should be ignored. *United States v. 162.20 Acres of Land, More or Less, Situated in Clay Cnty., State of Miss.*, 733 F.2d 377, 379 (5th Cir. 1984) (the Fifth Circuit has a "firm rule that one panel cannot disregard the precedent set by a prior panel even though it perceives error in the precedent"). Further, Defendant's new suggestion that TEA might not attribute its own speech to Plaintiffs (Br. 32–33)—spun from the same imaginary cloth as the

new claims of disclaimers and intranet websites—is belied by the statutory text, record evidence, and prior representations by Defendant's counsel making clear that the ratings will be "conspicuously displayed" on the TEA's internet website and attributed to booksellers. § 35.002(e); *Book People*, 91 F.4th at 337; ROA.1563–64; ROA.1385 (TEA Depo. 153:8–22).

Despite law of the case and the U.S. Supreme Court's mandate to "exercise great caution before extending [their] government-speech precedents" (*Matal v. Tam*, 582 U.S. 218, 235 (2017)), Defendant tries now for the *fourth* time to advance a government-speech argument. But this time he *only* argues that TEA's corrected ratings are government speech, conceding that the initial ratings are not government speech. Br. 31.

As explained above, he is wrong. The plain language of HB 900 requires booksellers to adopt the ratings of the government if TEA disagrees. Defendant even concedes that HB 900 "requires vendors to repeat the government's ratings back to it" as the vendor's own speech. Br. 12. Moreover, this Court and the District Court have repeatedly rejected the government-speech argument under the factors identified in *Shurtleff v. City of Boston, Massachusetts* (which Defendant fails to address), which consider (1) the history of the expression at issue; (2) the public's likely perception as to who is speaking, and (3) the extent to which the government has actively shaped or controlled the expression. 596 U.S. 243, 252 (2022). Given

the lack of history of book ratings, the public's likely perception of the ratings as the booksellers' speech (as conspicuously displayed), and the booksellers' (required) predominant role in creating the expression, the book ratings are not government speech under the *Shurtleff* factors. *Book People*, 91 F.4th at 338 ("The ratings are the vendor's speech, not the government's."). Defendant's argument also flouts the Supreme Court's stark warning about expansion of the government-speech doctrine because the "government-speech doctrine . . . is 'susceptible to dangerous misuse.'" *Matal*, 582 U.S. at 235. Here, no evidence has changed, no law has changed, and nothing about the prior three rulings were clearly erroneous to cause this Court to ignore the law of the case on this issue.

## V.  **The District Court correctly issued a permanent injunction that is properly tailored to provide complete relief.**

A permanent injunction is warranted because the Rating Requirements are unconstitutional, Plaintiffs would suffer irreparable constitutional, economic, and reputational injuries absent an injunction, and the balance of equities and public interest favor enjoining an unconstitutional law. ROA.762–766; ROA.3436–40; *Book People*, 91 F.4th at 340–41.[29]

Defendant insists, for the first time, that the District Court erred by granting a so-called "universal" injunction, believing instead that relief should have been

---

[29] Defendant fails to address irreparable injury, balance of equities, and public interest, thereby waiving those issues. *Sanders*, 553 F.3d at 926.

tailored to the specific parties before the Court. Br. 38–39 (alleging that the injunction is "broader than necessary to provide complete relief to each plaintiff with standing to sue") (citing *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025)). Defendant is wrong.

Because Defendant makes this argument for the first time in this appeal, he has forfeited the argument. *Sindhi v. Raina*, 905 F.3d 327, 333 (5th Cir. 2018). But even if this Court considers Defendant's belated argument, it should be rejected because the permanent injunction narrowly applies to specific unconstitutional provisions. The District Court considered whether to enjoin all of HB 900, including provisions of the law involving library collection policies, definitions and terms, and provisions concerning liability, parental consent, and reporting obligations (§§ 33.021(a), 33.021(d)(2)(A)(ii), 35.004–008). ROA.776–777, 781. But the Court ultimately only enjoined the Rating Requirements (§§ 35.001, 35.002, 35.0021, and 35.003)—*not* the entirety of HB 900. ROA.767, 3440–3441.

Moreover, the permanent injunction is appropriately tailored to provide complete relief by enjoining all enforcement of the Rating Requirements. ROA.3440–41. The injunction must be broad enough to protect the interests of Plaintiffs, who are independent bookstores and four organizations, and their members subject to the Rating Requirements. ABA represents approximately 2,100 members and more than 100 members in Texas (including bookstores and others);

AAP represents approximately 110 members, many of which distribute books to Texas schools (ranging from major commercial book publishers to small, non-profit presses); Authors Guild represents more than 15,000 writers of all genres, more than 500 of which are in Texas; and CBLDF represents many members, including those in Texas, subject to the Rating Requirements. ROA.1457–58; ROA.1464–65; ROA.1472–73; ROA.1478–79.

The injunction must also protect other booksellers subject to the Rating Requirements who would have standing for the same reasons as Plaintiffs. *CASA*, 606 U.S. at 852 n.12 (acknowledging that courts will need to craft relief that benefits more than the named plaintiffs to ensure that relief is complete). An injunction limited to the named Plaintiffs could expose new members and other booksellers to an unconstitutional law and unduly burden them (and the courts) to obtain a separate injunction. Thus, the District Court correctly crafted an injunction protecting all those subject to the Rating Requirements, while leaving intact provisions of the law dealing with other issues.

Further, this case is fundamentally distinct from *Trump v. CASA*, which involved a challenge to an Executive Order and whether federal courts have authority to issue universal injunctions under the Judiciary Act of 1789. *CASA*, 606 U.S. at 839. By contrast, this case involves a state law and statewide injunction narrowly tailored to only address a portion of the law passed. *See Welty v. Dunaway*,

791 F. Supp. 3d 818, 843 (M.D. Tenn. 2025) (*CASA* does not limit the availability of statewide injunctions; finding that plaintiffs are entitled to a permanent injunction enjoining the enforcement of a Tennessee statute). *CASA* also recognized the validity of equitable relief under *Ex parte Young*—the precise relief Plaintiffs seek here—based on "a long line of cases authorizing suits against state officials in certain circumstances." *CASA*, 606 U.S. at 847 n.9. Finally, *CASA* does not involve the First Amendment, which has different considerations. *Welty*, 791 F. Supp. 3d at 843 ("The court sees no reason to disregard the Supreme Court's prior First Amendment jurisprudence because of *CASA*.").

*          *          *

The District Court correctly held that HB 900's Rating Requirements are unconstitutional for at least three reasons. Those holdings—none of which the State has meaningfully challenged on appeal—each independently support the permanent injunction. Defendant's belated "marketplace participant" theory—forfeited at the preliminary injunction stage, barely raised at summary judgment, and now elevated to the centerpiece argument only after every other theory failed—cannot save the Rating Requirements. The State is not a marketplace participant under HB 900; the law operates as a top-down regulatory scheme, not a consumer choice. It not only regulates what booksellers must do to sell books but who Texas school districts (the purchasers) can buy books from. Further, HB 900 contains a litany of

55

unconstitutional constraints that require booksellers to perform subjective, controversial content assessments of books; publicly label those books using government-defined categories (with which they disagree); and adopt the government's "corrected" ratings as their own. The injunction is necessary to prevent irreparable harm to Plaintiffs and the booksellers they represent.

## CONCLUSION

The Court should affirm the Order granting Plaintiffs' Motion for Summary Judgment and issuing a permanent injunction.

Dated: May 13, 2026

Respectfully submitted,

*/s/ Laura Lee Prather*
Laura Lee Prather
laura.prather@haynesboone.com
Catherine L. Robb
catherine.robb@haynesboone.com
Michael J. Lambert
michael.lambert@haynesboone.com
William Reid Pillifant
reid.pillifant@haynesboone.com

**HAYNES AND BOONE, LLP**
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
Telephone: (512) 867-8400

Daniel L. Geyser
daniel.geyser@haynesboone.com

**HAYNES AND BOONE, LLP**
2801 N. Harwood Street, Suite 2300
Dallas, Texas 75201
Telephone: (303) 382-6219

**ATTORNEYS FOR PLAINTIFFS-APPELLEES**

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2026, I electronically transmitted the attached document to the Clerk of the Court of the 5th Circuit Court of Appeals using the ECF System of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Laura Lee Prather*
Laura Lee Prather
Attorney for Plaintiffs-Appellees

## ECF CERTIFICATION

I hereby certify that (i) required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (ii) the electronic submission is an exact copy of the paper document pursuant to 5th Cir. R. 25.2.1; (iii) the document has been scanned for viruses using the most recent version of Windows Defender and is free of viruses; and (iv) the paper document will be maintained for three years after the mandate or order closing the case issues, pursuant to 5th Cir. R. 25.2.9.

Dated: May 13, 2026

*/s/ Laura Lee Prather*
Laura Lee Prather
Attorney for Plaintiffs-Appellees

# CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that:

1.      This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains  12,996   words, excluding the parts of the response exempted by Fed. R. App. P. 32(f), and 5th Cir. R. 32.2.

2.      This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: May 13, 2026

/s/ Laura Lee Prather
Laura Lee Prather
Attorney for Plaintiffs-Appellees

**APPENDIX**

| App. | Description | Record Cite |
|------|-------------|-------------|
| A | Chart showing 16 steps required to comply with the Rating Requirements | ROA.964–65 |

**Appendix A**

| LIBRARY MATERIAL | |
|---|---|
| 1. | Vendors must rate "…**any communication**, language, or material, including a written description, illustration, photographic image, video image, or audio file…" |
| **CURRICULUM** | |
| 2. | "…other than library material **directly related to the curriculum** required under Section 28.002(a)…," and |
| **ACTIVE USE** | |
| 3. | "…in **active use** by the district or school." (neither defined) |
| **SEXUALLY RELEVANT** | |
| 4. | "'**Sexually relevant material**' means [library material]… that describes, depicts, or portrays sexual conduct, as defined by Section 43.25, Penal Code." |
| 5. | "**Sexual conduct**" means sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola. (43.25 Penal Code) |
| 6. | "**Sexual contact**" means any touching of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person." (43.01 Penal Code) |
| 7. | "**Lewd exhibition**" is not defined in the Penal Code. |
| **SEXUALLY EXPLICIT** | |
| 8. | "'[**S**]**exually explicit material**' means any [library material] …that describes, depicts, or portrays sexual conduct, as defined by Section 43.25, Penal Code, in a way that is patently offensive, as defined by Section 43.21, Penal Code." |

25-50891.964

| 9. | "**Patently offensive**" means so offensive on its face as to affront current community standards of decency. (43.21(a)(4) Penal Code) |
|---|---|
| 10. | "**Current community standards of decency**" are not defined in the Penal Code. |
| | **CONTEXTUAL ANALYSIS** |
| 11. | "For purposes of determining whether a library material is sexually explicit as required by Section 35.002, a library material vendor must perform a **contextual analysis** of the material to determine whether the material describes, depicts, or portrays sexual conduct in a way that is patently offensive." |
| 12. | **Factor 1**: "…the explicitness or graphic nature of a description or depiction of sexual conduct contained in the material;…" |
| 13. | **Factor 2**: "…whether the material consists  predominantly of or contains multiple repetitions of depictions of sexual or excretory organs or activities; and …" |
| 14. | **Factor 3**: "…whether a reasonable person would find that the material intentionally panders to, titillates, or shocks the reader…" |
| 15. | "[A] vendor must **weigh and balance** each factor and conclude whether the library material is patently offensive, recognizing that because each instance of a description, depiction, or portrayal of sexual conduct contained in a material may present a unique mix of factors." |
| 16. | "[A] vendor must **consider the full context in which the description, depiction, or portrayal of sexual conduct appears**, to the extent possible, recognizing that contextual determinations are necessarily highly fact-specific and require the consideration of contextual characteristics that may exacerbate or mitigate the offensiveness of the material." |

25-50891.965