**No. 25-50891**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

BOOK PEOPLE, INCORPORATED; VBK, INCORPORATED, doing business as BLUE WILLOW BOOKSHOP; AMERICAN BOOKSELLERS ASSOCIATION; ASSOCIATION OF AMERICAN PUBLISHERS; AUTHORS GUILD, INCORPORATED; COMIC BOOK LEGAL DEFENSE FUND,

*Plaintiffs-Appellees,*

*v.*

MIKE MORATH, in his official capacity as the COMMISSIONER OF THE TEXAS EDUCATION AGENCY,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
Case No. 1:23-cv-00858-ADA

## BRIEF OF *AMICI CURIAE* FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION AND CATO INSTITUTE IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Joshua J. Bennett
BAKER HOSTETLER LLP
2850 N. Harwood, Ste. 1110
Dallas, TX 75206
(214) 210-1166
jjbennett@bakerlaw.com

JT Morris
*Counsel of Record*
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
jt.morris@fire.org

Counsel for *Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
| --- | --- |
| Foundation for Individual Rights and Expression (FIRE) | *Amicus curiae* |
| Cato Institute | *Amicus curiae* |
| JT Morris | Counsel to *amicus* FIRE |
| Joshua J. Bennett Baker Hostetler LLP | Counsel to *amicus* Cato Institute |

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici* certifies that (1) *amici* do not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amici*.

/s/ JT Morris

JT Morris
Counsel for *Amici Curiae*

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .............................................. i

TABLE OF AUTHORITIES .................................................................. iv

INTEREST OF *AMICI CURIAE* ...................................................... 1

SUMMARY OF ARGUMENT ............................................................. 2

ARGUMENT ...................................................................................... 5

I.　Facial Challenges Serve an Important Role in Vindicating First Amendment Rights, and a Facial Challenge Was Appropriate Here. ................................................................. 5

　　A.　Facial challenges are an indispensable tool in preserving free speech. ........................................... 6

　　B.　Plaintiffs properly asserted a facial challenge against READER. ...................................................... 8

II.　The First Amendment Limits Government Power to Exact Unconstitutional Conditions Even When the Government Is Acting as a "Consumer." ...................................................... 10

　　A.　By forcing booksellers to choose between their livelihood or speaking the government's message, READER imposes unconstitutional conditions. ................................. 13

　　B.　READER's disclosure requirement far exceeds First Amendment limits. ................................................. 17

III.　READER's Indeterminate Provisions Are Void for Vagueness Because They Fail to Provide Fair Notice and Permit the Government to Distort the Marketplace of Ideas Through Arbitrary Enforcement ............................................................. 20

　　A.　READER's regulation of "sexually explicit material" suffers from vagueness and violates due process. ........... 21

1.     READER fails to provide clear standards and fair notice because it fails to say what "community standards" govern. ....................................... 22

2.     READER defies the settled meaning of "patently offensive." ................................................................ 23

B.     READER provides no standards for discerning whether a book is "sexually relevant," rendering it unconstitutionally vague. .................................................. 26

C.     READER's vagueness arms the government with authority to manipulate the free exchange of ideas............. 31

CONCLUSION ................................................................................. 34

CERTIFICATE OF COMPLIANCE ....................................................... 35

CERTIFICATE OF SERVICE ............................................................. 36

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) .............................................................. 13, 15–17

*Americans for Prosperity Foundation v. Bonta*,
594 U.S. 595 (2021) ........................................................................ 7

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) ...................................................................... 27

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*,
518 U.S. 668 (1996) ...................................................................... 16

*Book People, Inc. v. Wong*,
23-50668 (5th Cir.) ....................................................................... 25

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024)....................................................... 9, 10, 13

*Book People, Inc. v. Wong*,
98 F.4th 657 (5th Cir. 2024)......................................................... 19

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ..................................................................... 6, 7

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) .................................................................. 33

*Citizens United v. FEC*,
558 U.S. 310 (2010) ........................................................................ 7

*Dombrowski v. Pfister*,
380 U.S. 479 (1965) ........................................................................ 8

*Edwards v. State*,
642 S.W.3d 7 (Tex. App.—Beaumont 2021, pet. ref'd) ........................ 27

*FCC v. Fox Television Stations*,
567 U.S. 239 (2012) .............................................................. 20, 24, 30

*Fulton v. City of Philadelphia,*
320 F. Supp. 3d 661 (E.D. Pa. 2018) ..................................................... 14

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ........................................................ 12, 14–16

*Garay v. State,*
954 S.W.2d 59 (Tex. App.—San Antonio 1997, pet. ref'd) ............. 26, 27

*Jenkins v. Georgia,*
418 U.S. 153 (1974) ...................................................................... 24

*Kinney v. Weaver,*
367 F.3d 337 (5th Cir. 2004) ...................................................... 16

*Kolender v. Lawson,*
461 U.S. 352 (1983) ...................................................................... 31

*LaRue v. State,*
611 S.W.2d 63 (Tex. Crim. App. 1980) ...................................... 22

*Mahanoy Area Sch. Dist. v. B. L.,*
594 U.S. 180 (2021) ...................................................................... 32

*Meyer v. Grant,*
486 U.S. 414 (1988) ...................................................................... 32

*Miller v. California,*
413 U.S. 15 (1973) ................................................................... 23, 27

*Minarcini v. Strongsville City Sch. Dist.,*
541 F.2d 577 (6th Cir. 1976) ......................................................... 3

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) ................................................................ 6, 8, 9

*Nat'l Ass'n. of Mfrs, Inc. v. SEC,*
800 F.3d 518 (D.C. Cir. 2015) ................................................ 18, 19

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
585 U.S. 755 (2018) ........................................................................ 7

*Nat'l Rifle Ass'n of Am. v. Vullo,*
  602 U.S. 175 (2024) ................................................................ 32

*Penny Saver Publ'ns, Inc. v. Village of Hazel Crest,*
  905 F.2d 150 (7th Cir. 1990) .................................................. 26

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ................................................................. 7

*Roark & Hardee LP v. City of Austin,*
  522 F.3d 533 (5th Cir. 2008) .................................................. 31

*Roth v. United States,*
  354 U.S. 476 (1957) ................................................................ 32

*Smith v. Goguen,*
  415 U.S. 566 (1974) ........................................................... 20, 23

*Speech First, Inc. v. Fenves,*
  979 F.3d 319 (5th Cir. 2020) .................................................. 10

*Thornhill v. Alabama,*
  310 U.S. 88 (1940) ................................................................... 6

*United States v. Arthur,*
  51 F.4th 560 (5th Cir. 2022)................................................... 27

*Virginia v. Am. Booksellers Ass'n,*
  484 U.S. 383 (1988) ................................................................. 8

*Woodlands Pride v. Paxton,*
  168 F.4th 293 (5th Cir. 2026)................................................... 7

*Zauderer v. Off. of Disciplinary Couns.,*
  471 U.S. 626 (1985) ................................................................ 17

**Statutes**

Tex. Educ. Code
  § 33.021 ........................................................................... passim
  § 33.021(a)......................................................................... 4, 28
  § 33.021(d)(2)(A)(ii).................................................................. 23

§ 35.001 ............................................................... 2, 21, 25
§ 35.001(2) .................................................................. 4
§ 35.001(3) ............................................................. 4, 26
§ 35.002(b) ............................................................... 21
§ 35.003 ........................................................... 3, 11, 28

Tex. Penal Code
§ 43.21 ........................................................... 21, 22, 25
§ 43.25 ................................................................. 26–29
§ 43.25(a)(2) ............................................................. 27

**Other Authorities**

Amy Adler,
   Inverting the First Amendment, 149 U. PA. L. REV. 921 (2001) ....... 27

Andrew Lapin,
   Not just 'Maus': A Missouri school district removed several
   Holocaust history books, too, Jewish Telegraphic Agency (Nov.
   16, 2022) ........................................................................ 33

Anne Lyon Haight & Chandler B. Grannis,
   Banned Books: 387 B.C. to 1978 A.D. 120–22 (1978) ......................... 31

Annie Gowen,
   Censorship battles' new frontier: Your public library, Wash. Post
   (Apr. 17, 2022) ............................................................. 33

Austin ISD Libraries, Online Catalog, "The hero with a thousand
   faces" .......................................................................... 29

Dru Stevenson,
   Monopsony Problems with Court-Appointed Counsel, 99 Iowa L.
   Rev. 2273 (2014) ............................................................. 12

House Research Ctr., Bill Analysis, Tex. H.B. 900, 88th Leg., R.S.
   (2023) .......................................................................... 21

Jennie Wang,
   The Future of Print Books and Bookstores, Mich. J. Econ. Blog
   (Apr. 1, 2021) ................................................................ 12

Joseph Campbell,
*The Hero with a Thousand Faces* (2020) ............................................. 30

Kendall Tietz,
Anne Frank novel banned in Florida school over 'sexually
explicit' content: 'Minimization of the Holocaust', Fox News
(Apr. 13, 2013) ................................................................................ 33

Larry McMurty,
*Lonesome Dove* (2010) ................................................................ 5, 25

Mirzokhidjon Abdurakhmonov *et al.*,
*Unpacking Firm External Dependence: How Government
Contract Dependence Affects Firm Investments and Market
Performance*, 64 Acad. of Mgmt. J. 327 (2021) ............................. 11, 12

Rep. Christin Bentley,
("Filthy Books Found in Schools") ..................................................... 25

Rep. Christin Bentley,
Protect Childhood, "Sexually Explicit, Pervasively Vulgar,
Educationally Unsuitable Booklist Oct 5 Update" .......................... 5, 25

Trading Economics, *United States Government Spending to GDP* ........ 11

Webster's Third New International Dictionary (2001)("consumer") ..... 14

Webster's Unabridged Third New International Dictionary (2002)
("anal eroticism") ....................................................................... 28, 29

## INTEREST OF *AMICI CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the individual rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights nationwide without regard to speakers' views—including in Texas—through public advocacy, targeted litigation, and *amicus curiae* filings in cases involving expressive rights. *See, e.g.*, *Fellowship of Christian University Students at the University of Texas at Dallas v. Eltife*, 806 F. Supp. 3d 662 (W.D. Tex. 2025); Brief of FIRE as *Amicus Curiae* in Support of Plaintiff-Appellee, *Rogers v. Smith*, No. 22-30352 (5th Cir. filed Jan. 27, 2023); Brief of FIRE as *Amicus Curiae* in Support of Petitioner, *First Choice Women's Resource Centers, Inc. v. Davenport* (U.S. filed Aug 28, 2025).

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of

---

[1] No counsel for a party authored this brief in whole or part. Further, no person, other than *amici*, their members, or their counsel contributed money intended to fund the preparation or submission of this brief. Plaintiffs-Appellees consent to this brief's filing. Defendants-Appellants do not oppose its filing, but have not consented to the same.

individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and produces the annual *Cato Supreme Court Review*.

## SUMMARY OF ARGUMENT

The Constitution demands that when states pass laws—especially laws targeting speech—they give Americans fair notice of what the law requires or prohibits, with clear standards to keep public officials from chilling protected expression and distorting the marketplace of ideas. The Constitution likewise prohibits states from coercing Americans into giving up their First Amendment rights as "the cost of doing business." But Texas's Restricting Explicit and Adult-Designated Educational Resources Act ("READER"), Tex. Educ. Code § 35.001 et seq., violates both those principles. Even more, READER's coercive conditions and vague, unbounded terms hand public officials a censorial tool to wield against publishers, libraries, and the First Amendment-protected content they provide to the public.

2

The State enacted READER to police and remove "obscene content" from public schools and their libraries (among other aims). But READER resolves no issues for which current Texas statutes do not already account. Instead, it forces private library vendors and public employees onto the frontlines of the culture war against the school library, that "mighty resource in the free marketplace of ideas." *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976). In doing so, READER imposes a daunting burden. *See* ROA.144–71. It demands that those private vendors and school employees scrutinize every conceivable piece of school "library material" in "active use" and rate it as "sexually relevant," "sexually explicit," or unclassified. Failing to rate even one book "correctly"—as Texas declares it—means significant penalties for booksellers, including being blacklisted and barred from future sales. *See* Tex. Educ. Code § 35.003.

Those requirements are tailor-made for facial invalidation. There is no way to carry out READER's suffocating and speech-chilling mandates without violating the First Amendment.

Texas's status as a "consumer" or "market participant" does not allow it to dodge the First Amendment. The unconstitutional conditions

3

doctrine precludes Texas from threatening to withhold the immense benefits of its market power until booksellers parrot the State's favored views.

Even if the State is a "market participant," that does not save READER's regulations from being void-for-vagueness. READER's limitless requirements impose an impossible choice on booksellers: over-categorize and self-censor, or risk material economic harm. For instance, READER regulates literary depictions of "sexually relevant material"— a limitless term if ever there was one—by pointing to "sexual conduct, as defined by Section 43.25, Penal Code." Tex. Educ. Code §§ 35.001(2)–(3) (incorporating *id.* § 33.021(a)). Because READER applies those concepts outside their usual context—"visual materials"—no ordinary person can tell what library materials READER ensnares.

READER's text leads to a speech-chilling conclusion: the vagueness is the point. READER's standardless terms grant its enforcers the power to arbitrarily censor ideas they find unworthy. Take how READER's proponents identified several books describing minority or LGBTQ characters engaging in sexual intercourse as examples of those that

should be deemed "sexually explicit."[2] Those same proponents didn't list *To Kill A Mockingbird*, with its sexually graphic false rape testimony, or the classic Texas epic, *Lonesome Dove*, with its vivid portrayals of sex.[3] *E.g.*, Larry McMurty, *Lonesome Dove* 750–51 (2010) (e-book). That is a road to viewpoint discrimination that the Constitution squarely forecloses.

READER is a flagrant assault on the First Amendment, and *amici* urge the Court to affirm the permanent injunction.

## ARGUMENT

### I.    Facial Challenges Serve an Important Role in Vindicating First Amendment Rights, and a Facial Challenge Was Appropriate Here.

READER is a textbook example of why First Amendment facial challenges exist. The law threatens core First Amendment freedoms; if allowed to take effect, it will irreparably harm booksellers across Texas. The district court properly enjoined READER because there is no way to implement its rating system without violating the First Amendment.

---

[2] *See, e.g.*, Rep. Christin Bentley, Protect Childhood, "Sexually Explicit, Pervasively Vulgar, Educationally Unsuitable Booklist Oct 5 Update," https://tinyurl.com/yck7k5sx (last visited May 20, 2026).

[3] *See id.*

**A.** **Facial challenges are an indispensable tool in preserving free speech.**

Facial First Amendment challenges are vital to ensuring that Americans remain free to speak their minds. The Supreme Court has long recognized facial challenges as vital to protecting First Amendment rights, because "the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). As the Supreme Court explained over 80 years ago in upholding a facial First Amendment challenge, the "mere existence" of a statute impacting speech "results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview." *Thornhill v. Alabama*, 310 U.S. 88, 97–98 (1940).

To prevent that result, the Supreme Court has repeatedly upheld facial First Amendment challenges. True, facial challenges are not easy. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).[4] But neither are they rare, as the Court's decisions show.

---

[4] *Moody*'s admonition that facial challenges are "hard to win" arose in the overbreadth context, where courts ask whether a law's unconstitutional applications are substantial relative to its plainly legitimate sweep. *Moody*, 603 U.S. at 723–24.

Take *Citizens United*, in which the Court held a federal ban on corporate independent expenditures violated the First Amendment on its face because the law suppressed political speech based on the speaker's corporate identity. *Citizens United v. FEC*, 558 U.S. 310, 365 (2010). Likewise, in *Reed v. Town of Gilbert*, the Court facially invalidated a content-based sign code. 576 U.S. 155, 173 (2015). In another decision, the Court invalidated compelled notices imposed on pro-life pregnancy centers. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766–78 (2018). And in *Americans for Prosperity Foundation v. Bonta*, the Court facially invalidated a donor-disclosure requirement because it burdened associational rights. 594 U.S. 595, 615–19 (2021). In short, facial challenges are frequently successful in the First Amendment context and vital to preventing broad chills on protected speech.

Those chills often occur well before the state enforces an unconstitutional statute, especially through the coercive choice such

---

That demanding standard reflects the Court's caution that overbreadth invalidation is "strong medicine" reserved for laws that substantially chill protected speech. *Broadrick*, 413 U.S. at 613. It does not displace ordinary First Amendment scrutiny, compelled-speech analysis, or vagueness doctrine. *See, e.g., Woodlands Pride v. Paxton*, 168 F.4th 293, 308 (5th Cir. 2026) ("First Amendment overbreadth and Fourteenth Amendment vagueness claims overlap conceptually but remain distinct claims.").

statutes impose: remain silent, speak the government's message, or risk serious consequences. Pre-enforcement facial challenges exist to prevent exactly that threat to our free society. *Dombrowski v. Pfister*, 380 U.S. 479, 486–87 (1965) ("Because of the sensitive nature of constitutionally protected expression," speakers need not "risk prosecution to test their rights."); *see also Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988) (allowing booksellers' pre-enforcement challenge where statute was "aimed directly at plaintiffs," who faced "significant and costly compliance measures or risk[ed] criminal prosecution," because self-censorship is "a harm that can be realized even without an actual prosecution"). Without pre-enforcement facial challenges, statutes targeting speech would threaten the "breathing room for free expression" the First Amendment demands. *Moody*, 603 U.S. at 723. And READER is a prime example of a facially unconstitutional threat to that crucial breathing room.

### B. Plaintiffs properly asserted a facial challenge against READER.

READER's statutory design makes it facially invalid. As this Court has already explained, READER uses "a rating system for all library materials, imposed on library-material vendors" that applies to *all* book

vendors who sell "library materials"—itself a sweeping term—to Texas public schools. *Book People, Inc. v. Wong*, 91 F.4th 318, 324 (5th Cir. 2024).

READER requires covered vendors to review books, assign State-prescribed sexual-content ratings, submit those ratings to the Texas Education Agency (TEA), and accept TEA's substituted ratings if the agency disagrees. The agency's enforcement authority also includes "posting the vendors' lists of ratings, reviewing those ratings to determine whether a corrected rating is required, notifying vendors when their ratings are overridden, and posting lists of noncompliant vendors on TEA's website." *Id.* at 335. Those duties compel vendors "'to submit ratings with which they disagree'" and "'constrain[] them from continuing to do business with school districts if they fail to submit the required ratings or decline to acquiesce in the State's revised ratings.'" *Id.*

Unlike *Moody*, this case does not require this Court to map a statute across "an ever-growing number of apps, services, functionalities, and methods for communication and connection." 603 U.S. at 725. READER's relevant operation is straightforward: The challenged provisions require a defined speaker group—booksellers—to speak through Texas's rating

9

system or lose access to the public-school market. That makes this case closer to *Speech First, Inc. v. Fenves*, where this Court permitted a pre-enforcement First Amendment challenge to a university speech code because the challenged university policies applied to a defined group of speakers—students—and predictably chilled protected expression. 979 F.3d 319, 330, 335–39 (5th Cir. 2020).

As in *Fenves*, Plaintiffs may facially challenge a regime that forces them to choose between self-censorship and government-imposed consequences *before* it is enforced. As this Court already held, selling books is "arguably affected with a First Amendment interest" and Plaintiffs have "an interest in selling books without being coerced to speak the State's preferred message—the ratings." *Book People*, 91 F.4th at 329–30. READER's uniform rating scheme facially violates the First Amendment because it intolerably chills protected expression whenever it applies.

## II. The First Amendment Limits Government Power to Exact Unconstitutional Conditions Even When the Government Is Acting as a "Consumer."

READER is Texas's unconstitutional attempt to exert its imposing market power to distort the marketplace of ideas. Under the statute's

terms, booksellers must deliver the State's message and highly subjective assessments about disfavored viewpoints or risk not only losing lucrative government contracts but disqualification from gaining them altogether—until the vendor conforms. *See* Tex. Educ. Code §§ 35.003(a)–(e). That coercive condition is something the First Amendment cannot abide.

If the government is a "consumer," Appellant's Br. 17, it wields an immense power no other consumer possesses.[5] Government spending at the federal, state, and local levels contributed more than 30% to the GDP in 2025.[6] For many businesses, governments are the ideal "consumer," as they offer certainty, stability, and predictability. To that end, "the unique benefits accrued through government contracting … ha[ve] led to the emergence of a population of firms whose existence is almost entirely dependent on winning and maintaining governmental contracts[.]"[7]

---

[5] *E.g.*, Mirzokhidjon Abdurakhmonov *et al.*, *Unpacking Firm External Dependence: How Government Contract Dependence Affects Firm Investments and Market Performance*, 64 Acad. of Mgmt. J. 327, 329–32 (2021) (collecting studies).

[6] *See* Trading Economics, *United States Government Spending to GDP*, https://tinyurl.com/h6c7xbjv (last visited May 19, 2026).

[7] *Unpacking Firm External Dependence*, 64 Acad. of Mgmt. J. at 329 & n.1.

But with those benefits comes a troubling risk: Governments as consumers may wield coercive powers that distort markets.[8] The marketplace of ideas is no less susceptible to this market-distorting power. Indeed, the government can wield its immense economic and regulatory power to seek and exact concessions from contracting parties, like compelling private actors to adopt or voice the government's preferred views under threat of economic loss. *See, e.g., Fulton v. City of Philadelphia*, 593 U.S. 522, 530–32 (2021) (Philadelphia's attempt at exacting concessions through government contracts for religious charity's services violated charity's free exercise rights).

Booksellers—quintessential participants in the marketplace of ideas—may be uniquely vulnerable to both the lure of lucrative government contracts and the State's coercive pressure to conform. The profit margin for booksellers is small; some estimate it at as low as 2%.[9] Volume sales are therefore of paramount importance. And few other consumers can offer booksellers the volumes and stability governments

---

[8] *E.g., Unpacking Firm External Dependence*, 64 Acad. of Mgmt. J. at 329–32; Dru Stevenson, *Monopsony Problems with Court-Appointed Counsel*, 99 Iowa L. Rev. 2273 (2014).

[9] Jennie Wang, *The Future of Print Books and Bookstores*, Mich. J. Econ. Blog (Apr. 1, 2021), https://tinyurl.com/5n7bfc48 (last visited May 19, 2026).

do. By deploying the State's considerable market power to strongarm booksellers into viewpoint-driven obedience, READER threatens free expression.

**A.    By forcing booksellers to choose between their livelihood or speaking the government's message, READER imposes unconstitutional conditions.**

The unconstitutional conditions doctrine exists to thwart the kinds of speech-chilling coercion laws like READER impose. Under that doctrine, the government violates the First Amendment when the price to obtain government benefits is conformity with the governments' preferred viewpoints or having to deliver the government's message, even if there is no right to the benefit itself. *E.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). As this Court already concluded, Texas's law compels booksellers to speak or adopt the State's views about whether the books and periodicals they sell are "sexually explicit" or "sexually relevant." *Book People*, 91 F.4th at 339. The First Amendment therefore prohibits Texas, even as a consumer or purchaser of books, from tying such contracts to conformity with its views. *Id.*; *Agency for Int'l Dev.*, 570 U.S. at 214.

13

Despite what Texas argues, Appellant's Br. 16–29, the State's role as a "consumer" or "market participant" in the market for books doesn't excuse it from First Amendment constraints.[10] *Fulton* illustrates why. There, the City of Philadelphia was a consumer of foster care services and paid private foster agencies to administer parts of the government's foster care system, like child placement. *See* 593 U.S. at 529; *see also Fulton*, 320 F. Supp. 3d 661, 670–71 (E.D. Pa. 2018) (summarizing a contract for foster services worth nearly $20 million), *rev'd and remanded sub nom.* 593 U.S. 522 (2021). For over 50 years, Philadelphia contracted with Catholic Social Services for foster care services. And CSS provided those services consistent with its religious belief that "marriage is a sacred bond between a man and a woman"—meaning CSS wouldn't certify for foster placement any unmarried or same-sex couples, "[b]ecause the agency understands the certification of prospective foster families to be an endorsement of their relationships[.]" 593 U.S. at 530.

When CSS's beliefs became unpopular with city officials, the city abruptly terminated CSS's contract, ceased consuming its services, and

---

[10] A "consumer" is merely "one that utilizes economic goods." Webster's Third New International Dictionary 490 (2001).

14

refused to consider resuming use unless CSS violated its conscience and endorsed same-sex couples for placement. *Id.* In a unanimous decision, the Supreme Court held the city's refusal "to contract with CSS for the provision of foster care services unless it agrees to certify same-sex couples as foster parents . . . violate[d] the First Amendment." *Id.* at 542. The city's status as consumer of foster care services was immaterial to the constitutional question.

Although *Fulton* was a free-exercise case, its reasoning extends to the free speech context. In fact, the Court's holding in *Fulton* linking the city's refusal to provide a benefit based on CSS's refusal to endorse same-sex couples for placement tracks the Court's holdings invalidating unconstitutional conditions that restricted protected speech. *E.g.*, *Agency for Int'l Dev.*, 570 U.S. at 218–19 (holding the federal government couldn't condition receipt of program funds on the recipient's support of the government's views opposing prostitution).

These precedents confirm that, despite what Texas argues, labeling its actions as those of a "consumer" is immaterial to the First Amendment. Courts apply the unconditional conditions doctrine against government "consumer" action under the First Amendment and without

15

attaching any special significance to that broad label. *Agency for International Development* is a good example.

There, Congress, like all "consumers," had a need: "to combat the spread of HIV/AIDS around the world." 570 U.S. at 208. So, like all consumers, Congress allocated funds to acquire the services of nongovernmental organizations and satisfy that need. *Id.* at 208–09. That exchange is classic consumer behavior, economically indistinguishable from a homeowner's acquisition of a landscaper's services to keep a lawn mowed or an individual's acquisition of legal services to pursue a claim in court. And as a "consumer," the government fills a wide variety of needs by paying for the services of independent contractors—all subject to First Amendment constraints. *See, e.g.*, *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 676 (1996) (upholding government contractor's First Amendment retaliation claim); *Kinney v. Weaver*, 367 F.3d 337, 369–74 (5th Cir. 2004) (holding law enforcement not entitled to qualified immunity on First Amendment retaliation claim after they boycotted police academy instructors' courses).

16

Yet Congress's status as "consumer" made no difference in the Court's analysis or decision in *Agency for International Development*— nor should it have. "Lest the First Amendment be reduced to a semantic exercise," 570 U.S. at 215 (cleaned up), labeling government a "consumer" shouldn't make—and hasn't made—any difference in how courts analyze its actions under the First Amendment. This Court should reject Texas's request to depart from this settled law.

### B.    READER's disclosure requirement far exceeds First Amendment limits.

Texas finds no more success pivoting from claiming "consumer" status to arguing READER does not compel speech or exact an unconstitutional condition on compelled speech, but merely requires "disclosure of information about goods." Appellant's Br. 16.    The government may constitutionally require disclosures about a product or service if they seek to avoid potentially misleading commercial speech and are limited to "purely factual and *uncontroversial information*" that is not unduly burdensome on the purveyor's speech. *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 651 (1985) (emphasis added). What READER requires, however, isn't "purely factual information." READER instead commands booksellers to make more than a dozen judgment

17

calls—all subject to the State's veto—that could hardly be described as "uncontroversial." *See* Appellee's Br. 6–10. To the contrary, the labels that READER requires booksellers to apply *to their own goods*—"sexually relevant" or "sexually explicit"—are controversial on their face.

The D.C. Circuit grappled with a similar issue in *National Ass'n of Manufacturers, Inc.  v. SEC*, 800 F.3d 518 (D.C. Cir. 2015) ("*NAM II*"),[11] in rejecting an argument like Texas's. Trade associations challenged on First Amendment grounds a federal enactment requiring firms to disclose and report to the SEC whether their products may have been sourced with "conflict minerals" in war-torn areas in Africa. *Id.* at 522. *NAM II* rejected the government's argument that the disclosure was constitutional because forcing firms to mark their products as "not conflict free" was highly controversial. *Id.* at 551. The government required firms to convey a moral responsibility for foreign wars, which risked communicating to consumers that each firm's products "are ethically tainted." *Id.* at 530 (cleaned up). And "[b]y compelling an issuer

---

[11] The original *NAM* decision, 748 F.3d 359 (D.C. Cir. 2014), was overruled in part *en banc* in *American Meat Institute v. USDA*, 760 F.3d 18, 22–23 (D.C. Cir. 2014), but reinstated in *NAM II* on largely the same grounds.

to confess blood on its hands, the statute interfere[d] with [the] exercise of the freedom of speech under the First Amendment." *Id.*

If "conflict free" or "not conflict free" were too controversial to pass muster under the First Amendment, READER has no chance. The State cannot lawfully compel booksellers to confess to having sold "sexually explicit material for public school libraries," *Book People, Inc. v. Wong*, 98 F.4th 657, 659 (5th Cir. 2024) (Ho, J. dissenting from denial of reh'rg en banc), especially since booksellers don't actually believe they did any such thing. While "[r]equiring a company to publicly condemn itself is undoubtedly a more 'effective' way for the government to stigmatize and shape behavior than for the government to have to convey its views itself, … that makes the requirement more constitutionally offensive, not less so." *NAM II,* 800 F.3d at 530 (cleaned up). Here, READER openly threatens to exert the State's market power on booksellers who refuse to publicly condemn themselves and their goods as Texas demands. READER is therefore even more constitutionally offensive.

19

## III. READER's Indeterminate Provisions Are Void for Vagueness Because They Fail to Provide Fair Notice and Permit the Government to Distort the Marketplace of Ideas Through Arbitrary Enforcement.

READER violates the Constitution's due process protections against vague laws because it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012) (cleaned up). READER's core provisions—"sexually explicit material" and "sexually relevant material"—are the root of its unconstitutional vagueness.

When speech is involved, like it is here, "rigorous adherence" to the void-for-vagueness doctrine is required "to ensure that ambiguity does not chill protected speech." *Id.* at 253–54. And that is the rule regardless of the state's role as "marketplace participant." *See* State's Br. 25. Here, the risk to speech is pronounced because READER's standardless language opens the door to arbitrary enforcement, empowering the State to bend the marketplace of ideas to its preferred views. *See Smith v. Goguen*, 415 U.S. 566, 575 (1974).

20

A. **READER's regulation of "sexually explicit material" suffers from vagueness and violates due process.**

"Sexually explicit material," as used in READER, fails to give fair notice of what READER requires. Ridding schools of perceived "sexually explicit material" is READER's impetus. *See* House Research Ctr., Bill Analysis, Tex. H.B. 900, 88th Leg., R.S. (2023). Not only must schools rid their campuses of materials Texas and its enforcing agents consider "sexually explicit," but vendors must publicly recall all such materials from all schools statewide. Tex. Educ. Code § 35.002(b).

READER borrows its meaning of "sexually explicit material" from Texas Education Code § 33.021, which covers "material … that describes, depicts, or portrays sexual conduct . . . in a way that is patently offensive, as defined by Section 43.21, Penal Code." Tex. Educ. Code §§ 33.021, 35.001. In turn, under Texas Penal Code § 43.21, "patently offensive" means material "so offensive on its face as to affront current community standards of decency." That definition of "patently offensive" renders READER unconstitutionally vague for two reasons. First, READER fails to clarify what "community standards" govern a vendor's categorizing decisions. Second, READER's text departs from how courts have defined

21

"patently offensive" in the First Amendment context over decades, conflicting with the public understanding of that term.

### 1. READER fails to provide clear standards and fair notice because it fails to say what "community standards" govern.

READER's failure to specify which "community standards" apply to "sexually explicit material" is fatal to its enforceability. In the context of trial courts, "current community standards" are defined in discrete cases and in discrete locales, under jury instructions shaped through admissible evidence. *See LaRue v. State*, 611 S.W.2d 63, 64 (Tex. Crim. App. 1980). On the one hand, those standards must be more limited than a "national community standard." *Id*. But they also must not be confined to a single Texas county. *Id*. Between those two poles, the issue rests in the trial court's discretion as applied to a discrete set of materials in a discrete place. *Id*.

That means READER lacks any way to provide fair notice to vendors of how "community standards" operates in the statute's scheme. Unlike materials that courts and juries scrutinize under Section 43.21, READER lacks instructions defining appropriate "community standards." Even the "contextual analysis" vendors must perform under

22

READER to determine whether material is "patently offensive"—and thus "sexually explicit"—lacks *any* mention of what "current community standards" vendors should consider when weighing all the factors that section requires. Tex. Educ. Code § 35.0021. So vendors, many of which sell statewide, are left to guess whether they must pull a book in Odessa but not Austin, or rate a book differently in Corpus Christi than they might in Dallas. In most cases, they will simply pull both, harming free expression.

Nor does READER provide school officials charged with keeping "sexually explicit material" out of their school libraries with guidance about what community standards limit their discretion. *See* Tex. Educ. Code § 33.021(d)(2)(A)(ii). Even worse, that lack of clear guidance enables officials to impose their own standards, offending due process and risking viewpoint-based enforcement. *See Goguen*, 415 U.S. at 575–76.

### 2. READER defies the settled meaning of "patently offensive."

The scope and meaning of the term "patently offensive," and what materials receive treatment as "patently offensive" without offending the First Amendment, has developed over a half-century's worth of jurisprudence, starting with *Miller v. California*, 413 U.S. 15, 24 (1973).

23

But READER's text and purpose—and the State's expressed views about the same—confirm that it does not employ the settled constitutional meaning of "patently offensive." That flaw only further renders READER's "sexually explicit" provision unconstitutionally vague, as it leaves everyone guessing as to the term's actual meaning. *See Fox Television Stations*, 567 U.S. at 253–55.

"Substantive constitutional limitations, deriving from the First Amendment," fix which types of materials the state may scrutinize as "patently offensive." *Jenkins v. Georgia*, 418 U.S. 153, 160–61 (1974). Thus, "current community standards" do not control what qualifies as "patently offensive" but merely inform it. *Id.* In all events, under the First Amendment, only the most "hardcore" pornographic materials may even be scrutinized as "patently offensive." *Id.* (reversing movie theatre operator's obscenity conviction for showing sex-driven film *Carnal Knowledge* because it did not qualify as "patently offensive").

Yet READER's vague text, its legislative history, and all that READER's proponents have said about its scope and application prove READER—and its enforcers—would declare materials well short of "hardcore" as "patently offensive." That result both defies the narrow

24

constitutional scope of the term and leaves parties subject to READER uncertain about what material it regulates.

Start with the text. READER doesn't incorporate the established public meaning of "patently offensive." Under READER, "patently offensive" means something else. *See* Tex. Educ. Code §§ 33.021, 35.001; Texas Penal Code § 43.21.

Likewise, Texas's view of "patently offensive" breaks from the term's well-settled public meaning. READER's sponsors and proponents point to many books they say READER was meant to eliminate from school as "sexually explicit" and thus "patently offensive," centering on books related to the LGBTQ community. *E.g., Book People, Inc. v. Wong*, 23-50668 (5th Cir.), ECF 93, Patterson *Amicus Curiae* Br. 3–9.[12] Meanwhile, works long regarded as classics (like *Lonesome Dove*) have largely escaped scrutiny,[13] despite describing, depicting, or portraying sexual conduct that meets or exceeds much of what is found in the

---

[12] For a more complete list, see Rep. Christin Bentley, Protect Childhood, "Sexually Explicit, Pervasively Vulgar, Educationally Unsuitable Booklist Oct 5 Update," https://tinyurl.com/yck7k5sx (last visited May 20, 2026).

[13] See, for example, where Representative Christin Bentley publicly declared that Lonesome Dove "is not sexually explicit." Christin Bentley ("Filthy Books Found in Schools"), https://tinyurl.com/3e66yaae (last visited May 20, 2026).

materials READER's proponents have scrutinized. Larry McMurty, *Lonesome Dove* 750–51 (2010) (e-book) (recounting vividly one cowboy's sexual encounter). These conflicts with the public meaning of "patently offensive" underscore why READER is unconstitutionally vague. *See Penny Saver Publ'ns, Inc. v. Village of Hazel Crest*, 905 F.2d 150, 155 (7th Cir. 1990).

**B.    READER provides no standards for discerning whether a book is "sexually relevant," rendering it unconstitutionally vague.**

READER's "sexually relevant material" standard is also unconstitutionally vague. Tex. Educ. Code § 35.001(3). That standard turns on "sexual conduct as defined by Texas Penal Code Section 43.25." *Id*. But as with "patently offensive," READER isn't using the settled public meaning of "sexual conduct" under Section 43.25. At the same time, it provides no guidance about how to apply that narrow term in READER's new and much broader context. Both flaws show why the term renders READER unlawfully vague.

To start, over Section 43.25's long existence, its established legal meaning has covered only *visual* depictions of real people engaged in real sexual activity. *See id*. § 43.25(b); *cf. Garay v. State*, 954 S.W.2d 59, 63

26

(Tex. App.—San Antonio 1997, pet. ref'd) (rejecting a vagueness challenge to "lewd exhibition"—a form of sexual conduct—because, by tying lewd exhibition to actual conduct, the public has sufficient notice). What's more, in the realm of laws like Section 43.25, real conduct by real people is a constitutional requirement. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 249–50 (2002).[14] Thus, the settled public meaning of "sexual conduct" makes it straightforward to resolve whether a film or photograph depicts "sexual conduct." In those instances, the conduct is self-evident on the face of the challenged material, and any fact disputes revolve around issues like scienter or inducement.[15] *E.g.*, *Edwards v. State*, 642 S.W.3d 7, 15–16 (Tex. App.—Beaumont 2021, pet. ref'd).

With this backdrop in mind, READER does not follow the established meaning of "sexual conduct." Rather, READER stretches

---

[14] That said, material that doesn't involve real sex acts between real people (or, in Section 43.25's context, real children) may still be criminalized consistent with the First Amendment if obscenity is proven under *Miller*. *E.g.*, *United States v. Arthur*, 51 F.4th 560, 570 (5th Cir. 2022).

[15] An exception is the meaning of "lewd exhibition of the genitals" under the sexual conduct definition. See, e.g., Tex. Penal Code § 43.25(a)(2). In any event, the scope and meaning of this form of visible "sexual conduct" has vexed jurists, suggesting it likewise presents vagueness problems, particularly in READER's broad context. *See generally* Amy Adler, Inverting the First Amendment, 149 U. PA. L. REV. 921, 947 (2001) (reviewing caselaw and noting "the increasingly hazy definition of 'lascivious' or 'lewd'").

27

"sexual conduct" to reach materials far beyond Section 43.25, including material that merely "describes, depicts, or portrays sexual conduct." Tex. Educ. Code § 33.021(a). And there is no exception for fictional material or anything else that does not include real conduct by real people. That dramatic shift of what "sexual conduct" means renders READER's regulation of "sexually relevant material" incapable of fair notice. *E.g.*, Tex. Educ. Code § 35.003.

Imagine the headache that awaits any vendor—on pain of losing substantial sales—trying to discern whether any non-visual work they sell "describes, depicts, or portrays" sexual conduct. READER provides no standard to discern how explicit a reference must be to qualify as "sexual conduct." Is a single mention of a single sexual act on a single page, no matter how benign or important to a literary or artistic purpose, a "description" of "sexual conduct" that makes a work "sexually relevant" and thus subject to READER's rigors? If so, the archetype of "library materials"—the dictionary—may qualify as "sexually relevant." Anyone who attended grade school knows students may peruse its pages for "descriptions" (definitions) of sex acts listed in Section 43.25. *E.g.*, Webster's Unabridged Third New International Dictionary 76 (2002)

28

("anal eroticism"). One would hope Texas doesn't want vendors refusing to sell dictionaries to public schools. But READER's text casts serious doubt—and leaves those vendors guessing under the threat of penalty.

Consider next renowned classics like Harper Lee's *To Kill a Mockingbird*, the plot of which revolves around false accusations of rape—a form of "sexual conduct" under Section 43.25. During the criminal trial at the heart of the novel's plot, the alleged victim's father testifies falsely to seeing the innocent defendant "yonder ruttin' on my Mayella!"; "ruttin'" (or "rutting") is a crude reference to animalistic sexual intercourse, and, in this context, rape. New Oxford American Dictionary 1992 (3d ed.). But does that one vivid statement—or that entire plotline—imbue *To Kill a Mockingbird* with "sexual conduct" and thus render it "sexually relevant" under READER?

Or take Joseph Campbell's *Hero with a Thousand Faces*, available (for now) at Texas high schools like Austin's McCallum High School.[16] Campbell's work leverages world mythology—which often "describes,

---

[16] Austin ISD Libraries, Online Catalog, "The hero with a thousand faces," available at https://tinyurl.com/72756s4d ("Joseph Campbell's classic cross-cultural study of the hero's journey has inspired millions and opened up new areas of research and exploration.") (last visited May 20, 2026).

29

depicts, or portrays" sex acts—to illustrate, among other things, how human beings share similar beliefs across time and culture. This includes Campbell's analysis of the Minotaur myth: that mythical half-man, half-bull conceived by King Minos's queen after she succumbed to "an ungovernable passion" for an enchanted white bull and had mythical Daedalus "frame for her a wooden cow that would deceive the bull—into which she eagerly entered; and the bull was deceived." Campbell, *The Hero with a Thousand Faces* 33–34 (2020) (e-book) (cleaned up).

Under READER, Campbell's enlightening but tame exposition of this mythical act of "sexual bestiality" could mean the work is "sexually relevant," and thus subject to READER's restrictions. Or maybe not. But to avoid risking penalty, vendors are likely to rate the book as "sexually relevant," casting a shadow on a classic work and its availability.

The Due Process Clause demands more than what READER provides. Its "sexually relevant material" term, and any other portion of READER that rests on its definition of "sexual conduct," is unconstitutional. *See Fox Television Stations*, 567 U.S. at 253–55.

30

### C.     READER's vagueness arms the government with authority to manipulate the free exchange of ideas.

Saddled with standardless terms, READER only encourages the arbitrary exercise of government power to stifle expression based on the whims of the public officials enforcing it. In effect, the State can blacklist books expressing ideas it disfavors, under the threat of penalty. As history has proven time and again, one person's classic is another's target.[17] And rather than risk guessing wrong about whether a book falls within READER's nebulous scope, vendors will likely make those books unavailable to Texas schools. That is no way to preserve a vibrant marketplace of ideas.

Texas admits that the void-for-vagueness doctrine prohibits "laws that might 'encourage arbitrary and discriminatory enforcement.'" State's Br. 25 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) and *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546 (5th Cir. 2008)). But Texas makes no effort to explain how READER applies in its most basic and concrete ways. Instead, it insists READER's vagueness doesn't

---

[17] *See, e.g.*, Anne Lyon Haight & Chandler B. Grannis, Banned Books: 387 B.C. to 1978 A.D. 120–22 (1978) (documenting efforts to censor books).

31

violate the Constitution because "the State is acting as a marketplace participant." *Id.*

This Court should reject that dangerous vision. READER does not threaten the marketplace of goods—it threatens the marketplace of ideas. If officials wield READER's vague provisions to bully vendors into excluding books containing disfavored ideas, they are directly "us[ing] the power of the State" to "suppress disfavored expression." *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024) (citation omitted). That is not acting as a market participant. Rather, it is acting as a regulator of free expression. *Id.*

If the state can distort the marketplace of ideas through selectively enforcing READER, it will thwart one of the First Amendment's chief guarantees: "'the unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Meyer v. Grant*, 486 U.S. 414, 421 (1988) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). And that guarantee applies with no less force at public schools. After all, "America's public schools are the nurseries of democracy." *Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 190 (2021). By any measure, banning books because of partisan or ideological hostility to the

32

ideas they contain teaches students the wrong lesson about their rights as Americans and limits on the government's power.

This threat of arbitrary enforcement is no hypothetical. Activists and politicians on all sides have worked to remove hundreds of works from libraries across the country because they dislike the ideas they contain.[18] They have gone so far as to banish novels about the Holocaust over absurd concerns about "sexually explicit content.[19] By giving ideological censors a tool to arbitrarily target such works, READER will only fuel that crush of censorship.

In upholding a recent First Amendment challenge to a state ban on conversion talk therapy, the Supreme Court recently reaffirmed "a faith in the free marketplace of ideas as the best means for discovering truth." *Chiles v. Salazar*, 146 S. Ct. 1010, 1029 (2026). Just as a state law

---

[18] *See, e.g.*, Annie Gowen, Censorship battles' new frontier: Your public library, Wash. Post (Apr. 17, 2022), https://www.washingtonpost.com/nation/2022/04/17/public-libraries-books-censorship.

[19] *E.g.,* Kendall Tietz, Anne Frank novel banned in Florida school over 'sexually explicit' content: 'Minimization of the Holocaust', Fox News (Apr. 13, 2013), https://www.foxnews.com/media/anne-frank-novel-banned-florida-school-sexually-explicit-content-minimization-holocaust; Andrew Lapin, Not just 'Maus': A Missouri school district removed several Holocaust history books, too, Jewish Telegraphic Agency (Nov. 16, 2022), https://www.jta.org/2022/11/16/united-states/several-holocaust-books-including-maus-have-been-yanked-from-some-missouri-schools-amid-state-law.

banning talk therapy "based on viewpoint represents an 'egregious assault'" on that "faith in the free marketplace of ideas," *id.* (citation omitted) (cleaned up), so does READER by giving state officials the power to selectively target books based on viewpoint.

## CONCLUSION

For these reasons, *amici* urge the Court to affirm.

Dated: May 20, 2026

Joshua J. Bennett
BAKER HOSTETLER LLP
2850 N. Harwood, Ste. 1110
Dallas, TX 75206
(214) 210-1166
jjbennett@bakerlaw.com

Respectfully,

/s/ JT Morris
JT Morris
*Counsel of Record*
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
jt.morris@fire.org

Counsel for *Amici Curiae*

34

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2, this document contains 6,422 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font, and 12-point Century Schoolbook font for footnotes.

Dated: May 20, 2026
　　　　　　　　　　　　　/s/ JT Morris
　　　　　　　　　　　　　JT Morris

　　　　　　　　　　　　　Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

The undersigned certifies that on May 20, 2026, an electronic copy of this Brief of *Amici Curiae* Foundation for Individual Rights and Expression and Cato Institute in Support of Plaintiffs-Appellees and Affirmance was filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users, and that service of the brief will be accomplished by the CM/ECF system.

Dated: May 20, 2026                    /s/ JT Morris
                                       JT Morris

                                       Counsel for *Amici Curiae*