**No. 23-50891**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

**Book People, Incorporated; VBK, Incorporated doing business as Blue Willow Bookshop; Association of American Publishers; Authors Guild, Incorporated; Comic Book Legal Defense Fund; American Booksellers Association,**

***Plaintiffs-Appellees,***

**v.**

**Mike Morath, in his official capacity as the Commissioner of the Texas Education Agency,**

***Defendant-Appellant***

---

**On Appeal from the U.S. District Court for the Western Division of Texas Austin Division, Case No. 1:23-CV-00858-ADA, Judge Alan D Albright**

# BRIEF OF AMICUS CURIAE PEN AMERICAN CENTER, INC. (PEN AMERICA) IN SUPPORT OF PLAINTIFFS-APPELLEES

Peter D. Kennedy
Texas Bar No. 11296650
pkennedy@gdhm.com
James A. Hemphill
Texas Bar No. 00787674
jhemphill@gdhm.com
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
Telephone 512-480-5674

*Counsel of Record for Amicus Curiae*

## Certificate of Interested Persons and Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fifth Circuit Rule 29.2, Amicus PEN American Center (PEN America) certifies that, in addition to those listed in the parties' briefs, the following persons have an interest in the outcome of this appeal:

**PEN American Center, Inc. (PEN America),** ***Amicus Curiae***

PEN American Center, Inc., has no parent corporation and no publicly held corporation owns 10% or more of its stock.

*/s/ Peter D. Kennedy*
Peter D. Kennedy

## Table of Contents


Certificate of Interested Persons & Corporate Disclosure Statement ........ 2

Table of Contents ........ 3

Index of Authorities ........ 4

Statement of Identity and Interest ........ 7

Consent to File ........ 7

Fed. R. App. P. 29(A)(4)(e) Statement ........ 7

Summary of Argument ........ 8

Argument ........ 9

I. HB 900's mandatory rating system, if enforced, will chill writers' free expression and is incompatible with First Amendment principles ........ 9

A. HB 900's rating mandate would damage writers' ability to communicate with youthful audiences of varying ages ........ 9

B. HB 900's vague and overbroad criteria will pressure authors to self-censor ........ 14

II. The State is not a market participant under HB 900 ........ 19

Conclusion ........ 21

Certificate of Compliance ........ 21

Certificate of Service ........ 22

## Index of Authorities

**Cases** **Page**

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982) (plurality) ........................................ 15

*Bleistein v. Donaldson Lithographing Co.*,
188 U.S. 239 (1903) ........................................ 17

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ........................................ 17

*Canady v. Bossier Par. Sch. Bd.*,
240 F.3d 437 (5th Cir. 2001) ........................................ 16

*Cohen v. California*,
403 U.S. 15 (1971) ........................................ 16, 17

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) ........................................ 17

*Miller v. California*,
413 U.S. 15 (1973) ........................................ 10, 16

*U.S. v. Arthur*,
51 F.4th 560 (5th Cir. 2022) ........................................ 16

**Statutes**

Tex. Educ. Code § 35.002(b) ........................................ 11

Tex. Educ. Code § 35.002(e) ........................................ 9, 11

Tex. Educ. Code § 35.003 ........................................ 11

Tex. Educ. Code § 35.005 .......... 11

Tex. Penal Code § 43.21(a)(1) .......... 10

Tex. Penal Code § 43.21(a)(4) .......... 9

Tex. Penal Code § 43.25 .......... 9

**Other Authorities**

*Author Tamara Ellis Smith & Illustrator Nancy Whitesides on Tackling Stories Close to the Heart*, Cynsations: Celebrating Children's & Young Adult Literature (November 2023), https://cynthialeitichsmith.com/2023/11/guest-post-author-tamara-ellis-smith-illustrator-nancy-whitesides-on-tackling-stories-close-to-the-heart/ .......... 12

"Italian Art Experts Astonished by David Statue Uproar in Florida," *BBC Online*, March 27, 2023, https://www.bbc.com/news/world-europe-65087218 .......... 11

Jarret J. Krosoczka, *Difficult Truths in Life and on the Page*, Medium (November 14, 2021), https://medium.com/@studiojjk/difficult-truths-in-life-and-on-the-page-a8549e0f6492 .......... 12

*Reading Level Chart*, Booksource, https://www.booksource.com/reading-level-chart .......... 15

Scottie Andrew, *Book bans are surging—and taking an emotional toll on many authors*, CNN (Oct. 4, 2023), https://www.cnn.com/2023/10/04/style/book-bans-sales-authors-impact-cec/index.html .......... 14

Tom Crann, *'Nothing about my book that is anything but love': Mpls. author responses to Texas book list*, MPR News (November 11, 2021), https://www.mprnews.org/story/2021/11/11/nothing-about-my-book-that-is-anything-but-love-mpls-author-responds-to-texas-book-list ............12

Case: 25-50891 Document: 61-1 Page: 7 Date Filed: 01/29/2026

## Statement of Identity and Interest of Amicus Curiae

PEN American Center, Inc. (PEN America) is a nonprofit organization that represents and advocates for writers in the United States and abroad. PEN America is affiliated with over 100 centers worldwide that make up PEN International. PEN America's members include over 5,000 novelists, poets, essayists, journalists, and other writing professionals. PEN America has two Texas chapters and many Texas members. PEN America monitors the removal of books from school libraries and opposes government restrictions on literary expression. With this brief, PEN America explains the deleterious effects HB 900, if enforced, would have on its members' freedom of expression and ability to reach their audiences.

## Consent to File

Counsel for Plaintiffs-Appellees and Defendant-Appellant consent to the filing of this brief.

## Fed. R. App. 29(a)(4)(E) Statement

No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund preparing or submitting this brief, and no person other than the amicus curiae, its members, or its counsel, contributed money intended to fund preparing or submitting this brief.

## Summary of the Argument

PEN America opposes governmental interference in the creative writing process and dissemination of literature. HB 900 is such a censorial effort. The First Amendment protects writers' free expression and prohibits government attempts to dictate what is acceptable or meritorious expression.

By requiring booksellers to review every publication ever sold or offered to public schools and apply stigmatizing labels to some publications based on the booksellers' subjective application of extraordinarily vague and overbroad criteria, HB 900 imposes a pernicious scheme of delegated censorship that violates fundamental free speech principles. HB 900, if enforced, would pressure writers to modify their writing, in advance, to avoid having their works banned as "sexually explicit" or stigmatized as "sexually relevant" by booksellers or the State of Texas, without notice, consent, or participation in the labelling.

HB 900 adopts a simplistic and mechanical approach to young adult and children's literature. While the government has a general interest in the material that public school students read, HB 900 is an unconstitutionally vague, blunt, and overbroad restriction that the District Court correctly enjoined.

Case: 25-50891 Document: 61-1 Page: 9 Date Filed: 01/20/2026

## Argument

### I. HB 900's mandatory rating system, if enforced, will chill writers' free expression and is incompatible with First Amendment principles.

#### A. HB 900's rating mandate would damage writers' ability to communicate with youthful audiences of varying ages.

HB 900 requires booksellers to review every publication they have ever sold, or ever hope to sell, to Texas public school libraries and to label any publications they believe, based on their subjective judgments, are "sexually relevant" or "sexually explicit" as defined by the statute. "Sexually explicit" material "describes, depicts, or portrays sexual conduct" in a "patently offensive" way, that is, "so offensive on its face as to affront community standards of decency."[1] "Sexually relevant" material "describes, depicts, or portrays sexual conduct" under Texas law, whether or not it is "patently offensive." Tex. Educ. Code § 35.002(e); Tex. Penal Code § 43.21(a)(4). "Offensive" and "community standards of decency" are undefined, leaving unanswered which community's standards apply to which books. Is the "community" the entire State of Texas? If so, how does a vendor know what "standards of decency" are commonly understood within the second-largest and second-most populous state? Or is the "community" the local school district that

[1] "'Sexual conduct' means sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." Texas Penal Code § 43.25.

actually buys the library books, using local tax dollars? If so, how does a bookseller reconcile differing standards across over 1,200 districts to come up with a single rating? Or does it make 1,200 decisions for each publication?

HB 900's operative rating are *suis generis* under Texas law. "Sexually explicit" and "sexually relevant," as defined by the bill, are far broader categories of expression than obscenity, which is limited to speech that, when "taken as a whole," "appeals to the prurient interest in sex" and which "lacks serious literary, artistic, political and scientific value." Tex. Penal Code § 43.21(a)(1). *See Miller v. California*, 413 U.S. 15 (1973). HB 900's definitions lack these constitutionally required limitations. Booksellers are not directed to consider publications "as a whole." Rather, a single offending passage or image requires a "sexually explicit" or "sexually relevant" rating, even if it does not appeal to the prurient interest in sex, and regardless of its literary, artistic, political, or scientific value. A single depiction of "a female breast below the areola" or the anus or genitals of either gender could require a "sexually relevant" label, even in artworks, if deemed "lewd" (whatever that means).[2] This is not hyperbole – a similarly vaguely worded law in Florida was the basis for complaints that an art class photo of Michelangelo's David was "pornographic," forcing a superintendent's resignation because students saw one of

[2] Texas law leaves "lewd" undefined, and dictionary definitions lead to circular logic, using equally vague and subjective terms such as "offensive," "unchaste," or "lascivious."

the most famous artworks in the Western world.[3]

Under HB 900, after making their subjective evaluations of authors' works, booksellers must submit their ratings to the Texas Education Agency, which will publish them online. The TEA can override vendors' evaluations at will and require them to adopt and publish TEA's rating as their own, on penalty of losing the ability to sell ***any*** books to ***any*** school district library. Tex. Educ. Code. § 35.002(e); § 35.003.

Vendors may not sell books rated "sexually explicit" to school libraries, period, and they must (somehow) "recall" any "sexually explicit" book previously sold, no matter how long ago. Tex. Educ. Code § 35.002(b). Public school students, no matter what age or grade, must present written parental consent to check out any book labeled "sexually relevant." Tex. Educ. Code § 35.005. In short, HB 900 creates a scheme of delegated, yet mandatory, censorship. If enforced, it will keep books out of readers' hands and pressure authors, including PEN America's members, to self-censor to avoid their works being blacklisted or denigrated by vendors or the TEA.

Writers of books for children and young adults see their work as a vocation, and reaching young readers as essential to fulfill their artistic purpose. Such authors

---

[3] "Italian Art Experts Astonished by David Statue Uproar in Florida," *BBC Online*, March 27, 2023, https://www.bbc.com/news/world-europe-65087218.

write for audiences of different ages and maturity, but HB 900 treats all public-school students as if they were the same.

Author Tamara Ellis Smith writes that "a book is not finished until the reader reads it. If I've done my job, I've left enough space to let this alchemy happen between the reader and the story."[4] Jarrett J. Krosoczka, National Book Award finalist for *Hey Kiddo*, wrote his middle-grade illustrated memoir to help young people feel less alone, based on his own experience. "Books are like life preservers," he writes. "I, along with my colleagues, write for the teenagers we once were. And we defend a students' right to read because we know these books would have made our lives that much easier growing up."[5]

Junauda Petrus, author of the young adult novel *The Stars and the Blackness Between Them*, writes that her work "is so love-filled and wants to affirm, and make people feel safe and included and like they exist," and echoes the sentiments of many children's and young adult authors who write because of what books meant to them when they were young. "To me books are where I went to feel safe."[6] Laws that

---

[4] *Author Tamara Ellis Smith & Illustrator Nancy Whitesides on Tackling Stories Close to the Heart*, Cynsations: Celebrating Children's & Young Adult Literature (November 2023), https://cynthialeitichsmith.com/2023/11/guest-post-author-tamara-ellis-smith-illustrator-nancy-whitesides-on-tackling-stories-close-to-the-heart/.

[5] Jarret J. Krosoczka, *Difficult Truths in Life and on the Page*, Medium (November 14, 2021), https://medium.com/@studiojjk/difficult-truths-in-life-and-on-the-page-a8549e0f6492.

[6] Tom Crann, *'Nothing about my book that is anything but love': Mpls. author responses to Texas book list*, MPR News (November 11, 2021), https://www.mprnews.org/story/2021/11/11/nothing-about-my-book-that-is-anything-but-love-mpls-author-responds-to-texas-book-list.

prevent or hinder their books from reaching school libraries thwart one of the most important ways writers find and engage with their audiences.

Just as writers need readers, they also need vendors. Vendors, in turn, choose books that they believe are worth distributing. But compelling vendors to rate books under vague criteria that could ban them from school libraries, as HB 900 does, implicates the vendors – against their will – in hampering writers' ability to reach their intended audiences.

The impact of an involuntary "sexually explicit" or "sexually relevant" rating would extend far beyond Texas public school libraries. Those online ratings, in the second-largest U.S. book market, would create a potentially misleading resource for parents, teachers, and librarians everywhere. Because the ratings do not distinguish among ages or grades, parents of third graders and parents of high school juniors will see the same "sexual" ratings for books without useful context needed to make informed decisions. These labels will, undoubtedly, hurt writers' abilities to reach readers in Texas and beyond. For a writer intending to reach young audiences with age-appropriate material, a "sexually explicit" or "sexually relevant" label may be false, misleading, and stigmatizing for authors and their books. Writers with books removed from libraries in other states report that removals hurt their reputations,

their books sales, and their earnings.[7] These financial consequences may drive writers out of the business, preventing the creation of an incalculable number of potentially impactful and transformative books.

Labelling a book "sexual," potentially due to a single passage or image, also can stigmatize readers. Checking out or reading a book labelled "sexual" would embarrass many students, so HB 900, if enforced, will chill readers, not just writers.

### B. HB 900's vague and overbroad criteria will pressure authors to self-censor.

HB 900 violates the First Amendment because it is vague and overly broad, imposing a chilling effect on authors. The definitions of "sexually explicit" and "sexually relevant" are vague and do not account for the vast difference in students' ages, maturity, experiences, interests, and reading comprehension. HB 900's draconian penalties, which are not limited to books subject to labeling, incentivize booksellers to err on the side of over-labeling books to not lose the right to sell any books to Texas school districts – potentially limiting student access to publications appropriate for kindergarteners. This in turn chills authors' speech, who are likewise incentivized to self-censor to avoid their works being banned or stigmatized by a vendor's or the TEA's labeling decision, over which they have no control.

---

[7] Scottie Andrew, *Book bans are surging—and taking an emotional toll on many authors*, CNN (Oct. 4, 2023), https://www.cnn.com/2023/10/04/style/book-bans-sales-authors-impact-cec/index.html.

Writers must tailor their material for the intended audience's age – what language their readers can understand, what subjects may hold their interest, and what content is fitting and relevant for them. This is the heart of the artistic work that authors do when writing books for young adults, middle graders, and children.[8]

Freedom of expression and thought require young readers' access to the material that is appropriate for them. Limiting public school students to a narrow range of books denies them the chance to grow and mature, at their own pace, with literature. The plurality opinion in *Board of Education, Island Trees Union Free School District v. Pico* recognized the important "opportunity at self-education and individual enrichment" that school libraries afford students. 457 U.S. 853, 869 (1982) (plurality). HB 900 will restrict writers' ability to communicate with readers eager for this opportunity to learn and grow.

HB 900's definition is likely to lead to self-censorship by authors who may feel compelled to avoid certain topics and ideas that would be appropriate for their intended readers to ensure that their books remain accessible. Writers hoping to maximize their reach will be incentivized to avoid more complex topics that may be of critical importance to young readers. This chilling effect could be disastrous for children's and young adult literature, impeding writers' abilities to confront difficult

---

[8] Publishers and booksellers have long recognized this work through voluntary, sensible rating systems designed to help parents and educators select appropriate materials for their children. *E.g., Reading Level Chart*, Booksource, https://www.booksource.com/reading-level-chart.

ideas and truths and hampering students' abilities to grow and evolve as critical thinkers and readers.

As a writer's organization, PEN America has a significant interest in protecting authors' artistic processes. Content-based restrictions on the sale of writers' work without consideration of literary value or authorial intent are a gross violation of artistic freedom and have a chilling effect on literary imagination. Writers count on robust First Amendment freedoms and the value that our culture places on free expression when writing about new ideas and experimenting with form and style. See *Miller*, 413 U.S. at 23 (noting "inherent dangers of undertaking to regulate any form of expression"). Language can convey a multiplicity of meanings and courts must consider the ways in which language is "infused with intentional expression on many levels." *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 440 (5th Cir. 2001). In *United States v. Arthur*, this Court acknowledged the importance of recognizing artistic intent and method, holding that comparing "literary and artistic devices" used in challenged works to other works a "reasonable person would understand as having literary or artistic value" is a valid method in evaluating the third prong of the *Miller* test. 51 F.4th 560 (5th Cir. 2022).

In *Cohen v. California*, the Supreme Court articulated the importance of understanding layered meaning that may not be readily apparent at first blush, holding that:

> [O]ne man's vulgarity is another's lyric. ... . [I]t is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual….[M]uch linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well.

*Cohen v. California*, 403 U.S. 15, 25-26 (1971). HB 900 fails to recognize this dual communicative function of language, instead incentivizing overly simplistic – and ultimately, harmful – evaluations of literature.

Writers count on robust First Amendment freedoms and the value that our culture places on free expression when writing about new ideas and experimenting with form and style. Writers also rely on courts' recognition that art and literature often contain ineffable meaning. *See, e.g. Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995) ("[A] narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll.") (internal citations omitted)).[9]

---

[9] *Cf. Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239 (1903), which makes a similar point about visual art ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations…some works of genius would be sure to miss appreciation.") *and Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994). Copyright law's transformative use doctrine rests in part on the idea that the artistic intent behind the use of copyrighted material can produce "new expression, meaning, or message."

Without these protections, writers may shy away from innovation and bold exploration of challenging topics. Widespread efforts to remove and restrict books across the country, of which HB 900 is just one, have created a chilling effect on writers' speech, particularly ones that write for younger audiences. Award-winning children's author Robin Stevenson asserts that "self-censorship is the huge invisible iceberg beneath the bans we read about." For author and illustrator Sarah Brannen, being the target of book removals was exhausting and has infected her thoughts on future projects: "I can't help thinking, 'Is this book going to be banned?' ... . [I]t kills creativity to think about that." Author Katryn Bury has "stopped writing kid's books altogether." Author Sarah Gailey observes, "Every author and publishing professional I know—myself included—takes book challenges and book banning into account now. Fear of prosecution and retribution against ourselves, and against the librarians and booksellers who champion our work, is a constant presence as we discuss how to create the literature we feel the world needs right now."

Restricting writers' work on the basis of vague criteria that fails to account for authorial intent is a gross violation of artistic freedom and has a chilling effect on literary imagination. Writers who feel restricted from writing about ideas in novel and complex ways for fear of censorship may shy away from formal innovation and bold exploration of challenging topics.

## II. The State is not a market participant under HB 900.

Defendants-Appellants claim that the regulatory scheme required by HB 900 is in fact not state regulation of the market, but rather a mechanism by which the state government can acquire information from vendors as a "marketplace participant." But the ratings required by HB 900 are not simple "information" about products in the marketplace; they are highly subjective opinions of booksellers or the State about writers' works that may appear to have been adopted or approved by the authors themselves. Arguing that this rating system is comparable to the factual and uncontroversial information involved in typical consumer transactions wholly ignores the nature of literature and the artistic process.

HB 900 could easily lead to a raft of literary classics and core offerings of public school libraries being deemed unsuitable for sale to Texas public schools. Such texts include many works by Shakespeare, *The Great Gatsby*, *The Catcher in the Rye*, *The Lord of the Flies*, *Atlas Shrugged*, *The Giver*, *A Separate Peace*, and *The Grapes of Wrath*. It is hard to imagine that a simple request for information typical of an ordinary transaction would lead to the decimation of the heart of public school libraries, the staples of school curricula for decades.

Furthermore, framing these ratings as mere consumer information betrays a facile understanding of literature and does a disservice to writers. Writers' use of graphic language in their work often serves an artistic and literary purpose, and an

evaluation of how that language operates cannot be deemed "purely factual." The lack of clarity with respect to what the rating system requires is not simply a result of poor drafting. It also speaks to the difficulty of making categorical assessments about how content functions in art. The subjective evaluations required by HB 900 are a far cry from typical disclosures made by a vendor in ordinary business or the kind of informative and factual information to which consumers are entitled. The recognition in First Amendment jurisprudence of the multiplicity of meaning inherent in much artistic expression and the subjectivity of interpretation is incompatible with the idea that evaluations of how language operates in literature can be factual and objective assessments. HB 900 deviates from courts' longstanding commitment to considering artistic meaning and value and fails to consider authorial intent.

A rating system designed by the government for the express purpose of restricting access to literature is antithetical to fundamental free speech values. Defendants-Appellees are using the government speech doctrine as a smokescreen for what it really is—censorship of literature and the artistic process. Government interference in art and literature is a hallmark of the kind of tyranny the First Amendment is meant to repel.

## Conclusion

To preserve First Amendment values and protect writers' creative freedom and autonomy, the Court should affirm the District Court's judgment.

Respectfully submitted,

*/s/ Peter D. Kennedy*
Peter D. Kennedy
Texas Bar No. 1129650
pkennedy@gdhm.com
James A. Hemphill
Texas Bar No. 00787674
jhemphill@gdhm.com
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
Telephone 512-480-5674
*Counsel of Record for Amicus Curiae*

## Certificate of Compliance

This brief complies with the type-volume limitations of Fed. R. App. 29(a)(5) and Fed. R. App. P. 32(a)(7) because it contains 3,232 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ James A. Hemphill*
James A. Hemphill

## Certificate of Service

I certify that on May 29, 2026, I caused the foregoing Brief of PEN American Center as Amicus Curiae in support of Plaintiffs-Appellees to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send notice of such filing to all counsel of record.

*/s/ James A. Hemphill*
James A. Hemphill