**No. 25-50891**

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

BOOK PEOPLE, INCORPORATED; VBK, INCORPORATED, doing business as BLUE WILLOW BOOKSHOP; AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS; AUTHORS GUILD, INCORPORATED; COMIC BOOK LEGAL DEFENSE FUND,

*Plaintiffs-Appellees*,

v.

MIKE MORATH, in his official capacity as the COMMISSIONER OF THE TEXAS EDUCATION AGENCY,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
Civil Action No. 1:23-cv-08858, Judge Alan Albright

**BRIEF OF *AMICI CURIAE* PENGUIN RANDOM HOUSE LLC, ASSOCIATION OF UNIVERSITY PRESSES, AUTHORS AGAINST BOOK BANS, BARNES & NOBLE, INC., EDUCATIONAL BOOK AND MEDIA ASSOCIATION, FREEDOM TO LEARN ADVOCATES, HALF PRICE BOOKS, RECORDS, MAGAZINES, INC., THE INDEPENDENT BOOK PUBLISHERS ASSOCIATION, AND SOURCEBOOKS, LLC IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Peter B. Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, TX 75275-0116
(214) 768-4077
psteffensen@smu.edu

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

**Counsel for *Amici Curiae***

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

1. No. 25-50891, *Book People, Inc., et al. v. Mike Morath*

2. The undersigned counsel of record certifies that—in addition to the persons and entities listed in the Appellees' Certificate of Interested Persons—the following listed persons or entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

Penguin Random House LLC states that it is a limited liability company organized under the laws of Delaware with its principal place of business in New York, New York. Penguin Random House is owned by Bertelsmann SE & Co KGaA, a private entity. No other companies, private or public, own 10% or more of Penguin Random House LLC.

Association of University Presses states that it is a non-profit organization with its principal place of business in New York that does not have any parent corporations or issue stock and consequently there exists no publicly held corporation which owns 10% or more of its stock.

Authors Against Book Bans states that it is a non-profit organization with its principal place of business in New York. It is fiscally sponsored by EveryLibrary, a 501(c)(3) and 501(c)(4) non-profit organization. It does not have any parent

corporations or issue stock and consequently there is no publicly held corporation which owns 10% or more of its stock.

Barnes & Noble, Inc. states that it is a privately held corporation incorporated under the laws of Delaware with its principal place of business in New York, New York. Barnes & Noble, Inc. is owned by funds advised by Elliott Advisors (UK) Limited. No other companies, private or public, own 10% or more of Barnes & Noble, Inc.

Educational Book and Media Association states that it is a non-profit organization with its principal place of business in Virginia that does not have any parent corporations or issue stock and consequently there exists no publicly held corporation which owns 10% or more of its stock.

Freedom to Learn Advocates states that it is a non-profit organization with its principal place of business in Virginia that does not have any parent corporations or issue stock and consequently there exists no publicly held corporation which owns 10% or more of its stock.

Half Price Books, Records, Magazines, Inc. states that it is a privately held corporation incorporated under the laws of Texas with its principal place of business in Dallas, Texas. No other companies, private or public own 10% or more of Half Price Books, Records, Magazines, Incorporated.

The Independent Book Publishers Association states that it is a non-profit organization with its principal place of business in California that does not have any parent corporations or issue stock and consequently there exists no publicly held corporation which owns 10% or more of its stock.

Sourcebooks, LLC states that it is a limited liability company organized under the laws of Delaware with its principal place of business in Naperville, Illinois. Sourcebooks is a subsidiary of Penguin Random House LLC, which owns 55.991% of Sourcebooks. Penguin Random House LLC is a wholly owned subsidiary of Bertelsmann SE & Co. KGaA, a private entity. The remaining percentage of Sourcebooks is owned by Raccah Books, a private entity. No other companies, public or private, own 10% or more of Sourcebooks, LLC.

***Attorneys for Amici Curiae***

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305

Peter B. Steffensen
SMU Dedman School of Law
First Amendment Clinic
P.O. Box 750116
Dallas, TX 75275-0116

Respectfully submitted,

/s/ Thomas S. Leatherbury
Attorney of Record for *Amici Curiae*

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ...................... ii

TABLE OF AUTHORITIES ..........................................................................vi

INTEREST OF *AMICI CURIAE*..........................................................................1

SUMMARY OF ARGUMENT ..........................................................................5

ARGUMENT ..........................................................................................8

I. READER Will Disrupt a Pillar of American Culture and Literacy................8

II. READER Is Unconstitutionally Vague Because Its Rating Standards Leave Vendors Guessing About Which Books Must Be Labeled or Recalled. .............12

A. The vagueness doctrine demands rigorous scrutiny when a law regulates protected expression. ..........................................................................12

B. READER denies vendors fair notice and invites arbitrary enforcement...14

III. READER is a Prior Restraint on Protected Speech...................................20

CONCLUSION ..........................................................................................23

CERTIFICATE OF SERVICE..........................................................................25

CERTIFICATIONS UNDER ECF FILING STANDARDS .................................26

CERTIFICATE OF COMPLIANCE ..................................................................27

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ......................................................... 14

*Agency for Intern. Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ......................................................... 13

*Bantam Books v. Sullivan*,
372 U.S. 58 (1963) ......................................................... 21

*Book People, Inc. v. Wong*,
807 F. Supp. 3d 677 (W.D. Tex. 2025) ......................................................... 23

*Chiu v. Plano Indep. Sch. Dist.*,
339 F.3d 273 (5th Cir. 2003) ......................................................... 22

*Comm'n for Lawyer Discipline v. Benton*,
980 S.W.2d 425 (Tex. 1998) ......................................................... 12

*Free Speech Coalition, Inc. v. Paxton*,
606 U.S. 461 (2025) ......................................................... 17, 20

*Freedman v. Maryland*,
380 U.S. 51 (1965) ......................................................... 20, 21

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ......................................................... 12

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) ......................................................... 18

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967) ......................................................... 12

*Lakewood v. Plain Dealer Pub. Co.*,
486 U.S. 750 (1988) ......................................................... 19

*Legal Services Corp. v. Velazquez*,
531 U.S. 533 (2001) ......................................................... 14

*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025) ......................................................... 22

*Miller v. California*,
413 U.S. 15 (1973) .... 17

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) .... 13, 14

*Perry v. Sindermann*,
408 U.S. 593 (1972) .... 13

*Reno v. ACLU*,
521 U.S. 844 (1997) .... 17

*Staub v. City of Baxley*,
335 U.S. 313 (1958) .... 22

*United States v. Williams*,
553 U.S. 285 (2008) .... 12

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982) .... 12

**Statutes**

Tex. Educ. Code § 28.002 .... 18

Tex. Educ. Code § 33.021 .... 15

Tex. Educ. Code § 35.001 .... 15, 18

Tex. Educ. Code § 35.002 .... 8, 15, 19

Tex. Educ. Code § 35.0021 .... 15, 18

Tex. Educ. Code § 35.003 .... 15

Tex. Penal Code § 43.01 .... 15

Tex. Penal Code § 43.21 .... 15

Tex. Penal Code § 43.25 .... 15

**Other Authorities**

Finding a School, Tex. Educ. Agency, https://tea.texas.gov/texas-schools/general-information/finding-a-school-for-your-child/finding-a-school [https://perma.cc/7FKT-YN8M] (last visited May 17, 2026) .... 17

Genesis 35:22 (New American Standard) ........................................................16

QuickFacts: Texas, U.S. Census Bureau,
https://www.census.gov/quickfacts/fact/table/TX (last visited May 17, 2026)...17

S.R. Ranganathan, *The Five Laws of Library Science* (1931) ..................................5

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are organizations and corporations dedicated to books, joining together in opposition to H.B. 900. The law impairs each of their abilities to serve their mission. Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the timely filing of this amicus brief.

Penguin Random House LLC ("PRH") is the United States arm of the world's largest trade publisher, comprised of more than 300 editorially and creatively independent publishing imprints globally. PRH's mission is to ignite a universal passion for reading by creating books for everyone and creating a world where independent thinking, free expression, and creativity flourish. PRH also serves as a distributor for many independent publishers, providing new technologies, a leading supply chain, and the benefits and reach of its global sales force.

The Association of University Presses ("AUPresses") is an organization of more than 160 international nonprofit scholarly publishers, 80% of which are based in the United States. Since 1937, AUPresses has advanced the essential role of a global community of publishers whose mission is to ensure academic excellence and cultivate knowledge. The Association holds intellectual freedom, integrity, stewardship, and diversity and inclusion as core values. AUPresses members are

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no party or party's counsel authored this brief in whole or in part or contributed money toward the preparation of this brief.

active across many scholarly disciplines, including the humanities, arts, sciences, and are innovators in the world of digital publishing.

Authors Against Book Bans is a group of over 5,000 book creators across the country united by a single principle: that all people should have the freedom to read. Authors Against Book Bans unequivocally supports the availability of diverse voices on our library shelves, in our schools, and in our culture. Its concern is not only for the books themselves, but for the children, families, educators, librarians, and communities who suffer when the freedom to read is challenged and taken away.

Barnes & Noble, Inc. ("Barnes & Noble") is the world's largest retail bookseller and leading retailer of content, digital media and educational products. The Company operates approximately 600 Barnes & Noble bookstores across the United States and one of the Web's premier e-commerce sites, BN.com. Barnes & Noble's mission is to operate the best omni-channel specialty retail business in America, helping both its customers and booksellers reach their aspirations, while being a credit to the communities it serves.

The Educational Book and Media Association is a non-profit organization whose mission is to foster a unique community that brings together a wide range of wholesalers and publishers in order to address the ever-changing book and media buying needs of the educational marketplace.

Freedom to Learn Advocates (FTLA) was founded to promote universal access to books and educational resources for all communities regardless of race, economic status, religion, sexual orientation, gender identity, or political affiliation. Its mission is to resist initiatives that aim to limit access to books and information, often in the form of book banning policies.

Half Price Books, Records, Magazines, Inc. ("Half Price Books") is America's largest family-owned retailer for new and used books with a bustling website and more than 100 brick-and-mortar stores nationwide. With a foundation of keeping books in circulation and helping make the world a little better, Half Price Books has a long history of partnering with literacy programs and charity organizations nationwide.

The Independent Book Publishers Association ("IBPA") is the largest publishing trade association in the United States, with over 4,000 members. IBPA connects its members to the publishing industry and provides a forum for publishers to voice their concerns. IBPA's mission is to lead and serve the independent publishing community through advocacy, education, and tools for success.

Sourcebooks, LLC ("Sourcebooks") is the largest woman-led publisher in the United States with offices in Illinois and New York. Publishing both fiction and non-fiction for children, young adults, and adults across 19 imprints, Sourcebooks is

committed to reaching readers with books that will illuminate, inspire, and enlighten lives and believes that “books change lives”.

## SUMMARY OF ARGUMENT

*Amici* are in the business of helping books find their readers. The first three laws of library science are:

1. Books are for use.
2. Every person his or her book.
3. Every book its reader.

S.R. Ranganathan, *The Five Laws of Library Science*, 3, 75, 299 (1931). Not every book is for every person. That is where educators and librarians come in. Relying on their training and expertise, they help young Americans expand their intellectual horizons through literature by matching them with the right title at the right time in their lives.

Rather than supporting educators, the Restricting Explicit and Adult-Designated Educational Resources Act ("READER" or the "Act") disempowers them and forces "library materials vendors" against their will to participate in the State's unconstitutional efforts to restrict access in school libraries to books that contain the amorphously defined "sexually relevant material" or "sexually explicit material." In short, the State, through the Act, forces a poorly designed and constitutionally untenable regulatory regime on booksellers and publishers.

Under the Act, booksellers and publishers must determine whether books they have sold or will sell to Texas public schools or open enrollment charter schools are

"directly related to the [required] curriculum." Booksellers and publishers are forced to rate all other books sold to Texas schools in the past and future that are "in active use," choosing from those vaguely defined ratings of "sexually relevant material," "sexually explicit material" or "no rating." Further, book vendors are prohibited from selling "sexually explicit material" to Texas schools. Sexually relevant material" is subject to parental or guardian consent. Both terms rely on subjective estimations with fuzzy boundaries on both sides. Therefore, they are hopelessly vague. Moreover, READER does not allow for consideration of whether the work lacks serious literary, artistic, political or scientific value. By *Amici*'s estimation, such high school classics such as *The Handmaid's Tale* by Margaret Atwood, *Slaughterhouse-Five* by Kurt Vonnegut, or *Angela's Ashes* by Frank McCourt could conceivably be deemed "relevant" or even "explicit."

Under READER, all book vendors must submit their ratings on all of the covered books to the Texas Education Agency before being allowed to sell any title to schools. The Texas Education Agency is empowered to change or to challenge any rating, including no rating, forcing the book vendor to pick the "sexually explicit" or "sexually relevant" labels. The agency can then force the book vendor to recall a book if it takes issue with the book vendor's rating. Moreover, the agency must maintain a conspicuously public list of those book vendors who failed to

comply with the agency's directives and prohibit those vendors from continuing to sell to Texas schools.

The Act violates the First Amendment under several established doctrines. *Amici* focus on two: (1) the Act is unconstitutionally vague, and (2) the Act constitutes an impermissible prior restraint. Texas may not compel authors and publishers to carry its desired message and forbid distribution of an enormous amount of protected speech, particularly when the State's standards are moving targets.

## ARGUMENT

### I. READER Will Disrupt a Pillar of American Culture and Literacy

*Amici* may sell books for children, but we rarely sell books to children. We sell to parents, educators, and librarians. K-12 educational sales[2] are a major source of revenue to authors, publishers, and booksellers. For publishers it represents more than half a billion dollars in annual revenue. For many authors, K-12 sales will make or break their book. For youngsters, the school represents their primary—or sometimes only—nexus to works of literature. Forcing *Amici* to append the State's message to our own violates our free speech rights, and disrupting this marketplace will have serious and lasting consequences.

READER has already impacted Plaintiffs and *Amici*. In addition to requiring library materials vendors to submit lists of ratings to the State, READER prohibits book vendors from selling library materials to a school district or open-enrollment charter school unless they have rated all previous material sold to Texas school libraries. Tex. Educ. Code § 35.002(a). In other words, to sell books now and in the near future to Texas schools, book vendors must engage in the Sisyphean task of parsing every phrase of every covered book previously or currently being sold to a

[2] It is important to note that *Amici* do not sell to the Texas Education Agency. Rather, we sell to school districts. Further, because educators can buy books directly from booksellers, *Amici* cannot directly track every K-12 education sale.

district or school to determine if the work is "sexually explicit," "sexually relevant" or "no rating."

The burdens are real. Already, publishers have been asked for assistance developing ratings. In August 2023, a leading book distributor to schools requested that publishers self-rate their books. Citing the absence of clarity in the statute and lack of rating infrastructure, before the district court preliminarily enjoined READER, the distributor stated: "our goal is to get as robust of a collection of purchasable content ready on September 1st [2023]," the effective date of READER.

READER puts *Amici* between a rock and a hard place. The costs of non-compliance are extraordinary. But so are the costs of compliance. *Amici* do not have employees available—or trained—to perform a task that the State concedes is highly subjective and contextual. Given the lack of any objective guidance in the statute, "it is an open question whether this community standard is based on Austin, Texas, or Onalaska, Texas – or any of the more than 1,200 incorporated municipalities across Texas." ROA.713.

Industry-standard starting salary for editorial assistants is approximately $47,583 dollars a year at major publishers, roughly $25 dollars per hour. On average, it takes approximately one hour to read sixty pages of a book. Take an average book length of 300 pages: at five hours reading time, complying with the Act would cost publishers a minimum of $187.50 dollars per publication, without

considering training, oversight, and time deliberating on whether any given title meets the labeling standard of the Act. Simply reviewing a modest backlist of 500 titles would cost a minimum of $93,750 dollars.

For publishers with large backlists, that expense would be exorbitant. 50,000 titles would require 250,000 employee hours and cost at least $9.375 million dollars. For reference, Penguin Random House offers more than 100,000 titles in the K-12 setting. Worse, these estimates do not account for the time and cost of rating new works, re-rating existing works based on changing community standards, and re-rating works in response to the State's objections.

It is also important to understand the impact of the penalties imposed by the Act. Library materials vendors lose the ability to distribute and sell any of their books to the entire Texas school market either if they (i) do not comply with the problematic and prohibitively expensive mandatory ratings process or (ii) refuse to adopt TEA's rating contrary to their view. For publishers that sell directly to school districts, the risk is particularly acute. A single imprint's disputed rating could spell banishment from Texas school districts for the entire company. Worse, because many independent publishers rely on large publishers for distribution and sales, their titles are also implicated. Losing access to Texas schools is a devastating prospect. Texas is home to 25 of the 120 largest school districts by enrollment in the United

States. For booksellers, sales to Texas public school districts represent tens of millions of dollars of annual revenue.

In short, the Act's ramifications for booksellers and book publishers alike are daunting from an economic and cultural perspective. Larger publishers and booksellers will suffer a significant loss of revenue. Smaller ones could conceivably be forced to discontinue operations entirely. Since READER is indifferent to the wide variance in age and reading sophistication of students, READER incentivizes booksellers and publishers to only acquire and sell "safe" titles—that is, books that are suitable for the youngest readers—and forego the opportunity to introduce students to important voices and ideas.

Finally, the Act will have cultural and economic effects outside of schools. Librarians are often the greatest champions of new works. By stripping autonomy from them, fewer works will be discovered by young Americans, depriving them of valuable learning and developmental opportunities. These effects are destructive of a robust and flourishing marketplace of ideas.

Self-censorship is dangerous to a free society because it impacts much more than the speaker. It deprives listeners of ideas that *Amici* have a constitutional right to disseminate, narrows public debate, and distorts the marketplace of ideas by allowing fear of sanctions to decide what may be said. That danger is especially acute in schools. The Supreme Court has long recognized that the "classroom is

peculiarly the 'marketplace of ideas.'" *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). Where a law, like READER, pressures vendors to categorize protected expression in a manner that would lead to its removal from schools and prevent its distribution altogether, the burden is felt by both the speaker and the students who lose access to those constitutionally protected ideas.

## II. READER Is Unconstitutionally Vague Because Its Rating Standards Leave Vendors Guessing About Which Books Must Be Labeled or Recalled.

### A. The vagueness doctrine demands rigorous scrutiny when a law regulates protected expression.

The vagueness doctrine, rooted in the Due Process Clause, requires laws to provide clear standards regarding the conduct they regulate. *See Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.") A law is unconstitutionally vague when it fails to give a person of "ordinary intelligence a reasonable opportunity to know what is prohibited," and lacks "explicit standards" to protect against the "dangers of arbitrary and discriminatory enforcement." *Id.*; *United States v. Williams*, 553 U.S. 285, 304 (2008). And where a law, like READER, implicates books, ideas, or the distribution of constitutionally protected expression, courts apply a "more stringent" vagueness test. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *Comm'n for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 438 (Tex. 1998).

Because READER directly regulates the classification and distribution of books sold to public schools, that heightened standard applies.

The State argues the vagueness doctrine is inapplicable here because READER merely allows the State to operate as a marketplace participant rather than as a regulator, and in that role it requires certain purchasing conditions. Appellant's Br. at 26. In support, the State relies on *National Endowment for the Arts v. Finley*, which permitted limited subjective judgment in government grantmaking. *Id.* at 26–27 (citing *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998)).

The State's reliance on *Finley* fails on at least three grounds. First, *Finley* involved a "highly selective grant program," and declining to fund an artist did not restrict the artist's ability to distribute their work or seek funding elsewhere. *Finley*, 524 U.S. at 585. READER does not create a discretionary arts grant program. Rather, its terms unconstitutionally condition access to one of the largest schoolbook markets in the country by compelling vendors to classify protected expression using indeterminate standards, and to repeat the State's final judgment about that expression. The government may never condition access to protected expression on an unconstitutional basis. *See Agency for Intern. Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (the government "may not deny a benefit to a person on a basis that infringes . . . his interest in freedom of speech."); *see also Legal Services Corp. v. Velazquez*, 531

U.S. 533, 547 (2001) (explaining that the government does not have broad discretion to impose funding conditions "lest the First Amendment be reduced to a simple semantic exercise.").

Second, *Finley* involved nonbinding "considerations" in the grant program and did not "preclude awards to projects" that failed to meet those standards. Indeed, the discretionary grant program did not "even specify that those factors must be given any particular weight." *Finley*, 524 U.S. at 580. But here, READER does the opposite. The Act mandates classification of protected speech in specific categories, requires vendors to apply open-ended criteria, and imposes drastic consequences for disputed classifications.

Third, in *Finley* the government made its own judgment regarding the evaluated work itself. But under READER, vendors are first required to make their own ratings determinations on the content of protected speech not obscene for minors, which the State then publishes. Conditioning vendors' access to the market on a requirement that they make subjective statements on protected speech is not a matter of purchaser preference—it is compelled speech. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 592 (2023) (holding the First Amendment prohibits a state from "coopt[ing] an individual's voice for its own purposes.").

### B. READER denies vendors fair notice and invites arbitrary enforcement.

READER's rating requirements are unconstitutionally vague. The Act requires booksellers and publishers to classify protected works using indeterminate terms without providing workable standards. *See* Tex. Educ. Code §§ 33.021(a), 35.001(2)–(3), 35.002(b), 35.0021, 35.003.

READER turns on two definitions, one crucial omission, and several undefined terms. First, READER defines "sexually relevant" material as material that "describes, depicts, or portrays sexual conduct." To define "sexual conduct," the Act incorporates the Texas Penal Code, and includes "sexual contact," "sexual intercourse" or "any portion of the female breast below the top of the areola." *See id.* (adopting the definition of "sexual conduct" from Tex. Penal Code § 43.25(a)(2)). "Sexual contact," in turn, is defined as "any touching of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person." *Id.* (adopting the definition of "sexual contact" from Tex. Penal Code § 43.01(3)). Notably, there is no requirement that the material taken as a whole appeal to the prurient interest or describe sexual conduct that is patently offensive.

Second, the Act defines "sexually explicit" material as material that "describes, depicts, or portrays sexual conduct . . . in a way that is patently offensive," as defined by Section 43.21 of the Texas Penal Code ("'Patently offensive' means so offensive on its face as to affront current community standards of decency."). Tex. Educ. Code § 33.021(a).

*Amici* do not publish or sell pornography, yet we find ourselves governed by a law that borrows language selectively from anti-pornography statutes. This paradigm harms students and *Amici* alike. Judgments of educational appropriateness must be made by professional educators and librarians. Yet under READER it is publishers and booksellers who must apply vague definitions that will lead to inconsistent results and ratings. For the "sexually relevant" category, what does it mean to "portray" sexual conduct? The law does not offer guidance. How explicit or detailed does the portrayal need to be? Is a fleeting reference sufficient? Is there some threshold of how graphic the portrayal needs to be? What about double entendres or euphemisms? Again, no guidance is offered.

Attempting to apply these definitions to specific works underscores the futility of the task. Should the Bible be classified as "sexually relevant" because it contains numerous portrayals of sexual conduct? *See, e.g.*, Genesis 35:22 (New American Standard) ("It came about while Israel was dwelling in that land, that Reuben went and lay with Bilhah, his father's concubine, and Israel heard of it"). Must art history books displaying nudes created by revered masters from Leonardo DaVinci and Goya to Matisse and Modigliani be labeled "sexually relevant" and withheld from high school students absent parental consent? How about line drawings in medical texts? These are all open questions.

The definition of "sexually explicit" is even more vague. Texas is made up of nearly 32 million people and 9,000 K-12 campuses. Inevitably, "community standards of decency" vary dramatically.[3] But READER does not even narrow that subjective inquiry to its constitutional bounds: it omits any consideration of whether the work, taken as a whole, lacks serious value. *See Miller v. California*, 413 U.S. 15, 24 (1973). In *Reno v. ACLU*, the Court held that a statute ostensibly protecting minors from "patently offensive" material on the internet was unconstitutional because it omitted the requirement established in *Miller* that the material must "lack serious literary, artistic, political, or scientific value" in order to be validly regulated. 521 U.S. 844, 865 (1997); *see also Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 474 (2025) (regulation of material that is obscene as to minors must take into account whether "as a whole" the material "lack[s] serious literary, artistic, political, or scientific value *for minors*") (emphasis in original). Yet READER omits this consideration, and the State attempts to distract from the risk of banning protected expression by masquerading as an ordinary purchaser.

Perhaps READER hints at assessing a work's serious value when it provides for the weighing and balancing of multiple subjective factors. *See* Tex. Educ. Code

---

[3] *See QuickFacts: Texas*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/TX (last visited May 17, 2026) (reporting Texas population of 31,290,831 as of July 1, 2024); *Finding a School*, Tex. Educ. Agency, https://tea.texas.gov/texas-schools/general-information/finding-a-school-for-your-child/finding-a-school [https://perma.cc/7FKT-YN8M] (last visited May 17, 2026) (noting Texas's 1,207 school districts and charters "contain nearly 9,000 campuses").

§ 35.0021(b) ("in performing the **contextual** analysis … [the] vendor must consider the following…"); *id.* § 35.0021(c) ("a vendor must **weigh** and **balance each factor** …"); *id.* § 35.0021(d) ("a library material vendor must consider the **full context** in which the description, depiction, or portrayal of sexual conduct appears, to the extent possible, recognizing that contextual determinations are necessarily **highly fact-specific** and require the consideration of **contextual characteristics** that may exacerbate or mitigate the offensiveness of the material.") (emphasis added). But this weighing and balancing only compounds the uncertainty and increases the costs and administrative burdens of compliance. State-imposed restrictions cannot be so vague that the "censor is set adrift upon a boundless sea[.]" *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 504 (1952). READER fails this test.

Finally, two undefined terms are central to READER's unconstitutionally vague scheme. READER includes all material in "active use" and excludes any material that is "directly related to the curriculum" required by the State. Tex. Educ. Code § 35.001(3) (citing Tex. Educ. Code § 28.002(a)). But READER never explains what it means for material to be in 'active use" or "directly related" to the curriculum. Which curriculum? How are *Amici* to account for the distinctions in curricula between the over 1,000 distinct school districts in Texas? The law leaves unresolved the relationship of many types of materials used in the educational setting, including supplemental and reference materials, literary works,

commentaries used to contextualize material, and more. For a vendor, the path to determining what is "directly related" is trackless.

The standards for determining what material is "in active use" are no clearer. READER requires vendors to recall material rated "sexually explicit" that is "in active use" by a school. Tex. Educ. Code § 35.002(b)(1)–(2). The vendor then is required to submit a list of such materials "in active use" annually. Tex. Educ. Code §§ 35.002(c)–(d). But the law leaves unexplained what it means for a material to be "in active use." Is something "in active use" if it sits on a library shelf but is never checked out? Is it "in active use" if it is recommended as supplemental reading on a teacher's syllabus? READER does not say.

All these ambiguities in turn invite arbitrary and inconsistent application by the Texas Education Agency and school districts. In other words, the Act invites "unbridled discretion" because they are required to supply their own standards to the terms. *See Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759 (1988). As the district court correctly noted, "READER requires Plaintiffs to assign subjective, confusing, and unknowable Rating Requirements." ROA.3432. Book vendors—fearing the consequences of contested designations by the State—may well err on the side of caution and over-designate. The law is so unclear that it is likely that different sellers —each guessing at what will pass muster in the eyes of Texas

authorities—will have different ratings. In sum, the vagueness of the law compounds the burden felt by *Amici* and exacerbates the Act's chilling effects.

## III. READER is a Prior Restraint on Protected Speech

The district court correctly held that READER is an unconstitutional prior restraint because it prevents speech that is not obscene from "occurring in the first instance" without any of the procedural safeguards the Supreme Court has mandated for such silencing schemes. ROA.3434–3435; *see Freedman v. Maryland*, 380 U.S. 51, 58 (1965). Yet the State tries to sidestep the prior restraint question by claiming READER imposes nothing more than a purchasing condition.

But the State's framing fails. READER requires private vendors to classify protected expression before any sale to public schools may occur, and even bars future sales until the vendors comply. That is not ordinary consumer choice—that is tantamount to a licensing regime.

Because of the unbridled discretion that the State's reviewers have to police the rating and removal of "sexually explicit" books, it is possible under the Act for a book to be banned from Texas schools in perpetuity without having met the definition of obscenity for minors. *See Free Speech Coalition, Inc.*, 606 U.S. at 474. And the State's licensing regime on speech applies without any constitutionally mandated safeguards.

The Supreme Court has held that when a state executive body lists particular publications as objectionable without following the proper judicial process, the state has engaged in a prior administrative restraint which creates a heavy presumption against its constitutional validity. *Bantam Books v. Sullivan*, 372 U.S. 58, 70 (1963). The Court has further held that "a state is not free to adopt whatever procedures it pleases for dealing with obscenity. . . without regard to the possible consequences for constitutionally protected speech." *Freedman,* 380 U.S. at 57. "A noncriminal process which requires the prior submission of a film to a censor avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Id.* at 58. "The burden of proving that the film is unprotected expression must rest on the censor." *Id.* "While the State may require advance submission of all films, in order to proceed effectively to bar all showings of unprotected films, the requirement cannot be administered in a manner which would lend an effect of finality to the censor's determination whether a film constitutes protected expression." *Id.* In cases of freedom of expression, "only a procedure requiring a judicial determination suffices to impose a valid final restraint." *Id.* Because of the Court's unique sensitivity to freedom of expression, "the exhibitor" of an expression "must be assured by statute or authoritative judicial construction, that the censor will, within a specified brief period, either issue a license or go to court to restrain showing" the expression. *Id.* at 58–59.

The State's main argument against the district court's conclusion that the Act is an unconstitutional prior restraint is that publishers do not have a right for the government to buy their books. Appellant's Br. at 27–28 (citing *Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025)). But that argument gets prior restraint doctrine exactly wrong. A prior restraint is a system which "regulat[es] speech contingent on the will of an official[.]" *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003) (citing *Staub v. City of Baxley*, 335 U.S. 313, 322 (1958)). READER does just that by imbuing the State with significant power to prevent publishers from distributing their protected speech to a willing audience, unless they meet the cripplingly expensive and time-consuming preconditions the State has imposed on them.

By forbidding certain types of books based on intrinsically subjective "standards" before school districts have even purchased them, the State is in effect preventing speech that is not obscene from "occurring in the first instance" without any of the mandated safeguards required by *Freedman*. In addition, the economic ramifications of READER are massive. For example, Appellee Blue Willow, an independent book seller, estimates that it would cost between $200 to $1000 to review each book it sells to the Texas Public School system and that "the total cost to read and rate books already sold to Texas public schools would be between $4 million and $500 million." ROA.1452–53. The alternative for the independent seller

is permanent banishment from selling books to Texas public schools. Multiply this paradigm by 50 states, each with their own ideas, and the picture becomes clearer—death by 1,000 label papercuts for *Amici*. As the district court held, the "Rating Requirements are prior restraints because they prevent speech from occurring in the first instance by prohibiting the distribution of books possibly protected by the First Amendment." On that (correct) understanding, the prior restraint imposed by the Rating Requirements is "unconstitutional because it lacks adequate safeguards." *Book People, Inc. v. Wong*, 807 F. Supp. 3d 677, 693 (W.D. Tex. 2025); ROA.3435.

## **CONCLUSION**

For the foregoing reasons, the Court should affirm the judgment of the district court.

Dated: May 20, 2026

Respectfully submitted,

*<u>/s/ Thomas S. Leatherbury</u>*
Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

Peter B. Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, Texas 75275-0116
(214) 768-4077
psteffensen@smu.edu

Counsel for *Amici Curiae*[4]

[4] Counsel for *Amici Curiae* thank SMU Dedman School of Law students Michael Kelley, Yussra Hamid, and Sean Nussbaum for their substantial contributions to this brief.

## CERTIFICATE OF SERVICE

I certify that on May 20, 2026, I caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit through the CM/ECF system. I certify that the participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Thomas S. Leatherbury*
Attorney of Record for *Amici Curiae*

**CERTIFICATIONS UNDER ECF FILING STANDARDS**

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Thomas S. Leatherbury*
Attorney of Record for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 4,193 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the type-face requirements and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rules 32.1 and 32.2 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Thomas S. Leatherbury*
Attorney of Record for *Amici Curiae*