No. 25-50891

# UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

---

Book People, Inc.; VBK, Inc. (d/b/a Blue Willow Bookshop); Association of American Publishers; Authors Guild, Inc.; Comic Book Legal Defense Fund; American Booksellers Association,
*Plaintiffs-Appellees*,

v.

Mike Morath, in his official capacity as the Commissioner of the Texas Education Agency,
*Defendants-Appellants*.

---

On Appeal from the United States District Court for the Western District of Texas, Austin Division
Civil Action No. 1:23-cv-00858-ADA

---

## BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION OF TEXAS AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

---

BRIAN KLOSTERBOER
CHLOE KEMPF
THOMAS BUSER-CLANCY
ADRIANA PIÑON
ACLU FOUNDATION OF TEXAS, INC.
P.O. BOX. 8306
HOUSTON, TX 77288

STUART SARNOFF
LEAH KORN
CAMILA TUCKER
O'MELVENY & MYERS LLP
1301 AVE. OF THE AMERICAS,
SUITE 1700
NEW YORK, NY 10019

BROOKE WILNER
O'MELVENY & MYERS LLP
1625 EYE STREET, NW
WASHINGTON, DC 20006
(202) 383-5300

May 20, 2026

*Counsel for* Amicus Curiae *American Civil Liberties Union of Texas*

# CERTIFICATE OF INTERESTED PERSONS

**Case Number and Style**: No. 23-50668, *Book People, Inc. v. Wong*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. **Plaintiffs-Appellees**: Book People, Inc., VBK, Inc. d/b/a Blue Willow Bookshop, American Booksellers Association, Association of American Publishers, Authors Guild, Inc., and Comic Book Legal Defense Fund. None of the Plaintiffs-Appellees are a publicly held corporation; no Plaintiff-Appellee has any parent corporation; and no publicly held corporation owns 10 percent or more of any Plaintiff-Appellee's stock.

2. **Counsel for Plaintiffs-Appellees**: Laura Lee Prather, Catherine L. Robb, Michael J. Lambert, William Reid Pillifant, and Daniel L. Geyser of Haynes and Boone, LLP.

3. **Defendants-Appellants**: Mike Morath, in his official capacity as chair of the Commission of Education.

4. **Counsel for Defendants-Appellants**: Ken Paxton, Brent Webster, William R. Peterson, Cameron Fraser, and Nathaniel A. Plemons, of the Office of the Attorney General.

5. ***Amicus Curiae***: State Representative Jared Patterson.

6. **Counsel for *Amicus Curiae***: Robert Henneke and Chance Weldon of the Texas Public Policy Foundation.

7. ***Amici Curiae* in District Court**: Educational Book & Media Association; Association of University Presses; Barnes & Noble, Inc.; Freedom to Read Foundation; Freedom to Learn Advocates; American Association of School Librarians; and Association of University Presses.

8. **Counsel for *Amici Curiae* in District Court**: Peter D. Kennedy of Graves, Dougherty, Hearon & Moody, P.C.; Everett William Jack, Jr., Celyra Imani Myers, and Linda J. Steinman of Davis Wright Tremaine LLP.

9. ***Amicus Curiae***: American Civil Liberties Union of Texas.

10. **Counsel for *Amicus Curiae***: Stuart M. Sarnoff, Brooke M. Wilner, Leah Korn, and Camila Tucker of O'Melveny & Myers LLP; Brian Klosterboer, Chloe Kempf, Thomas Buser-Clancy, and Adriana Piñon of the ACLU Foundation of Texas, Inc.

*/s/ Stuart Sarnoff*
Stuart Sarnoff

*Counsel of Record for*
Amicus Curiae
AMERICAN CIVIL LIBERTIES
UNION OF TEXAS

# TABLE OF CONTENTS

**Page**

INTERESTS OF *AMICUS CURIAE* ............................................................................1

INTRODUCTION ................................................................................................2

ARGUMENT .......................................................................................................4

I. The Law of the Case Doctrine Precludes the State From Re-Litigating the Issues of Plaintiffs' Standing, Government Speech, and Sovereign Immunity.............................................................................................4

A. The law of the case precludes the re-litigation of issues that have already been decided.........................................................4

B. Several of the legal issues now raised by the State—including Plaintiffs' standing, government speech, and sovereign immunity—were already decided by this Court and thus cannot be relitigated. ..........................................................................7

II. The District Court's Injunction Is Properly Tailored to Provide the Plaintiffs "Complete Relief" Under *Trump v. CASA* ...........................12

A. The district court's injunction is appropriate in scope to provide complete relief to Plaintiffs. .............................................13

B. *CASA* did not foreclose injunctions that operate statewide. ...............20

CONCLUSION ...................................................................................................25

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Book People, Inc. v. Wong*,
692 F.Supp.3d 660 (W.D. Tex. 2023) ........ 8

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) ........ *passim*

*Brooks v. United States*,
757 F.2d 734 (5th Cir. 1985) ........ 5, 6

*Dombrowski v. Pfister*,
380 U.S. 479 (1965) ........ 19

*In re Felt*,
255 F.3d 220 (5th Cir. 2001) ........ 5

*Free v. Abbott Laby's, Inc.*,
164 F.3d 270 (5th Cir. 1999) ........ 6, 10

*Hopwood v. Texas*,
236 F.3d 256 (5th Cir. 2000) ........ 6

*Jackson Federation of Teachers v. Fitch*,
799 F. Supp. 3d 571 (S.D. Miss. Aug. 18, 2025) ........ 18, 22, 25

*League of United Latin American Citizens v. Executive Office of the President*,
2026 WL 252420 (D.D.C. 2026) ........ 23, 26

*Liberty Mut. Fire Ins. Co. v. Fowlkes Plumbing, LLC*,
850 F. App'x 213 (5th Cir. 2021) ........ 6

*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025) ........ 11

*Miot v. Trump*,
2026 WL 659420 (D.C. Cir. Mar. 6, 2026) ........ 21

*National Education Association-New Hampshire v. New Hampshire Attorney General*,
2025 WL 2807652 (D.N.H. Oct. 2, 2025) ........ 23

## TABLE OF AUTHORITIES
## (continued)

**Page**

*Oakes Farms Food & Distrib. Servs., LLC v. Adkins*,
154 F.4th 1338 (11th Cir. 2025) ......................................................................12

*Reporters Comm. for Freedom of the Press v. Rokita*,
147 F.4th 720 (7th Cir. 2025) ..........................................................................24

*Roberts v. Cooper*,
61 U.S. (20 How.) 467 (1857) ..........................................................................5

*Shaw v. Smith*,
166 F.4th 61 (10th Cir. 2026) ..........................................................................20

*Trump v. CASA*,
606 U.S. 831 (2025)........................................................................*passim*

*United States v. Becerra*,
155 F.3d 740 (5th Cir. 1998) ..................................................................6, 11, 12

*United States v. Camou*,
184 U.S. 572 (1902)...........................................................................................6

*United States v. Castillo*,
179 F.3d 321 (5th Cir. 1999) ............................................................................4

*United States v. Florida*,
2026 WL 879178 (11th Cir. Mar. 31, 2026) .....................................................21

*United States v. Teel*,
691 F.3d 578 (5th Cir. 2012) ........................................................................4, 12

*United States v. Texas*,
794 F. Supp. 3d 427 (W.D. Tex. 2025) ............................................................17

*Vasquez Perdomo v. Noem*,
148 F.4th 656 (9th Cir. 2025) ..........................................................................22

*Vine v. PLS Fin. Servs., Inc.*,
807 F. App'x 320 (5th Cir. 2020) .......................................................................6

*Virginia v. Hicks*,
539 U.S. 113 (2003)..........................................................................................19

*White v. Murtha*,
377 F.2d 428 (5th Cir. 1967) ............................................................................5

## TABLE OF AUTHORITIES
## (continued)

**Page**

**Statutes**

Tex. Educ. Code § 35.001(1) ....................15
Tex. Educ. Code § 35.002 ....................9, 11, 17
Tex. Educ. Code § 35.002(a) ....................22
Tex. Educ. Code § 35.003 ....................17
Tex. Educ. Code § 35.003(b)(1) ....................8
Tex. Educ. Code § 35.003(c) ....................17
Tex. Educ. Code § 35.003(d) ....................17

**Other Authorities**

*CASA's Complete Relief Paradox*, 139 HARV. L. REV. 646 (2025) ....................25

**Rules**

5th Cir. R. 29.2 ....................3

## INTERESTS OF *AMICUS CURIAE*

*Amicus Curiae* American Civil Liberties Union of Texas ("ACLU of Texas") is a nonpartisan, nonprofit organization with thousands of members and supporters across the State. Founded in 1938, the ACLU of Texas is headquartered in Houston and is one of the largest ACLU affiliates in the nation. The ACLU of Texas works with communities, at the State Capitol, and in the courts to fulfill the promises of the Constitution for every Texan, no exceptions. From Amarillo to Brownsville and Beaumont to El Paso, the ACLU of Texas believes in a Texas that works for all of us—a Texas where each person has an equal say in the decisions that shape our future and everyone can build a good life. The ACLU of Texas has expertise in the First Amendment and an interest in guarding against government censorship of free expression and ideas—which goes to the heart of this case—and in challenging government censorship and unconstitutional laws.

## INTRODUCTION

As this Court made clear in assessing the State's[1] first appeal, Texas's Restricting Explicit and Adult-Designated Educational Resources Act ("READER" or the "Act") placed a heavy burden on private booksellers and vendors ("Plaintiffs"):[2] the Act required them to review and "rate" every book ever sold to a Texas school district that remains in "active use" to determine which books are too "sexually explicit" or "sexually relevant" as the Act defines those terms. After that initial, burdensome rating process (which the Plaintiffs were required to undertake at their own expense), the Act then required that Plaintiffs correct and publicly re-post those ratings if the Texas Education Agency happened to disagree with them. If the Plaintiffs refused to comply, the Act would bar them from doing any further business with Texas school districts.

As a consequence, this Court determined in the State's previous appeal that READER's requirements inflicted concrete, non-speculative, and redressable injuries on the Plaintiffs—injuries that conferred standing on the Plaintiffs to

---

1 For purposes of this brief, "the State" or "the Commissioner" each refer to Defendant-Appellant Mike Morath, in his official capacity as the Commissioner of the Texas Education Agency.

2 For purposes of this brief, "Plaintiffs" means Plaintiffs-Appellees Book People, Inc.; VBK, Inc. (d/b/a Blue Willow Bookshop); Association of American Publishers; Authors Guild, Inc.; Comic Book Legal Defense Fund; and American Booksellers Ass'n.

challenge the Act. Undeterred by this Court's prior ruling on this issue, the State tries again in this second appeal to challenge the Plaintiffs' standing, raising identical arguments to those this Court already considered (and rejected) the first time around. The State also raises a similarly familiar argument that the Texas Education Agency's communication of ratings to a vendor under READER is not government speech, but that also was already decided in its first appeal. The State cannot use this second appeal as an end-run around the settled law of the case.

Separately, the State raises a brief, conclusory argument that the district court's injunction is improperly "universal," invoking the Supreme Court's decision in *Trump v. CASA*, 606 U.S. 831 (2025). In doing so, the State ignores both the non-universal nature of the injunction and the actual holding of *CASA*, which plainly did not prohibit injunctions that operate statewide. *CASA* merely reiterated the longstanding requirement that injunctions be no broader than necessary to provide "complete relief" to the Plaintiffs—exactly what the district court's injunction does here.

*Amicus Curiae* submits this brief to help clarify these matters: this Court should decline the State's invitation to re-open settled legal issues and affirm the district court's appropriately tailored injunction.[3]

[3] *Amici Curiae* is mindful of the Court's direction to "avoid the repetition of facts or legal arguments contained in the principal briefs" (5th Cir. R. 29.2), and that

# ARGUMENT

## I. The Law of the Case Doctrine Precludes the State From Re-Litigating the Issues of Plaintiffs' Standing, Government Speech, and Sovereign Immunity

In this second appeal, the State seeks improperly to re-litigate several issues, including challenges both to Plaintiffs' standing and the merits of the Plaintiffs' suit, that it already raised—and that this Court already resolved—in its first appeal. Specifically, the State asserts various conclusory challenges to the Plaintiffs' standing throughout its brief, attempts to re-argue that the State's challenged conduct constitutes government speech not restricted by the First Amendment, and also offers a passing challenge to this Court's previous sovereign immunity ruling. But the law of the case has settled each of these issues. The Court should thus decline the State's attempt to take another bite at those apples.

### A. The law of the case precludes the re-litigation of issues that have already been decided.

Under the law of the case doctrine, "the appellate court on a subsequent appeal[] abstains from reexamining an issue of fact or law that has already been decided on appeal." *United States v. Teel*, 691 F.3d 578, 582 (5th Cir. 2012); *see also, e.g.*, *United States v. Castillo*, 179 F.3d 321, 326 (5th Cir. 1999) ("The law-of-

---

the parties' principal briefs addressed these issues to some extent. This brief thus endeavors to elaborate on these issues, raising additional points and authorities for the Court's consideration, without unnecessarily rehashing the points made by Plaintiffs.

the-case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (quotation omitted). Without it, "there would be no end to a suit," because "every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions or speculate of chances from changes in its members," meaning "it would be impossible for an appellate court to perform its duties satisfactorily and efficiently." *White v. Murtha*, 377 F.2d 428, 431 (5th Cir. 1967) (quoting *Roberts v. Cooper*, 61 U.S. (20 How.) 467, 481 (1857)). Put simply, this doctrine promotes judicial economy by preventing reconsideration of settled issues.

The doctrine applies to issues that the appellate court previously decided both explicitly and "by necessary implication." *In re Felt*, 255 F.3d 220, 225–26 (5th Cir. 2001) (The law-of-the-case doctrine precludes consideration, in a subsequent appeal, of matters decided "tacitly or implicitly" in a prior appeal.) (quotation omitted). Any matters that were previously "fully briefed to the appellate court" and served as a foundation for that court's determinations are considered the law of the case. *Id.*

Consistent with this doctrine, "a second appeal generally brings up for revision" only "proceedings subsequent to . . . the prior appeal." *Brooks v. United States*, 757 F.2d 734, 739 (5th Cir. 1985). Thus, any proceedings that occurred before the previous appeal are no longer subject to revision—parties cannot petition the appellate court in a subsequent appeal for review of an issue that the appellant

could have raised in the prior appeal but did not. *Id.* (citing *United States v. Camou*, 184 U.S. 572, 574, (1902)). And there is no "'jurisdiction exception' to the law of the case doctrine"; once the Court has decided a jurisdictional question of law, the parties may not revisit it. *Free v. Abbott Laby's, Inc.*, 164 F.3d 270, 273 (5th Cir. 1999).

This Court has explained that the reexamination of issues previously decided is limited to cases where "controlling authority has since made a contrary decision of the law applicable to such issues" or "the decision was clearly erroneous." *United States v. Becerra*, 155 F.3d 740, 752–53 (5th Cir. 1998) (quotation omitted). The standard for departing from the law of the case is a high one—to "ignore the law of the case" under the latter exception, "the prior decision must be 'dead wrong.'" *Vine v. PLS Fin. Servs., Inc.*, 807 F. App'x 320, 327 (5th Cir. 2020) (quoting *Hopwood v. Texas*, 236 F.3d 256, 273 (5th Cir. 2000)). If "the question is close, by definition it cannot be dead wrong." *Liberty Mut. Fire Ins. Co. v. Fowlkes Plumbing, LLC*, 850 F. App'x 213, 217 (5th Cir. 2021) (quotation omitted); *see also Hopwood*, 236 F.3d at 272 ("Mere doubts or disagreement about the wisdom of a prior decision of this or a lower court will not suffice.") (quotation omitted).

### B. Several of the legal issues now raised by the State—including Plaintiffs' standing, government speech, and sovereign immunity—were already decided by this Court and thus cannot be relitigated.

The State's brief raises multiple legal issues that this Court already addressed in the State's prior appeal, including whether Plaintiffs have standing and whether the Texas Education Agency's conduct under READER constitutes government speech that is not implicated by the Free Speech Clause. Under the law-of-the-case principles just described, the State cannot re-raise these issues, and this Court should decline to address them for a second time.

***First***, the State raises various perfunctory challenges to Plaintiffs' standing throughout its brief, retreading familiar ground—that Plaintiffs' injuries are speculative or too attenuated. But this Court already considered this issue at length. As the Court explained in its opinion in the State's first appeal, the Plaintiffs had "concrete, cognizable injuries"; that could "be traced to the Commissioner's enforcement of READER"; and that were "redressable by an injunction against" the Commissioner. *Book People, Inc. v. Wong*, 91 F.4th 318, 332–33 (5th Cir. 2024). In other words, there is no longer a question to resolve: "Plaintiffs have standing." *Id.* at 333.

Despite this issue having been fully resolved in its first appeal, the State's brief improperly floats the specter of a standing challenge in several places. For example, the State's first invocation of standing—an assertion that Plaintiffs have

not "articulated how they could have standing to challenge a delegation [of government authority to regulate free speech] *to themselves*," State's Br. at 29 (emphasis in original)—is pure digression. Neither the district court nor this Court determined that Plaintiffs had standing based on an assertion that READER was an unconstitutional delegation of government authority; instead, both courts determined that Plaintiffs were "likely to prove a First Amendment violation on other grounds," namely compelled speech, and to prove economic injury. *Book People*, 91 F.4th at 336 n.102; *Book People, Inc. v. Wong*, 692 F.Supp.3d 660, 680 (W.D. Tex. 2023) ("Plaintiffs' ability to sell books is arguably proscribed by READER unless and until they comply with requirements that are burdensome[,] [] costly[,]" and "imminent," which "confers standing"). This Court should thus ignore the State's reconstituted attempt to manufacture a dispute about standing, an issue which has already been considered and resolved.

The State next attacks Plaintiffs' standing to challenge READER's requirement that vendors must "rate the library material according to the [Texas Education Agency's] corrected rating." Tex. Educ. Code. § 35.003(b)(1). In the State's view, Plaintiffs' claims of injury based on this statutory provision are "far too attenuated to give rise to standing," because they are purportedly "unfounded" and "rest[] on speculation" "in this pre-enforcement posture." State's Br. at 32–38.

Notably, the State attempts in this second appeal to reframe Plaintiffs' standing as relating *only* to the correction or re-posting of certain ratings. State Br. at 32 (citing Tex. Educ. Code. §§ 35.002). But the Plaintiffs have never argued that their standing is based exclusively on READER's requirement that they "submit the rating to the Texas Education Agency," as the State asserts. State's Br. at 32. Instead, as this Court determined in the State's first appeal, Plaintiffs' standing derives in part from the substantial initial burden of providing individual ratings for each book in the first place, a process that Plaintiffs convincingly explained "will require them to divert extensive time and resources from their normal operations," costing "between $200 to $1,000 per book" and risking the continued viability of their businesses. *Book People*, 91 F.4th at 331. In fact, this Court held that Plaintiffs had established not one but *two* sufficiently non-speculative injuries "under [] pre-enforcement standing precedent"—a constitutional injury based on their compelled speech and, separately, an independent economic injury, *id.* at 331, 340—and had similarly demonstrated sufficient causation and redressability, *id.* at 332–33.

To be clear, both the initial burden of rating each book *and* the continued burden of correcting and re-posting ratings if required by the Texas Education Agency independently give rise to Plaintiffs' standing. *See id.* at 329–33. Notwithstanding the State's attempts to narrow and reframe the Plaintiffs' basis for standing in its second appeal, the State cannot avoid the law of the case doctrine.

*Free*, 164 F.3d at 273 (once a Court has decided a jurisdictional question, the law of the case precludes the parties from re-raising the issue). Nor can the State argue that this Court's finding of standing—based upon a detailed determination of injury, causation, and redressability, for both constitutional and economic harm—is clearly erroneous. Put simply, this Court has already determined the Plaintiffs have standing to challenge READER.

***Second***, the State raises the already-litigated issue of whether the Texas Education Agency's communication of ratings to a vendor under READER is government speech that cannot be restricted by the First Amendment. State's Br. at 31. If this argument sounds familiar, that is because it is: the State previously raised (and lost) an identical challenge. *Book People*, 91 F.4th at 337 (addressing the State's argument that READER does not affect Plaintiffs' First Amendment rights because "the law does not require [the Agency] 'to identify or otherwise associate any vendor with any book or any rating'"). This Court was unconvinced, explaining that the public would understand "[t]he ratings are the vendor's speech, not the government's." *Id.* at 338.

Similarly, the State now asserts that READER does not compel the Plaintiffs' speech because it "requires only that vendors repeat the government's speech back to the government." State's Br. at 32. But this contrived argument, relating only to READER's requirement that booksellers adopt the Texas Education Agency's

"corrected" ratings, ignores the statute's additional requirement that those booksellers review library material and issue ratings in the first place. Tex. Educ. Code §§ 35.002. In any event, this Court similarly has already addressed (and rejected) this argument. *Book People*, 91 F.4th at 338–40 (holding the government speech exception does not apply to READER's requirement that Plaintiffs "adopt TEA's 'corrected' rating").

To the extent the State tries to suggest that this Court's decision in *Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025), constitutes "controlling authority [that] has since made a contrary decision of the law applicable to such issues," *Becerra*, 155 F.3d at 753, such an argument would fail. In *Little*, this Court held that a county public library's collection decisions, including which books to stock or remove from shelves, was government speech not subject to a Free Speech challenge. 138 F.4th at 837–38. The Court explained that by curating a collection of books, a public library engages in expressive activity that amounts to government speech, like a museum curating its exhibits. *Id.* at 837, 854. Here, in contrast, the Plaintiffs are private booksellers and organizations, not public librarians. And unlike the public library's museum-like curation of material in *Little*, here the State seeks to issue its own ratings through opinions publicly attributable to Plaintiffs, like a

ventriloquist speaking through a dummy.[4] In short, there is no "controlling authority" that "has since made a contrary decision of the law applicable to" this case. *Becerra*, 155 F.3d at 752-53.

***Third***, in its Statement of Jurisdiction, the State purports to "contend that sovereign immunity bars the suit." State's Br. at 1. But as the State appropriately acknowledges, "this Court resolved the issue against [it] in the appeal of the preliminary injunction." *Id.* (citing *Book People*, 91 F.4th at 336). The State is right—this issue similarly was already resolved and cannot be relitigated here. *Teel*, 691 F.3d at 582.

## II. The District Court's Injunction Is Properly Tailored to Provide the Plaintiffs "Complete Relief" Under *Trump v. CASA*

Among the State's multitude of challenges to the district court's injunction is its brief argument that the injunction is improperly "universal" under the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). State Br.

[4] The recently issued *Oakes Farms Food & Distrib. Servs., LLC v. Adkins*, 154 F.4th 1338 (11th Cir. 2025), is even further afield. As an initial matter, *Oakes Farms* was issued by another circuit, and it is therefore not the "controlling authority" required to ignore the law of the case. *Becerra*, 155 F.3d at 753. But it is also inapt. In *Oakes Farms*, the Eleventh Circuit considered an independent contractor private farm whose contract to provide food to a school district was terminated after a farm employee publicly posted, among other things, that COVID-19 was a "hoax." 154 F.4th at 1341. That court determined that while independent contractors are similar to government employees for First Amendment purposes, the district's termination of the farm's contract was due to legitimate safety concerns during the pandemic, and not any allegedly protected speech. *Id.* at 1347–48.

at 38–39. But this challenge fails on multiple grounds. The injunction is not universal and, even if it was, it is no broader than necessary to afford Plaintiffs the "complete relief" to which they are entitled, as contemplated by *CASA*. And *CASA*, contrary to the State's assertions, does not prohibit statewide injunctions.

In *CASA*, the Supreme Court held that "universal injunctions"—which it defined as orders barring the government from applying a challenged policy "to anyone in the country"—"likely exceed the equitable authority that Congress has given to federal courts." 606 U.S. at 839, 841 (emphasis omitted). But the Court was careful to limit its holding. It did not hold that ***all*** broad injunctions (even the narrow class of "universal" injunctions) are *per se* impermissible; rather, it reiterated that the proper scope of an injunction is that which is "no broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 831. The Court acknowledged that in some circumstances, "complete relief" may require enjoining enforcement beyond just the named plaintiffs—particularly where organizational plaintiffs have large memberships or where narrower relief would be "unworkable." *Id.* at 852, n.12. The district court's injunction in this case falls comfortably within those allowable bounds.

### A. The district court's injunction is appropriate in scope to provide complete relief to Plaintiffs.

The State contends that the district court "erred by issuing a universal permanent injunction, forbidding Commissioner Morath from enforcing READER

against anyone, not merely Plaintiffs," and that such a universal injunction falls "outside the bounds of a federal court's equitable authority." State Br. at 38–39 (quoting *CASA*, 606 U.S. at 847). But the State mischaracterizes both the injunction and the law.

As an initial matter, the district court's injunction in this case is not "universal" as that term is understood in *Trump v. CASA*. It enjoins enforcement of specific, unconstitutional provisions of HB 900 by a single state official, specifically, Commissioner Morath; his employees, agents, and the like; and those "in active concert with him." ROA.3440–41. The injunction thus does not apply to an unlimited number of individuals. And it is further confined to the Commissioner's enforcement authority under the Texas Education Code, where he exercises enforcement powers against only school districts and charter schools in Texas—not the nation (or even state) at large.

The sweeping injunction in *CASA,* by contrast, reached far beyond the parties and purported to restrain government action on a nationwide basis, regardless of any connection, or lack thereof, to the plaintiffs or their injuries. *CASA*, 606 U.S. at 839 (explaining the injunction at issue "barr[ed] various executive officials from applying the policy ***to anyone*** in the country") (emphasis added). The injunction here is thus fundamentally different than the "universal" injunction the Court faced in *CASA*, because it is limited to the Commissioner's enforcement of specific

provisions of the Texas Education Code against a defined class of regulated parties—school districts and, for certain provisions, book vendors like Plaintiffs. Unlike the "universal" injunction in CASA, the injunction here does not purport to bind an unlimited number of government actors nationwide; it instead targets the sole official charged with administering and enforcing READER under the Texas Education Code.

To be sure, READER purports to regulate all "library material vendors," defined as "any entity that sells library material to a public primary or secondary school in this state," Tex. Educ. Code § 35.001(1), meaning the injunction's protection extends to vendors beyond just the named Plaintiffs. But that breadth is a function of the statute's own reach, not an improper expansion of the district court's equitable authority. As the Supreme Court recognized in *CASA*, "[t]here may be other injuries for which it is all but impossible for courts to craft relief that is complete and benefits only the named plaintiffs." 606 U.S. at 852 n.12. That is precisely the case here.

The State's real objection is not that the injunction is "universal" in any meaningful sense (it applies only to one official enforcing specific provisions of one statute within one state) but rather that the injunction protects non-Plaintiff vendors from enforcement of READER's rating requirements. But the State's objection

misunderstands both the nature of the Plaintiffs predicament and the relief required to make them whole.

For example, four of the named Plaintiffs are trade associations whose members are vendors subject to READER's rating requirements. The American Booksellers Association represents more than 100 Texas booksellers; the Association of American Publishers represents approximately 110 members, many of which distribute books to Texas schools; the Authors Guild represents more than 500 Texas-based writers; and the Comic Book Legal Defense Fund represents many members in Texas who are subject to READER's requirements. ROA.1457–58; ROA.1464–65; ROA.1472–73; ROA.1478–79. Collectively, these organizations represent thousands of booksellers, publishers, and authors who would be directly harmed by enforcement of READER and who have organizational standing through the named Plaintiffs. An injunction that protected only the named plaintiffs in this litigation, while leaving the Commissioner free to enforce READER's requirements against all other booksellers seeking to provide books to Texas schools, would not provide the organizational Plaintiffs "complete relief" under *CASA*. 606 U.S. at 861. That is because organizational membership is inherently fluid—members join and leave on an ongoing basis. Any injunction limited to current members would immediately erode, leaving some members subject to requirements already declared unconstitutional. *CASA*'s "complete relief" inquiry requires courts to account for this

reality. *See* 606 U.S. at 852 n.12 (recognizing that it may be "impossible for courts to craft relief that is complete and benefits only the named plaintiffs"); *see also United States v. Texas*, 794 F. Supp, 3d 427, 455 (W.D. Tex. 2025) (identifying, post-*CASA*, the concern that an injunction should "cover individuals who become affiliated with the organizations after the injunction issues").

Accordingly, an injunction preventing the Commissioner from enforcing the specific sections of READER that unconstitutionally compel Plaintiffs' speech is, properly, the narrowest possible injunction that will provide the Plaintiffs with complete relief. READER's rating requirements operate as a unitary regulatory scheme: they require all vendors to rate books, submit ratings to the Texas Education Agency, and adopt the government's "corrected" ratings—or face a complete ban on selling books to Texas schools. Tex. Educ. Code §§ 35.002, 35.003. There is no mechanism in READER allowing the Commissioner to selectively enforce these requirements against some vendors but not others. A vendor is either compliant with the entire scheme or is blacklisted. §§ 35.003(c), (d). It would therefore be impossible to craft a narrower injunction—one that, for example, barred enforcement only against named Plaintiffs—because READER's requirements themselves do not operate on a vendor-by-vendor basis that can be disaggregated.

The court in *Jackson Federation of Teachers v. Fitch* confronted analogous circumstances. There, the court issued a statewide preliminary injunction preventing

the enforcement of a Mississippi law that would have prohibited public schools statewide from engaging in certain diversity, equity, and inclusion initiatives, among other things. 799 F. Supp. 3d 571, 575 (S.D. Miss. Aug. 18, 2025). The court rejected Mississippi's argument that any injunction should be limited to the named parties, explaining that such an injunction would be "unsatisfying as to granting them complete relief . . . [because] Plaintiff students would be deprived of the opportunity to interact with and learn from their fellow students at schools across the state," rendering such a limitation "impracticable, if not impossible." *Id.* at 584–85 (applying and citing *CASA*).

So too here. Absent the injunction, the Plaintiffs "will be barred from selling any books to Texas public schools" and will face "extensive" compliance costs that would "assuredly put Blue Willow, BookPeople, and similar booksellers with lean staffs and low profit margins out of business." *See* ROA.1-22, Dkt. 90 at 19–20. If the injunction were narrowed to cover only named Plaintiffs, the Commissioner could still enforce READER's requirements against, for example, future members of the organizational Plaintiffs. Those members would still face the unconstitutional choice of complying with the compelled-speech regime or being blacklisted from selling to Texas schools. Separately, the named bookstore Plaintiffs would face a market in which their publishers and suppliers are chilled, blacklisted, or forced into unconstitutional speech—harming their own commercial and expressive activities.

*CASA*, 606 U.S. at 852 ("[T]here is no way 'to peel off just the portion of the nuisance that harmed the plaintiff.'"). And every other bookseller, publisher, and author in Texas would be exposed to a law already declared unconstitutional—unreasonably forcing each to bear the expense of separate litigation to vindicate the same rights adjudicated here. *See Dombrowski v. Pfister*, 380 U.S. 479, 491 (1965) (Parties "are entitled to be free of the burdens of defending prosecutions . . . aimed at hammering out the structure of the statute piecemeal, with no likelihood of obviating similar uncertainty for others."). The chilling effect on both Plaintiffs and non-Plaintiffs alike would be severe: facing enforcement of an unconstitutional statute, "many . . . persons rather than vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citation omitted).

In short, an injunction more limited than that drafted by the district court could not alleviate the Plaintiffs' injuries, because their speech would still be unconstitutionally restricted. Indeed, the State itself does not attempt to propose a narrower injunction, much less one that would still provide the various Plaintiffs complete relief. The district court's injunction, which enjoins the Commissioner from enforcing the facially unconstitutional sections of READER, is thus

appropriately drafted to redress Plaintiffs' injuries, *i.e.*, to provide the Plaintiffs with "complete relief." *CASA*, 606 U.S. at 851.

### B. *CASA* did not foreclose injunctions that operate statewide.

The State's *CASA*-based challenge independently fails because it presupposes that the Supreme Court categorically prohibited statewide injunctions. It did not.

*CASA* recognized that some plaintiffs challenging statewide action might be entitled to a statewide injunction in order to receive "complete relief." *Id.* In *CASA*, the Court expressly reserved ruling on the outer limits of the doctrine, instead reiterating only that injunctions should be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 831. Contrary to the State's assertion that the Court established "black-letter law," State's Br. at 39, the Court thus plainly did ***not*** hold that statewide injunctions are *per se* impermissible.

In fact, multiple circuit courts have addressed—and rejected—the exact argument that the State makes here. The Tenth Circuit, for example, expressly dismissed the argument that *CASA* foreclosed statewide relief, explaining that the Supreme Court "left open for lower courts to determine the scope of 'complete relief,'" and a statewide injunction may in some circumstances provide an "indivisible remedy" that is permissible even if it "incidentally benefits some third parties." *Shaw v. Smith*, 166 F.4th 61, 83 n.11 (10th Cir. 2026). The Eleventh Circuit likewise concluded that *CASA* "supports state-wide relief" because the

"equitable tradition has long embraced the rule that courts generally may administer complete relief between the parties," and when statewide violations of federal law are proven, "complete injunctive relief may be statewide." *United States v. Florida*, 2026 WL 879178, at *10 (11th Cir. Mar. 31, 2026). And the D.C. Circuit has observed that reading *CASA* as categorically establishing irreparable harm whenever the government is enjoined "overstates the holding" of the decision, which "was tethered to the distinct context" of that case. *Miot v. Trump*, 2026 WL 659420, at *4 (D.C. Cir. Mar. 6, 2026). In short, the State's attempt to transform *CASA* into a blanket prohibition on statewide relief finds no support in the decision itself or in the weight of authority interpreting it.

The State's administrability problem further underscores why a statewide injunction is necessary in this case. Courts have recognized that when a challenged law operates uniformly across a jurisdiction, it is often impossible for an enforcing official to distinguish between protected and unprotected parties in real time, raising serious administrability concerns. In *Vasquez Perdomo v. Noem*, for example, the Ninth Circuit upheld a district-wide restraining order protecting all persons from suspicion-less immigration stops, reasoning that a narrower order would be unenforceable because agents could not determine in advance whether a person they were about to stop was a named plaintiff, such that an injunction limited to the named

parties would not afford them "meaningful relief." 148 F.4th 656, 686–87 (9th Cir. 2025).

The same structural problem exists here in a different form: READER applies uniformly to every "library material vendor" that sells to Texas schools, and its compliance-or-blacklisting mechanism operates categorically. § 35.002(a). It would thus be "impracticable, if not impossible," *Jackson Fed'n*, 799 F. Supp. 3d at 575, for the Commissioner to selectively enforce READER against only non-Plaintiff vendors while exempting named Plaintiff vendors, as doing so would require identification of whether the subject entity was a member of a Plaintiff organization as of the date of the injunction. And even were such an identification logistically possible, it would still not serve to provide the named Plaintiffs complete relief—the Plaintiffs' interactions with non-Plaintiff publishers, booksellers, and authors in the ordinary course of their statewide business would remain negatively impacted by READER's requirements. An injunction limited to the named Plaintiffs would thus be illusory at best, because it would nominally protect them while leaving intact the very regulatory apparatus that causes their injuries.

Courts have also held that *CASA*'s "complete relief" standard affirmatively supports statewide injunctions where the plaintiffs' operations are themselves statewide and the challenged law targets those operations uniformly. In *National Education Association-New Hampshire v. New Hampshire Attorney General*, the

court interpreted *CASA*'s "complete relief" standard as in fact requiring a statewide injunction, blocking enforcement of a law that prohibited schools and public entities statewide from engaging in activities "related" to "diversity, equity, and inclusion" and enjoining the law as to all regulated entities, not merely the named plaintiffs. 2025 WL 2807652, at *1 (D.N.H. Oct. 2, 2025).

Similarly, in *League of United Latin American Citizens v. Executive Office of the President*, the court found *CASA* did not preclude even a ***nationwide*** permanent injunction, where the plaintiff organizations operated in every state and served members subject to the challenged provision nationwide. The court explained that "[a]lthough th[e] injunction reache[d] the relevant Defendants throughout the Nation, it [wa]s not an improper 'universal injunction'" because awarding narrower relief (specifically, protecting only the named plaintiffs) would "not fully redress the threatened injuries," leaving the "only [] feasible option" to be enjoining the defendants' nationwide implementation of the challenged provision in full. 2026 WL 252420, at *92 (D.D.C. 2026) (citing *CASA*, 606 U.S. at 863). So, too, here: the organizational Plaintiffs represent thousands of vendors throughout Texas, and an injunction limited to named parties alone would leave those organizations' future members—identically situated as their current members—subject to the same unconstitutional compulsion.

The Seventh Circuit reached the same conclusion in a case with strong parallels to this one. *Reporters Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 733 (7th Cir. 2025). There, media organizations challenged Indiana's police "buffer zone" law, a statewide criminal statute that they alleged chilled newsgathering activities across the state. That court held that "enjoining the buffer law's enforcement statewide may be necessary to provide the plaintiffs themselves with complete relief," because the plaintiff organizations relied on information from citizens throughout Indiana and thus could not receive complete relief if the law were enforceable in some jurisdictions but not others. *Id.* The same is true here: just as the *Rokita* plaintiffs could not confine their newsgathering to particular jurisdictions, Plaintiffs here cannot confine their bookselling, publishing, and expressive activities to particular school districts or to transactions involving only fellow named Plaintiffs. A narrower injunction would leave Plaintiffs subject to READER's chilling effects whenever their members interact with any Texas school—which is to say, in the ordinary course of their statewide business.

These holdings are particularly instructive in cases like this one, which involve challenges to education and speech regulations that seek to operate statewide. As the court explained in *Jackson Federation* regarding a challenge to a statewide educational censorship law, "injunctions of this type should be all-or-nothing renditions," because "[s]omething less than a statewide preliminary

injunction would be insufficient to afford complete relief to these putative plaintiffs." 799 F. Supp. 3d 571, 585 (S.D. Miss. 2025). That reasoning applies with equal force here, where Plaintiffs are booksellers, publishers, and authors whose commercial and expressive activities cannot be neatly cabined to interactions with only those entities that are not also named parties. *See, e.g.*, *CASA's Complete Relief Paradox*, 139 HARV. L. REV. 646, 660 (2025) (arguing that "nonparty relief should be understood as 'necessary' under CASA when the nature of the right violated requires that an injunction run to persons other than the plaintiff," and identifying First Amendment rights as such paradigmatic "aggregate rights").

Accordingly, contrary to the State's assertions, *CASA* does not preclude the district court's injunction below. The weight of post-*CASA* authority confirms that statewide injunctions remain permissible where, as here, they are necessary to provide plaintiffs with complete relief from government action that operates statewide. The State invites this Court to interpret *CASA* as categorically rejecting statewide injunctions. Just as circuit and district courts nationwide have done, this Court should decline that invitation.

## CONCLUSION

The Court should affirm the district court's injunction, which is appropriately tailored to provide the Plaintiffs complete relief.

Respectfully submitted,

/s/ Stuart Sarnoff

STUART SARNOFF
LEAH KORN
CAMILA TUCKER
O'MELVENY & MYERS LLP
1301 AVE. OF THE AMERICAS,
SUITE 1700
NEW YORK, NY 10019

BROOKE WILNER
O'MELVENY & MYERS LLP
1625 EYE STREET, NW
WASHINGTON, DC 20006
(202) 383-5300

*Counsel for* Amicus Curiae *American Civil Liberties Union of Texas*

BRIAN KLOSTERBOER
CHLOE KEMPF
THOMAS BUSER-CLANCY
ADRIANA PIÑON
ACLU FOUNDATION OF TEXAS, INC.
P.O. BOX. 8306
HOUSTON, TX 77288

May 20, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of May, 2026, a true and correct copy of the foregoing was filed electronically using the CM/ECF system, which served counsel for the parties.

*/s/ Stuart Sarnoff*
Stuart Sarnoff

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5,736 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Times New Roman, font size 14.

*/s/ Stuart Sarnoff*
Stuart Sarnoff

## CERTIFICATIONS UNDER ECF FILING STANDARDS

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Stuart Sarnoff*
Stuart Sarnoff