No. 25-50891

# In the United States Court of Appeals for the Fifth Circuit

BOOK PEOPLE, INCORPORATED; VBK, INCORPORATED, doing business as BLUE WILLOW BOOKSHOP; AMERICAN BOOKSELLERS ASSOCIATION; ASSOCIATION OF AMERICAN PUBLISHERS; AUTHORS GUILD, INCORPORATED; COMIC BOOK LEGAL DEFENSE FUND,

Plaintiffs–Appellees,

v.

MIKE MORATH, in his official capacity as the COMMISSIONER OF THE TEXAS EDUCATION AGENCY,

Defendant–Appellant.

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## REPLY BRIEF

KEN PAXTON
Attorney General of Texas

WILLIAM R. PETERSON
Solicitor General
William.Peterson@oag.texas.gov

BRENT WEBSTER
First Assistant Attorney General

CAMERON FRASER
NATHANIEL A. PLEMONS
Assistant Solicitors General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

*Counsel for Appellant*

# Table of Contents

Table of Authorities ....................................................................................... ii

Supplemental Statement of Jurisdiction........................................................ 1

Argument in Reply ........................................................................................ 2

    I.   The State Does Not Violate the First Amendment by Requesting Information About Goods as a Condition of Purchase.............................. 3

        A.   READER involves the State as a marketplace participant. ................. 3

            1.   READER does not compel speech. ............................................... 3

            2.   School districts are political subdivisions of state government. ................................................................................. 5

        B.   READER is a constitutional condition on sales to public schools. ....................................................................................... 6

            1.   READER is constitutional under *Alliance for Open Society*............ 8

            2.   *Fulton v. City of Philadelphia* does not support Plaintiffs. ............. 11

            3.   Plaintiffs' "objective fact" standard is incorrect. ....................... 13

            4.   Plaintiffs' complaints about costs are irrelevant............................ 15

        C.   Plaintiffs' vagueness challenges fail. .................................................. 15

    II.   The State Does Not Violate the First Amendment by Requiring Vendors to Repeat Corrected Ratings to the State. ................................. 18

        A.   The Texas Education Agency's ratings constitute government speech. .......................................................................... 20

        B.   Repeating the Texas Education Agency's corrected rating of library material is a constitutional condition on selling library materials to public schools. .............................................................. 20

        C.   Plaintiffs' "misattribution" theory is speculative and meritless.......................................................................................... 21

    III.  The District Court Erred by Entering a Universal Injunction. ................. 24

Conclusion ................................................................................................... 26

Certificate of Compliance ............................................................................ 27

# Table of Authorities

**Page(s)**

**Cases:**

*AbbVie, Inc. v. Murrill*,
166 F.4th 528 (5th Cir. 2026).................................................................17

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ...............................................................*passim*

*Board of Education, Island Trees Union Free School District v. Pico*,
457 U.S. 853 (1982)......................................................................... 7-8

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) ........................................................ 20, 21

*Bristol Myers Squibb Co. v. Sec'y U.S. Dep't of Health & Hum. Servs.*,
155 F.4th 245 (3d Cir. 2025) ....................................................3, 9, 21

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)........................................................................ 23

*Dolan v. City of Tigard*,
512 U.S. 374 (1994) ........................................................................11

*El Paso Educ. Initiative, Inc. v. Amex Properties, LLC*,
602 S.W.3d 521 (Tex. 2020) ............................................................ 5

*Employment Division v. Smith*,
494 U.S. 872 (1990) ....................................................................... 12

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021)................................................................... 11, 12

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ....................................................................... 10

*In re Gee*,
941 F.3d 153 (5th Cir. 2019) ........................................................ 2, 23

*Hazelwood School District v. Kuhlmeier*,
484 U.S. 260 (1988) ......................................................................... 8

*Kolender v. Lawson*,
461 U.S. 352 (1983) ........................................................................16

*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025) ....................................................*passim*

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................ 24

*Machete Prods., L.L.C. v. Page*,
    809 F.3d 281 (5th Cir. 2015) .................................................. 14

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ........................................................... 2, 23

*NASA v. Nelson*,
    562 U.S. 134 (2011) ......................................................... 11, 14

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ................................................................16

*National Ass'n of Manufacturers, Inc. v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015) ...............................................13

*Pecos Cnty. Appraisal Dist. v. Iraan-Sheffield Indep. Sch. Dist.*,
    672 S.W.3d 401 (Tex. 2023) .................................................... 5

*Penguin Random House, LLC v. Gibson*,
    796 F. Supp. 3d 1052 (M.D. Fla. 2025) ................................... 7

*Penguin Random House, LLC v. Robbins*,
    172 F.4th 581 (8th Cir. 2026) ................................................. 8

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ............................................................... 10

*PETA v. Gittens*,
    414 F.3d 23 (D.C. Cir. 2005) ..................................................16

*Pickering v. Bd. of Ed.*,
    391 U.S. 563 (1968) ............................................................... 10

*Planned Parenthood of Greater Ohio v. Hodges*,
    917 F.3d 908 (6th Cir. 2019) ................................................... 3

*Regan v. Taxation With Representation of Washington*,
    461 U.S. 540 (1983) ................................................................. 8

*Roark & Hardee LP v. City of Austin*,
    522 F.3d 533 (5th Cir. 2008) ..................................................17

*Royal Ins. Co. of Am. v. Quinn-L Cap. Corp.*,
    3 F.3d 877 (5th Cir. 1993) ................................................ 19, 21

iii

*Stout v. Grand Prairie Indep. Sch. Dist.*,
    733 S.W.2d 290 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) ............................... 6

*Tex. Democratic Party v. Abbott*,
    961 F.3d 389 (5th Cir. 2020) ......................................................................17

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ........................................................................... 24, 25

*Village of Hoffman Estates v. Flipside*,
    455 U.S. 489 (1982) ...................................................................................17

*Voting for Am., Inc. v. Steen*,
    732 F.3d 382 (5th Cir. 2013) ...................................................................... 22

*Women's Med. Ctr. of Nw. Hous. v. Bell*,
    248 F.3d 411 (5th Cir. 2001) .......................................................................17

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
    471 U.S. 626 (1985) ............................................................................. 13, 14

**Constitutional Provision and Statutes:**

U.S. Const. amend. I.............................................................................*passim*

28 U.S.C.
    § 1291.................................................................................................. 1
    § 1292.................................................................................................. 1

Tex. Educ. Code
    ch. 28 ................................................................................................. 6
    ch. 31 ................................................................................................. 6
    ch. 37 ................................................................................................. 6
    § 35.003 ..............................................................................................16
    § 35.007 ..............................................................................................17

Tex. Gov't Code § 485.022 ................................................................... 14

**Other Authorities:**

Guidance Document for Senate Bill (SB) 13 Library Materials Policy,
    Texas Education Agency (Aug. 28, 2025) ......................................... 23

2 Rodney A. Smolla & Melville B. Nimmer, *Smolla & Nimmer on*
    *Freedom of Speech* § 19:7 (2025) ......................................................... 4

## Supplemental Statement of Jurisdiction

Appellant's opening brief identifies the district court's judgment as a final judgment and this Court's jurisdiction as arising under 28 U.S.C. § 1291.

The district court has referred to this appeal as an "interlocutory appeal." ROA.21; Dkt. 122 at 2 ("Defendant filed a Notice of Interlocutory Appeal of the Court's Order permanently enjoining provisions of HB 900[.]"). *But see* ROA.3442 (Caption: "Defendant Morath's Notice of Appeal"). If the district court were correct to characterize the appeal as interlocutory, this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ARGUMENT IN REPLY

Plaintiffs contend that the State has placed onerous conditions on sales to public schools. But if vendors dislike these conditions, they are free "to decline the [sales]," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013), or raise prices. READER does not "compel" anything. As a condition on the benefit of selling to public schools, READER is constitutional because it affects speech only in the context of those sales. *Id.* This appeal is straightforward, and this Court should reverse.

Plaintiffs now acknowledge that facial invalidity is the governing standard rather than a separate theory of invalidity, although their description of the decision below is incorrect. *Compare* Appellees' Br. 33 ("[T]he District Court . . . found the Rating Requirements to be facially unconstitutional.") *with* ROA.3436 ("The Court therefore does not need to address Plaintiffs' arguments that READER facially violates the First Amendment[.]"). Because Plaintiffs raised facial challenges, their claims are subject to *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).

Like the district court, Plaintiffs conflate two different aspects of READER: (1) the requirement that vendors rate library materials sold to public schools; and (2) the requirement that vendors repeat any corrected ratings. This is a mistake: Although both are constitutional, they require different analyses, particularly because "standing is not dispensed in gross," and Plaintiffs must separately demonstrate "standing to challenge each provision of law at issue." *In re Gee*, 941 F.3d 153, 161–62 (5th Cir. 2019). As in the opening brief, Commissioner Morath addresses each aspect in turn.

## I.  The State Does Not Violate the First Amendment by Requesting Information About Goods as a Condition of Purchase.

The First Amendment allows the State, like any consumer, to request information about goods that it purchases and to decline to purchase from vendors that refuse to provide requested information. *See, e.g.*, *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 911 (6th Cir. 2019) (en banc) ("Governments generally may do what they wish with public funds[.]"). Neither Plaintiffs nor amici overcome this commonsense analysis.

### A.  READER involves the State as a marketplace participant.

#### 1.  READER does not compel speech.

Plaintiffs are wrong to assert that READER compels speech. *E.g.*, Appellees' Br. 18–21. "The statute does not contain any civil or criminal penalties, and the only consequence for vendors that choose not to comply is that the school districts and open-enrollment charter schools will not purchase books from them." Appellant's Br. 4. As the Third Circuit has explained, "[a] violation of the First Amendment right against compelled speech occurs only in the context of actual compulsion." *Bristol Myers Squibb Co. v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 155 F.4th 245, 266–67 (3d Cir. 2025) (internal quotation marks omitted).

Plaintiffs focus on the word "regulation," noting that READER "regulates the purchase of books by Texas public schools." Appellees' Br. 38–39 (quoting Appellant's Br. 4). Their argument elevates form over substance. The question is not whether READER is a "regulation" but whether the State *regulates itself* (setting conditions on its purchases) or *regulates private parties* through its sovereign

3

authority. The crucial fact, which Plaintiffs do not deny, is that READER does not exert the State's coercive power as a sovereign by threatening criminal punishment or civil liability. READER concerns only how public funds will be spent, *i.e.*, the government as a marketplace participant.

According to Plaintiffs, "A private consumer has no authority to compel a private party to identify products previously sold, make content-based assessments of products (already sold and to be sold), or coerce private parties to adopt their views." Appellees' Br. 47. But every private consumer possesses precisely the same authority and coercive power exercised in READER: Like the State, a private party can make requests of a vendor and, if the vendor refuses, decline to purchase. FIRE's amicus brief correctly acknowledges that the State is exercising "market power," FIRE Amicus Br. 4, 10, 13, not sovereign authority.

A treatise quoted by Plaintiffs describes the "touchstone of the regulator/participant dichotomy [a]s whether the government is merely behaving with the powers of a private actor or whether it is exercising functions only within the capacity of authority of the government." Appellee's Br. 48 (quoting 2 Smolla & Nimmer on Freedom of Speech § 19:7). Declining to purchase exemplifies the "powers of a private actor," not government authority.

Plaintiffs identify no case that treats a government's request for information related to its own purchases as compelled speech, and they develop no argument for extending First Amendment doctrines applicable to the government as regulator to these circumstances. The State's request for information from potential vendors is,

at most, a condition on the benefit of selling to the State reviewed under the principles of *Alliance for Open Society* and its progeny.

### 2. School districts are political subdivisions of state government.

Plaintiffs note that READER governs purchases by public schools rather than purchases out of the State's general funds, but school districts are heavily regulated political subdivisions of state government, and Plaintiffs did not raise this distinction to the district court. *See* ROA.2077 (arguing that READER places "unconstitutional conditions on a party's ability to contract with the government"); ROA.3286 (characterizing READER as "a condition of obtaining a government benefit").

To the extent that Plaintiffs suggest that school districts are private actors, they are incorrect. *See, e.g.*, Appellees' Br. 39 (referring to the "autonomous purchasing decisions of independent school districts"). School districts are not "autonomous" but are political subdivisions of the State. *Pecos Cnty. Appraisal Dist. v. Iraan-Sheffield Indep. Sch. Dist.*, 672 S.W.3d 401, 406 (Tex. 2023). Similarly, "open-enrollment charter schools act as an arm of the State government." *El Paso Educ. Initiative, Inc. v. Amex Properties, LLC*, 602 S.W.3d 521, 529 (Tex. 2020). Regardless of whether the State purchases books directly or through school districts, vendors interact with the state government as a potential purchaser in the marketplace, not as a regulator.

To the extent Plaintiffs suggest that the Legislature violated state law by restricting purchases by public schools, the argument is forfeited and incorrect. *See* Appellees' Br. 34 (asserting that schools "act independently under Texas law"); Penguin Random House Amicus Br. 16 (asserting that purchasing decisions "must be made by professional educators and librarians"). Under Texas law, "a school

district is purely a governmental agency and exercises only such powers as are delegated to it by the state." *Stout v. Grand Prairie Indep. Sch. Dist.*, 733 S.W.2d 290, 296 (Tex. App.—Dallas 1987, writ ref'd n.r.e.). Texas regulates public schools in numerous ways throughout the Education Code. *See, e.g.*, Tex. Educ. Code ch. 28 (curriculum); *id.* ch. 31 (instructional materials); *id.* ch. 37 (discipline). There is no support for any argument that the Legislature lacks the power to limit purchases of library materials by public schools, and Plaintiffs failed to raise this argument to the district court.

## B.  READER is a constitutional condition on sales to public schools.

Sitting en banc, this Court rejected any "right to receive information from the government in the form of taxpayer-funded library books." *Little v. Llano County*, 138 F.4th 834, 836 (5th Cir. 2025) (en banc). "[T]he right to receive information is not implicated by a library's . . . not acquiring a book[.]" *Id.* at 842.[1] "By definition, libraries must have discretion to keep certain ideas—certain viewpoints—off the shelves. The First Amendment does not force public libraries to have a Flat Earth Section." *Id.* at 848 (internal quotation marks omitted). By not buying a book, "the library does not prevent anyone from 'receiving' the information in it." *Id.* In READER, Texas exercises the acquisition discretion recognized in *Little* and requests information from vendors to aid in the exercise of that discretion.

---

[1] The dissent distinguished book removals from book acquisitions. *See Little*, 138 F.4th at 886 n.19 (Higginson, J., dissenting) ("[B]ook acquisitions demand different considerations than book removals.").

Plaintiffs' argument that READER impermissibly "prevents the distribution of constitutionally protected material" conflicts with *Little*. Appellees' Br. 30; *see also id.* at 31 (suggesting that libraries violate the First Amendment by not acquiring "valuable works" and "classic books"); *id.* at 33 (characterizing not purchasing books as a "direct speech violation"); *id.* at 44 (complaining that school districts will not purchase "constitutionally protected works with significant public value"). *Little* refutes Plaintiffs' characterization of the government not purchasing books as a "prior restraint" on speech. Appellees' Br. 30–32.[2]

The inconsistency of Plaintiffs' arguments with *Little* is confirmed by their reliance (at 46) on *Penguin Random House LLC v. Gibson*, which rejects *Little* and relies on the right to receive information in library books that this Court did not recognize. *See* 796 F. Supp. 3d 1052, 1063–64, 1069 & n.1 (M.D. Fla. 2025) (stating that "the Eleventh Circuit has taken a different track" than *Little*).

Amicus PEN America similarly argues that READER violates the First Amendment because it will "keep books out of readers' hands" and "hampe[r] writers' ability to reach their intended audiences." PEN America Amicus Br. 11, 13. PEN America relies (at 15) on the plurality opinion in *Board of Education, Island Trees*

---

[2] *Compare* Appellees' Br. 48 ("[I]t is 'no defense' that books can still be published and sold elsewhere.") *with Little*, 138 F.4th at 848 ("The library does not own every copy. . . . The only thing disappointed patrons are kept from 'receiving' is a book of their choice at taxpayer expense. That is not a right guaranteed by the First Amendment.").

7

*Union Free School District v. Pico*, 457 U.S. 853, 869 (1982) (plurality op.), which this Court "ruled long ago . . . carries no precedential weight." *Little*, 138 F.4th at 843.[3]

As the en banc Court held in *Little*, there is no First Amendment right for vendors to compel public schools to purchase their books. The State has exercised its discretion to determine which library materials may be purchased by public schools,[4] *id.* at 848, and it does not violate the First Amendment for the State to request information from vendors to aid in the exercise of that discretion.

### 1.  READER is constitutional under *Alliance for Open Society*.

Echoing the district court, Plaintiffs assert that READER imposes "quintessential unconstitutional conditions" because it "requires vendors to surrender their First Amendment rights." Appellees' Br. 44. But as the opening brief explains (at 20–21), the government may permissibly impose "a condition [that] may affect the recipient's exercise of its First Amendment rights." *Alliance for*

---

[3] PEN America also argues that it would be "disastrous" if writers "feel compelled to avoid certain topics and ideas" because public schools might not purchase their books. PEN America Amicus Br. 15. One hopes school libraries (and other consumers) decline to purchase materials propounding Holocaust denial, KKK propaganda, or the Flat Earth. That such works are unlikely to meet with commercial success or be purchased by public schools does not violate the First Amendment, even if authors choose not to write them as a result. "[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983).

[4] Plaintiffs have not argued that the requested information is unrelated to legitimate pedagogical concerns. *See Penguin Random House, LLC v. Robbins*, 172 F.4th 581, 588 (8th Cir. 2026) (suggesting that even if the selection of books for public school libraries were not government speech, it would be subject to review under the deferential standard of *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988)).

*Open Soc'y*, 570 U.S. at 214. The relevant inquiry is whether the affected speech is within "the limits of the government spending program" or "outside the contours of the program." *Id.* at 214–15.[5]

READER survives constitutional scrutiny because any effect on vendors' First Amendment rights is within the limits of sales to public schools. Plaintiffs do not deny that "[o]utside the context of th[eir] communications to the Texas Education Agency regarding particular products sold to public schools, on their own time and dime, vendors remain free to say (or not say) anything they please." Appellant's Br. 23; *see also Bristol Myers Squibb*, 155 F.4th at 269 (upholding the Drug Price Negotiation Program under *Alliance for Open Society* because "the Program does not limit or compel speech outside of the contractual documents any company must sign to participate in the Program" and companies "remain free to criticize the Program in any [other] forum or instrument").

The Appellees' brief contains only a short response to *Alliance for Open Society*. Appellees' Br. 45-46. Although Plaintiffs quote the test, they fail to apply it. *See* Appellees' Br. 46 ("HB 900 seeks to leverage the benefits of selling books to Texas schools to regulate private speech, forcing booksellers to shelve their First Amendment rights for the opportunity to continue to sell books to Texas schools.").

---

[5] In discussing *Little*, Plaintiffs distinguish "the right to *compel* public schools to purchase their books" from "the right not to be barred from distributing books" to public schools. Appellees' Br. 32. *Alliance for Open Society* provides the standard for the constitutionality of a condition on the benefit of selling books to public schools.

Plaintiffs do not assert—much less provide a reasoned argument—that READER affects speech outside the context of selling books to Texas public schools.[6]

Plaintiffs' reliance on *Perry v. Sindermann* is misplaced. *See* Appellees' Br. 41 (citing 408 U.S. 593 (1972)). *Perry* involved a retaliation claim under the First Amendment subject to the *Pickering* balancing test. 408 U.S. at 598 (citing *Pickering v. Bd. of Ed.*, 391 U.S. 563 (1968)).

Government employee speech principles are instructive, although not directly applicable, but they support Commissioner Morath. READER does not preclude vendors from selling books to public schools because of vendors' speech as citizens. READER instead asks vendors to provide information about products they sell to the State. Rather than *Perry*, the more closely analogous case is *Garcetti v. Ceballos*, which "[r]efus[ed] to recognize First Amendment claims based on government employees' work product." 547 U.S. 410, 422 (2006). In the same way the government does not violate the First Amendment by disciplining employees for speech pursuant to employment responsibilities, it does not violate the First Amendment by asking vendors for information about their products.

Plaintiffs do not deny that the information sought by the State—the contents of the books purchased—is relevant to purchasing decisions. Although "the government may not require a person to give up a constitutional right . . . in exchange

---

[6] Plaintiffs' summary of the argument asserts that READER "regulate[s] private speech outside any legitimate government program." Appellees' Br. 16. This argument is not developed in the body of the brief, and rather than *Alliance for Open Society*, appears to concern whether READER is "legitimate."

for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the [right given up]," *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994), the benefit at issue—selling books to public schools—is directly related to providing information about the content of those books. *Cf. NASA v. Nelson*, 562 U.S. 134, 151 (2011) ("[T]he challenged portions of both SF–85 and Form 42 consist of reasonable, employment-related inquiries that further the Government's interests in managing its internal operations."); *id.* at 154 ("Asking an applicant's designated references broad, open-ended questions about job suitability is an appropriate tool for separating strong candidates from weak ones.").[7]

### 2. *Fulton v. City of Philadelphia* does not support Plaintiffs.

Amicus FIRE relies on *Fulton v. City of Philadelphia*, FIRE Amicus Br. 12, 14-15, but its arguments are inconsistent with the Supreme Court's analysis, which concerns "the inclusion of a formal system of entirely discretionary exceptions [that] render[ed] the contractual non-discrimination requirement not generally applicable." 593 U.S. 522, 536 (2021); *see also id.* at 542 ("The City offers no compelling reason why it has a particular interest in denying an exception to CSS while making them available to others."). Because the law burdened religious exercise and was not generally applicable, it was subject to strict scrutiny. *Id.* at 533–34.

---

[7] *Nelson* reviewed the reasonableness of these questions with respect to an assumed right to informational privacy, 562 U.S. at 138, and does not suggest that job applicants possess any broad First Amendment protection against compelled speech.

This reasoning is unrelated to the facts of this case and does not "exten[d] to the free speech context." FIRE Amicus Br. 15. FIRE suggests that *Fulton* treated "endors[ing] same-sex couples for placement" as an unconstitutional condition on "the city's refusal to provide a benefit." *Id.* This is incorrect—the Supreme Court performed a traditional burden analysis under the Free Exercise Clause and held that the law's exceptions meant that it was not generally applicable. *Fulton*, 593 U.S. at 541 (discussing *Employment Division v. Smith*, 494 U.S. 872 (1990)). *Fulton* says nothing about free speech or whether the law at issue would have violated free exercise in the absence of these exceptions.

Far from holding that "[t]he city's status as consumer of foster care services was immaterial," FIRE Amicus Br. 15, the Supreme Court acknowledged that "[t]he government ... commands heightened powers when managing its internal operations" and "when individuals enter into government employment or contracts, they accept certain restrictions on their freedom as part of the deal," *Fulton*, 593 U.S. at 535. Although these considerations did not allow the practice at issue to survive strict scrutiny under the Free Exercise Clause, they were not "immaterial."

Nor is *Fulton* factually analogous. *Fulton*'s facts would resemble those of this case if Philadelphia, as one of *many* consumers of foster care services,[8] requested

---

[8] The free speech arguments raised by the petitioner in *Fulton* and not addressed by Supreme Court rested on the fact that the City had a monopoly (technically, a monopsony) as the only purchaser of foster care services. *See* Petitioner's Br. at 31, *Fulton v. City of Philadelphia*, 593 U.S. 522 (No.19–123), 2020 WL 2836494 ("The City seeks to use its monopoly power[.]"). The petitioner did not merely face loss of the right to sell services to a single buyer (the City) but "the loss of its foster care ministry." *Id.* at 32. In contrast, public schools are not the only purchasers of books.

information from private foster care agencies about their services, such as their placement philosophy, the qualifications of staff, or number of children placed. Such questions about agencies' services would not violate the First Amendment, even if the City declined to contract with agencies that refused to answer them.

### 3. Plaintiffs' "objective fact" standard is incorrect.

Plaintiffs suggest that when purchasing goods as a marketplace participant, the government can require only the disclosure of "factual and uncontroversial information," Appellees' Br. 47–48, but they offer no support for this standard.

Although they do not cite the case, the standard Plaintiffs invoke is drawn from *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, which allows a State to use its coercive powers as a sovereign to compel parties to "include in . . . advertising purely factual and uncontroversial information." 471 U.S. 626, 651 (1985).[9] Texas could require vendors to disclose factual and uncontroversial information in every advertisement of every book sold to anyone, upon pain of criminal or civil liability.[10]

But nothing requires the government to consider only purely factual and uncontroversial information in its hiring or purchasing decisions. Consider questions that an employer might pose in a job interview:

---

[9] FIRE acknowledges this link. FIRE Amicus Br. 17–18.

[10] FIRE, for example, cites *National Ass'n of Manufacturers, Inc. v. SEC*, 800 F.3d 518 (D.C. Cir. 2015), which involved compelled disclosures "on each reporting company's website and in its reports to the SEC." *Id.* at 522. That case has no relevance to a government requesting information for its hiring or purchasing decisions.

- Who do you consider a great leader?

- What is your management philosophy?

- What role should there be for constitutional *stare decisis*?

Each would violate Plaintiffs' prohibition on requesting a "controversial and subjective" opinion. Or consider the standards applied by Texas in an incentive program for movie production companies, including whether a film "portrays Texas or Texans in a negative fashion" and shows "respect for the diverse beliefs and values of the citizens of Texas." *Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 285 (5th Cir. 2015) (quoting Tex. Gov't Code § 485.022(e)).

In *NASA v. Nelson*, the Supreme Court rejected the theory that the "background-check process [for federal employment] violates a constitutional right to informational privacy." 562 U.S. at 142. Government "as proprietor" has far fewer constraints than when "exercise[ing] its sovereign power to regulate or license." *Id.* at 148. The Supreme Court "reject[ed] the argument that the Government, when it requests job-related personal information in an employment background check, has a constitutional burden to demonstrate that its questions are 'necessary' or the least restrictive means of furthering its interests." *Id.* at 153. The government has "wide latitude" in dealing with its employees, *id.* at 154, and equally wide latitude in its purchasing decisions.

Neither Plaintiffs nor amici identify any case applying the *Zauderer* standard to a government's hiring or purchasing decisions.

14

#### 4. Plaintiffs' arguments about costs are irrelevant.

Plaintiffs and amici raise the purported costs and complexity of providing the information requested by the State, *e.g.*, Appellees' Br. 20–21, but they fail to identify any legal significance to these costs,[11] which are irrelevant where the State acts as a buyer making an offer in a marketplace. If vendors find the requested information too difficult or too costly to provide, then they could stop selling books to public schools or, alternatively, could raise their prices.[12] These are the same options available to any seller when a potential customer makes an expensive request.

If a seller dislikes the terms on which a buyer offers to transact, then the sellers' recourse is to decline the deal, not ask federal courts to compel the buyer to purchase on the seller's preferred terms.

### C. Plaintiffs' vagueness challenges fail.

The opening brief explains that the doctrine of void for vagueness "applies where the State acts as a regulator" and not to the State's "purchasing decisions." Appellant's Br. 25. "Neither Plaintiffs nor the district court identify any case applying the 'void for vagueness' doctrine to a State as a marketplace participant." *Id.* The Appellees' brief neither identifies any such case nor develops an argument that the doctrine should be extended to this context.

---

[11] Plaintiffs do not suggest that whether the First Amendment permits compelled speech depends on the expense of creating the compelled speech.

[12] Imagine, for example, that the Legislature required that any book sold to public schools be leather-bound and gilt-edged. Such a requirement would surely raise vendors' costs to supply books, but if it made sales unprofitable, vendors could either raise their prices or decline the sales.

15

There is good reason—vagueness protects against "arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Vagueness should not constrain hiring and purchasing decisions, where the government often applies subjective criteria. And the only consequence of a vendor misapplying READER's statutory criteria is that the Texas Education Agency "'may' disagree and inform the vendor of the error." Appellant's Br. 27 (quoting Tex. Educ. Code § 35.003).

Commissioner Morath cited several cases for the proposition that "the consequences of imprecision are not constitutionally severe" when "the Government is acting as patron rather than as sovereign." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998); *see* Appellant's Br. 25–27.[13]

Plaintiffs distinguish these cases as involving "congressional appropriations and government grants," Appellees' Br. 29, but never explain why this distinction helps them. The government's "deci[sion] to fund particular projects," *Finley*, 524 U.S. at 587, is not more constrained for purchases than for grants. To the contrary, the government has fewer constraints when acquiring goods for its own use (or when hiring employees) than when subsidizing private speech. When funding the arts, the NEA may not engage in "invidious viewpoint discrimination," *id.*, but in acquiring books, libraries may "keep certain ideas—certain viewpoints—off the shelves." *Little*, 138 F.4th at 848. Neither law nor reason supports extending vagueness doctrine to informational requests to potential vendors.

---

[13] Consider, for example, *PETA v. Gittens*, where the District of Columbia solicited artwork that was "'dynamic and invites discovery,' 'original and creative,' 'durable' and 'safe.'" 414 F.3d 23, 25–26 (D.C. Cir. 2005).

Nor do Plaintiffs grapple with the strict standard for vagueness challenges to civil statutes. They rely (at 26) on *Village of Hoffman Estates v. Flipside*, but that standard applies to "a quasi-criminal or a criminal law." 455 U.S. 489, 500 (1982); *see also Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001) (involving a statute that "can be characterized as quasi-criminal").

READER is not quasi-criminal because the only consequence of an incorrect rating is possible correction by the Texas Education Agency. That leaves Plaintiffs with the "especially high" vagueness standard for civil statutes: "[T]he statute must be so vague and indefinite as really to be no rule at all." *AbbVie, Inc. v. Murrill*, 166 F.4th 528, 546 (5th Cir. 2026) (quoting *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020)). Plaintiffs do not come close to satisfying this standard. The statute provides detailed definitions. Appellant's Br. 3–4 & n.3–4. That Plaintiffs believe there would be "difficulties" in applying them hardly means that the statute provides "no rule at all."

Plaintiffs complain that the Texas Education Agency has not provided guidance. Appellees' Br. 27–28. The Commissioner of the Texas Education Agency "may adopt rules as necessary to administer" the statute, Tex. Educ. Code § 35.007, but by suing before any rules could be adopted, Plaintiffs blocked Commissioner Morath from providing guidance. The potential for clarifying regulatory guidance is one reason that establishing "facial vagueness is often difficult, perhaps impossible," "[i]n the context of pre-enforcement review." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 547 (5th Cir. 2008).

17

Neither the district court nor Plaintiffs have identified any statute holding a State's purchasing criteria unconstitutionally vague. If vendors believe that the State's criteria are too vague or otherwise do not wish to provide the requested information, then their recourse is to forgo sales to public schools.

*     *     *

Looking past rhetoric about book bans and censorship, the correct analysis is intuitive and straightforward. The State, like any other consumer, is free to request information from vendors about their products as a condition of purchase. And if vendors refuse to provide that information, the State can decline to purchase from them. Fundamentally, this case concerns a complaint that sellers dislike the terms on which a buyer has offered to transact. Nothing in this arrangement violates the First Amendment.

## II. The State Does Not Violate the First Amendment by Requiring Vendors to Repeat Corrected Ratings to the State.

Analyzing the two aspects of READER separately is important because Plaintiffs raise a distinct challenge to the requirement that vendors repeat the Texas Education Agency's corrected ratings of library materials.

As the district court found and Plaintiffs do not deny, the Texas Education Agency could review and rate all library materials for itself, ROA.3431, ROA.4097 (Plaintiffs' counsel), and require vendors to supply lists of library materials sold along with the government's ratings of those materials. Appellant's Br. 32.

To the extent that Plaintiffs generally complain about the requirement that vendors must repeat the Texas Education Agency's ratings, their arguments fail for

18

the reasons discussed above. Any speech is compelled only in the context of sales to the government and is thus a constitutional condition on the benefit of those sales. *See id.* 33–34.

Plaintiffs also raise a "misattribution" theory: Because the Texas Education Agency rates only *some* library materials, they contend that agency ratings reported by vendors will be misattributed to vendors by the public because of how vendors' ratings will be displayed on the agency's website. *See* ROA.926 (detailing the misattribution theory). Even if "misattribution" could render a condition unconstitutional under *Alliance for Open Society*, which Plaintiffs do not argue, this theory of misattribution is incorrect for the reasons explained in the opening brief, and any misattribution injury would be self-inflicted because vendors could avoid it by submitting ratings lists that note which ratings are corrected ratings. Appellant's Br. 34–35.

Rather than respond on the merits, Plaintiffs rely on procedure, arguing that the opinion affirming the preliminary injunction resolved these issues against Commissioner Morath. Plaintiffs are wrong. This Court's earlier decision did not address standing to challenge this aspect of the statute, and the evidence presented at the summary judgment stage confirms that the misattribution theory fails on the merits. ROA.1350; ROA.1357; ROA.3971; *see also, e.g.*, *Royal Ins. Co. of Am. v. Quinn-L Cap. Corp.*, 3 F.3d 877, 881 (5th Cir. 1993) ("Because the standard of review for factual determinations on direct appeal is higher than the standard applied during an interlocutory appeal of a preliminary injunction, the interlocutory appeal normally will not establish law of the case on factual matters.").

Nor do Plaintiffs deny that even if they were correct on the misattribution, the injunction is vastly overbroad. Any misattribution injury would be cured by enjoining the Texas Education Agency from misattributing its corrected ratings to vendors. Appellants' Br. 38.

## A. The Texas Education Agency's ratings constitute government speech.

Plaintiffs misread the opening brief in complaining that Commissioner Morath identifies the Texas Education Agency's ratings as government speech. *See, e.g.*, Appellees' Br. 50, 51 (relying on the law of the case doctrine).

The opening brief correctly explains that "the communication of the corrected ratings *from the agency to the vendor* constitutes government speech." Appellants' Br. 31 (emphasis added). This proposition—that speech created and communicated by the government is government speech—is necessarily correct. This Court's previous decision addresses the communication of these corrected ratings *from the vendors to the agency*, 91 F.4th at 338, a different issue.

## B. Repeating the Texas Education Agency's corrected ratings of library material is a constitutional condition on selling library materials to public schools.

Under *Alliance for Open Society*, repeating the corrected ratings is a constitutional condition on sales to the government because it concerns speech only within the contours of that program. Appellant's Br. 33–34.

Plaintiffs repeatedly insist that they must "adopt the rating of the government." Appellees' Br. 51; *id.* at 2 ("adopt the government's 'corrected' ratings as their

own"); *id.* at 14 (same); *id.* at 56 (same); *id.* at 13 ("adopt the TEA's ratings as their own"); *id.* at 21 ("adopt the government's ratings *as their own*").

But Plaintiffs disregard the crucial difference between requiring vendors to repeat the correct ratings and to "agree with the correctness of the agency's ratings." Appellant's Br. 33–34. Plaintiffs do not deny that vendors are "free to express disagreement publicly with the agency's ratings." *Id.* at 33. They are not required to "avow any belief," and "outside the context of the sales to public schools, vendors can freely assert a contrary belief, on their own time and dime." *Id.* at 34; *see also Bristol Myers Squibb*, 155 F.4th at 266–67. Because READER merely requires vendors to repeat the government's ratings within the contours of the program of selling to public schools, it is a constitutional condition on the benefit of selling to public schools under *Alliance for Open Society*.

### C.  Plaintiffs' "misattribution" theory is speculative and meritless.

Plaintiffs also contend that future displays of ratings on the Texas Education Agency's website will misattribute the agency's corrected ratings to vendors, but this is no answer to *Alliance for Open Society*. Even if misattribution were to occur, a condition is constitutional if it is within the contours of the program.

Moreover, although this Court concluded that Plaintiffs were "likely to succeed" on a misattribution theory at the preliminary injunction stage, 91 F.4th at 340, at summary judgment, Plaintiffs failed to satisfy the strict standards for facial invalidity (particularly in the pre-enforcement context), and the summary judgment record demonstrated that their misattribution theory is so speculative that they lack standing to assert it. *Royal Ins. Co.*, 3 F.3d at 881.

21

Nothing in the statute prevents vendors from distinguishing their own ratings from corrected ratings issued by the Texas Education Agency. Appellant's Br. 34–35. Plaintiffs note that READER does not expressly permit this marking, Appellees' Br. 21, but nothing forbids it. "READER does not mandate that ratings lists be provided to the Texas Education Agency in any particular form or format." Appellant's Br. 34. This Court must adopt a constitutional construction of READER and must "defer to [Commissioner Morath's] interpretation of how the law is to be enforced." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013). Plaintiffs disregard these interpretive principles.

Plaintiffs' arguments illustrate the dangers of a pre-enforcement, facial challenge. Based on a "requirement" that appears nowhere in the statute—that vendors' ratings lists may not distinguish corrected ratings from the vendor's own ratings—Plaintiffs ask courts to enjoin the statute as a whole.

Nor do Plaintiffs' record citations support them. The summary judgment record confirms that Plaintiffs' website theories are speculative. *See* ROA.1362 ("We haven't made those determinations yet."). And if the agency posts the "list that the vendor—the publisher submits," ROA.1520, that fact only underscores that vendors can avoid injury by marking corrected ratings on lists they submit.

Plaintiffs also did not present evidence that the hypothetical website will be publicly available. The summary judgment record confirms that there are "portions of the [agency's] website that only certain school districts['] staff with certain access can see." ROA.1393; *see also* ROA.1564 (arguing that the purpose of posting "is so the school districts know if they can purchase from those vendors"). Plaintiffs

22

presented no contrary evidence.[14] The misattribution theory was not proven on the summary judgment record, and Plaintiffs did not show that, correctly interpreted, the statute is unconstitutional in any, much less a substantial number, of its applications. *Moody*, 603 U.S. at 718.

The misattribution theory also fails for lack of standing. If vendors choose to submit ratings lists that do not distinguish corrected ratings, any misattribution would be a self-inflicted injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013). Both before this Court and the district court, Commissioner Morath has disclaimed any interpretation of the statute that would forbid vendors from distinguishing corrected ratings in ratings lists. *See* ROA.3971 ("There's nothing in the statute preventing them from doing that.").

The preliminary injunction appeal did not address Plaintiffs' standing to assert a misattribution theory. *See In re Gee*, 941 F.3d at 161–62 (requiring plaintiffs to demonstrate standing granularly). And their theory of injury was not supported by the summary judgment record. "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the

---

[14] Plaintiffs go outside the record by citing a guidance document never cited below. *See* Appellees' Br. 24 (citing Guidance Document for Senate Bill (SB) 13 Library Materials Policy, Texas Education Agency (Aug. 28, 2025), https://tea.texas.gov/health-safety-and-discipline/school-boards/sb13-guidance-0.pdf). Not only should this Court not permit Plaintiffs to expand the record on appeal, but the document expressly excludes the portions of READER at issue: "[T]his policy excludes references to those [enjoined] requirements." Guidance Document for Senate Bill 13, *supra*, at 1.

litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the summary judgment stage, Plaintiffs failed to present evidence that they will be injured by a hypothetical future website misattributing the agency's corrected ratings to vendors.

In the unlikely event that misattribution were to occur in the future, a vendor could raise an as-applied challenge. Moreover, Plaintiffs do not deny that any misattribution would be fully cured by an injunction limited to directing the Texas Education Agency not to attribute the agency's corrected ratings to vendors when posting on its website.

*     *     *

Like the requirement that vendors provide initial ratings, the requirement that vendors repeat any corrected ratings provided by the Texas Education Agency is a constitutional condition on the benefit of selling library material to public schools. Plaintiffs' misattribution theory was unsupported by the summary judgment record, is speculative, and involves self-inflicted injury.

## III. The District Court Erred by Entering a Universal Injunction.

Finally, the district court erred by entering a universal permanent injunction, forbidding Commissioner Morath from enforcing READER against anyone.

Contrary to Plaintiffs' forfeiture argument (at 53), Commissioner Morath raised *Trump v. CASA* below, noting its holding that "an injunction binds only the parties before the Court." ROA.4099. Moreover, Plaintiffs never briefed the proper scope of injunctive relief. *See* ROA.941–42; ROA.3295–99. Where Plaintiffs never argued in favor of a universal injunction, Commissioner Morath cannot be faulted for not opposing one.

24

The ACLU Amicus Brief underscores Plaintiffs' failure to develop this argument with its lengthy attempt to defend the universal injunction, ACLU Amicus Br. 12–25, contending that the injunction is "the narrowest possible injunction that will provide the Plaintiffs with complete relief." *Id.* at 17. But the ACLU cites nothing in support: no findings by the district court; no evidence; not even any argument by Plaintiffs. Plaintiffs did not develop this "complete relief" theory below, much less obtain findings on it.

Plaintiffs, in contrast, attempt to justify the universal injunction as necessary to protect third parties. *See* Appellees' Br. 54 ("The injunction must also protect *other booksellers* subject to the Rating Requirements who would have standing for the same reasons as Plaintiffs. An injunction limited to the named Plaintiffs could expose . . . *other booksellers* to an unconstitutional law and unduly burden them (and the courts) to obtain a separate injunction." (emphases added)).

Entering an injunction to protect non-parties is precisely what the Supreme Court held is "outside the bounds of a federal court's equitable authority under the Judiciary Act." *Trump v. CASA, Inc.,* 606 U.S. 831, 847 (2025). An injunction must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861. Plaintiffs' justification (at 54) of the injunction as necessary to "protect other [non-party] booksellers" conflicts directly with *CASA*.

25

## Conclusion

For these reasons, this Court should reverse and render judgment in favor of Commissioner Morath.

Respectfully submitted.

/s/ William R. Peterson

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

WILLIAM R. PETERSON
Solicitor General
William.Peterson@oag.texas.gov

CAMERON FRASER
NATHANIEL A. PLEMONS
Assistant Solicitors General

*Counsel for Appellant*

26

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,498 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ William R. Peterson
WILLIAM R. PETERSON